# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

MI FAMILIA VOTA EDUCATION FUND,
as an organization;  MURAT LIMAGE;
PAMELA GOMEZ,

                  Plaintiffs.

                     v.

KEN DETZNER, in his official capacity as
Florida Secretary of State,

                  Defendant.

CIVIL ACTION

FILE NO. 8:12-CV-1294-T-27MAP

## STATEMENT OF INTEREST OF THE UNITED STATES

- 1 -

## I.     INTRODUCTION

The United States files this Statement of Interest in opposition to Defendant's motion to

dismiss, ECF 16, pursuant to 28 U.S.C. § 517, because this case presents an important question

regarding the proper construction of Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c

("Section 5").[1]  The State of Florida has adopted a new database matching program that results in

registered voters being removed from the voter rolls.  This new practice has not been submitted

for administrative or judicial preclearance pursuant to Section 5 of the Voting Rights Act, and

despite a lack of preclearance, the change has been implemented in Florida's covered counties

subject to Section 5.  The plaintiff's claims are therefore not moot, as the change has been

implemented in covered jurisdictions without appropriate preclearance, including the removal of

voters from the registration rolls.  Further, nothing in the Help America Vote Act ("HAVA")

requires the State to implement its chosen database matching program, nor does it excuse the

failure to obtain preclearance.  In this case, as in all Section 5 enforcement actions, the United

States has a strong interest in ensuring that Section 5 is vigorously and uniformly enforced.  The

United States therefore urges the Court to deny the Florida Secretary of State's motion to

dismiss.

## II.     LEGAL BACKGROUND

Florida's new voter registration list maintenance practices and procedures are voting

changes that must be submitted for review before they can be implemented in the five counties

subject to Section 5—Collier, Hardee, Hendry, Hillsborough, and Monroe Counties.  Here, at the

---

[1]  Pursuant to 28 U.S.C. § 517, "[t]he Solicitor General, or any officer of the Department of
Justice, may be sent by the Attorney General to any State or district in the United States to attend
to the interests of the United States in a suit pending in a court of the United States. . . ."  Under
this provision, "[t]he United States Executive has the statutory authority, in any case in which it
is interested, to file a statement of interest[.]"  *Gross v. German Found. Indus. Initiative*, 456
F.3d 363, 384 (3d Cir. 2006).

- 2 -

direction of the State, the covered counties implemented these new, unprecleared voting

practices and procedures.  Even though the State represents that it has stopped additional

implementation of its program, this case is not moot because the covered counties have already

implemented this unprecleared change, impacting voters.  The United States respectfully submits

that Defendant's arguments are contrary to the plain language of Section 5 and would lead to

results that would undermine Congress's intent that covered jurisdictions submit all voting

related changes either to the U.S. Department of Justice for administrative review, or to a three-

judge panel in the District Court of the District of Columbia for judicial review.

Section 5 applies to all changes of "any voting qualification or prerequisite to voting, or

standard, practice or procedure with respect to voting" adopted or sought to be implemented by

covered jurisdictions, and the Act defines the term "voting" very broadly.  42 U.S.C. §§ 1973c,

1973*l*(c)(1).  The Supreme Court has made clear that, in covered jurisdictions, "all changes in

voting must be precleared."  *Presley v. Etowah County Comm'n*, 502 U.S. 491, 501 (1992).  In

this case, as outlined below, the State of Florida had previously submitted voting changes related

to both its implementation of HAVA and other voter registration list maintenance procedures

involving the use of database matching.  None of these previous submissions, which received

preclearance, included the procedures at issue in this case, namely, matching the records

contained in the Florida Voter Registration System ("FVRS") with citizenship data contained in

the Florida Department of Highway Safety and Motor Vehicle ("DHSMV") MAN Driver and

Vehicle Express ("MDVA") database, forwarding the results of this data matching to County

Supervisors of Elections, and requiring Supervisors of Elections to initiate the removal of

registered voters from FVRS based on this matching.  Florida's use of this matching procedure

constitutes a change in practice and procedure that requires preclearance.

- 3 -

A.    **Legal Standard in Section 5 Enforcement Actions**

The legal standards to be applied in Section 5 cases have been well established by the

Supreme Court.  Congress enacted the Voting Rights Act of 1965 to "rid the country of racial

discrimination in voting." *South Carolina v. Katzenbach*, 383 U.S. 301, 315 (1966).  Section 5 is

an integral part of the Act, designed "to shift the advantage of time and inertia from the

perpetrators of the evil to its victim[s], by freezing election procedures in the covered areas

unless the changes can be shown to be nondiscriminatory." *Reno v. Bossier Parish Sch. Bd.*, 520

U.S. 471, 477 (1997) (*Bossier I*) (internal citations and quotation marks omitted).  Section 5

"automatically suspends the operation of voting regulations . . . and furnishes mechanisms for

enforcing the suspension." *Katzenbach*, 383 U.S. at 335.  This suspension occurs "pending

scrutiny by federal authorities to determine whether their use would violate the Fifteenth

Amendment." *Id*. at 334.  In 2006, Congress reauthorized the preclearance requirements of

Section 5 of the Voting Rights Act. *See Shelby County, Alabama, v. Holder*, 679 F.3d 848 (D.C.

Cir. 2012) (upholding the reauthorization of Section 5).

The Voting Rights Act sets forth a unique statutory scheme to resolve issues that arise

under the preclearance provisions.  The Act provides for a clear division of jurisdiction between

"substantive discrimination questions" and "coverage questions." *Allen v. State Board of*

*Elections*, 393 U.S. 544, 559 (1969) (internal quotations omitted).  "Congress expressly reserved

for consideration by the District Court for the District of Columbia or the Attorney General—the

determination whether a covered change does or does not have the purpose or effect of denying

or abridging the right to vote on account of race or color." *Perkins v. Matthews*, 400 U.S. 379,

385 (1971) (internal quotations omitted).  The Attorney General and the United States District

Court for the District of Columbia have "exclusive authority," *Lopez v. Monterey County*, 519

- 4 -

U.S. 9, 23 (1996) (*Lopez I*), to make the substantive preclearance determination of "whether a proposed change actually discriminates on account of race," *United States v. Bd. of Supervisors of Warren County*, 429 U.S. 642, 646 (1977). Such a determination is "foreclosed" to any other court. *Perkins*, 400 U.S. at 385. Pursuant to Sections 5 and 14(b) of the Voting Rights Act, 42 U.S.C. §§ 1973c & 1973*l*(b), covered jurisdictions seeking preclearance of a new voting change have a choice of filing a declaratory judgment action in the District Court for the District of Columbia, or making an administrative submission to the Attorney General, who then has 60 days to act on a completed submission. *Morris v. Gressette*, 432 U.S. 491, 501-02, 504 n. 19, 505 n.21 (1977).

Pursuant to Sections 12(d) and (f) of the Voting Rights Act, 42 U.S.C. § 1973(d) & (f), the United States and/or private plaintiffs can bring coverage actions to enjoin enforcement of unprecleared changes. Such coverage actions are heard by three-judge federal district courts convened in jurisdictions covered by Section 5. Such courts may consider only "coverage" questions, determining "whether a particular state enactment is subject to the provisions of the Voting Rights Act, and therefore must be submitted for approval before enforcement." *Allen*, 393 U.S. at 559-60. In such coverage cases, a court "lacks authority to consider the discriminatory purpose or nature of the changes." *Lopez I*, 519 U.S. at 23. The Supreme Court has repeatedly held that there are only three issues to be decided in a coverage action: "whether § 5 covers a contested change, whether § 5's approval requirements were satisfied, and if the requirements were not satisfied, what temporary remedy, if any, is appropriate" until the change is precleared or abandoned. *Lopez I*, 519 U.S. at 23; *see also McCain v. Lybrand*, 465 U.S. 236, 251 n. 17 (1984) (same); *City of Lockhart v. United States*, 460 U.S. 125, 129 n. 3 (1983) (same). This three-part test must be applied in a Section 5 enforcement action such as the present case.

- 5 -

Pursuant to Section 5, "[w]henever" a covered jurisdiction "enact[s] or seek[s] to administer any . . . standard, practice, or procedure with respect to voting different from that in force or effect," it must first obtain administrative or judicial preclearance. 42 U.S.C. § 1973c. The language of Section 5 is clear: "any voting qualification or prerequisite to voting or standard, practice or procedure with respect to voting" adopted or sought to be implemented by covered jurisdictions must be submitted for preclearance. 42 U.S.C. § 1973c(a); *Presley*, 502 U.S. at 501; *see also Allen*, 393 U.S. at 566 ("Congress intended to reach any state enactment which altered the election law of a covered State in even a minor way"); *Clark v. Roemer*, 500 U.S. 646, 652 (1991) (voting changes in covered jurisdictions "will not be effective as law until and unless [pre]cleared.") (internal quotations and citations omitted).

In this case, Collier, Hardee, Hendry, Hillsborough, and Monroe Counties are subject to the preclearance requirements of Section 5. *See* 40 Fed. Reg. 43,746 (1975); 41 Fed. Reg. 34,329 (1976). In the case of partially covered states, the Supreme Court has recognized that "§ 5's preclearance requirement applies to a covered county's nondiscretionary efforts to implement a voting change required by state law, notwithstanding the fact that the State is not itself a covered jurisdiction." *Lopez v. Monterey County*, 525 U.S. 266, 282 (1999) (*Lopez II*). Further, "[a] State, whether partially or fully covered, has authority to submit any voting change on behalf of its covered jurisdictions and political subunits," and indeed, submissions by the State serve its interests in that "the State is better able to explain to the Attorney General the purpose and effect of voting changes it enacts than are the individual covered jurisdictions." 28 C.F.R. § 51.23. As a majority of a three-judge panel in *Bone Shirt v. Hazeltine*, 200 F. Supp. 2d 1150, 1156 (D.S.D. 2002) found, "Congress intended that either the legislative body that enacted the legislation or the executive body that was responsible for administering the legislation would

- 6 -

be responsible for obtaining preclearance." The Court in that case concluded that the State was

the appropriate defendant for a Section 5 enforcement action, even though only two counties in

South Dakota were subject to Section 5's requirements. *Id.* (holding that "[u]nder the plain

meaning of the Voting Rights Act, the state of South Dakota is an entity that must secure

preclearance from the Attorney General or bring a declaratory judgment action" for review of a

law passed by the state legislature that impacts voting in the covered counties). In this case,

Florida enacted the new database matching program and has required covered counties to

implement it, and it is therefore an appropriate defendant in this Section 5 enforcement action.

    **B.**    **Prior Approval of the State's Benchmark Practices Did Not Include the New Database Matching Program**

    At least two prior submissions by the State of Florida are relevant to this case: its 2005

submission of changes to the state election code, and its 2011 submission that included its

database matching program to identify deceased voters for removal from the rolls.

    On July 5, 2005, Florida submitted an omnibus bill containing numerous changes to

Florida's election code, including Chapter 2005-278, for preclearance. *See* Submission No.

2005-2390 (Exhibit 1a).[2] Chapter 2005-278 amended Fla. Stat. 98.075. *See* Exhibit 1b at 24-25.

The submitted changes were significant because they amended, among other things, provisions

of the law relating to the creation of a state voter registration database, the removal of voters

from the rolls in certain circumstances, and voter registration list maintenance procedures. For

example, the 2005 submission amended Fla. Stat. 98.075 to authorize the Department of State to

---

[2] The United States attaches to this statement of interest the following documents related to Submission Number 2005-2390: Exhibit 1a (the July 5, 2005 cover letter from Florida to the Department); Exhibit 1b (Chapter 2005-278, with changes); Exhibit 1c (a State PowerPoint presentation explaining the changes), and Exhibit 1d (the Sept. 6, 2005 letter from the Department to Florida).

- 7 -

identify voters subject to removal based on the categories of deceased persons, duplicate registrations, felony convictions, and adjudications of mental incapacity, *see* Exhibit 1b at 25 (Fla. Stat. 98.075(1)-(5)). This provision of the law was also amended to provide that the Department of State and Supervisors of Election could receive information from sources that were not expressly identified in the statute to determine other bases of ineligibility, including citizenship. *See id.* In support of its 2005 submission, the state submitted a PowerPoint presentation that identified the procedures the Department of State and Supervisors of Election would use to prepare lists for identifying and removing potentially ineligible registrants.[3] *See* Exhibit 1c at 5-7.

On September 6, 2005, the Department precleared the submitted changes but specifically noted that "Chapter 278, Section 20 (2005) that amends F.S. 98.075, which pertains to voter registration record maintenance activities" was "enabling in nature[]. . . [t]herefore, the State of Florida is not relieved of its responsibility to seek Section 5 review of any changes affecting voting proposed to be implemented pursuant to this legislation." *See* Exhibit 1d at Att. A, p. 7 (¶ 89) and pp. 1-2 (noting that enabling legislation is identified with an asterisk in the attachment). *See* Procedures for the Administration of Section 5 of the Voting Rights Act, 28 C.F.R. § 51.15 ("With respect to legislation (1) that enables or permits the State or its political subunits to institute a voting change . . . the failure of the Attorney General to interpose an objection does not exempt from the preclearance requirement the implementation of the particular voting change that is enabled, permitted, or required, unless that implementation is explicitly included and described in the submission of such parent legislation."). Therefore, any new program to

---

[3] This PowerPoint is similar to one issued by the State regarding the database matching program at issue here. *See* Exhibit 10.

- 8 -

check citizenship eligibility pursuant to Florida Stat. 98.075, for example, such as the current

program at issue here, would be an enabled change that requires Section 5 review.

On June 8, 2011, the State of Florida submitted another omnibus bill of voting changes

that modified portions of Florida's election code, including Chapter 2011-40, for preclearance.

*See* Submission No. 2011-2187 (Exhibit 2a).[4]  Among other things, the submission amended Fla.

Stat. §§ 98.075(3)(b), 98.075(6), and 98.093.  The amendments to 98.075(3) related to

identifying deceased persons by obtaining information from the Social Security Administration.

Exhibit 2b at 14.  The amendments to 98.075(6) related to the use of additional sources of

information pertaining to the removal of deceased registrants or persons with felony convictions

or mental incapacitation adjudications whose voting rights were not restored.  *See id.*; 98.075(2)-

(5).  The submission also included changes to 98.093, which gave the Department of State the

authority to "identify ineligible registered voters" by "access[ing] certain information from state

and federal officials and entities in the format prescribed."  *Id.* at 15; Fla. Stat. 98.093(1).  The

changes to the title of Section 98.093 provided that state and local officials had the duty to

furnish "information," instead of exclusively providing lists, related to criminal records,

deceased persons, and persons deemed mentally incapacitated.  *Id.*; Fla. Stat. 98.093.  Notably,

the changes to the title of Section 98.093 of the Florida statutes did not expand the scope of the

section.  *Id.*  The 2011 submission also gave the Secretary of State the authority to "[p]rovide

written direction and opinions to supervisors of elections on the performance of their official

duties with respect to the Florida Election Code or rules adopted by the Department of State."

Exhibit 2b at 8; Fla. Stat. 97.012.

---

[4]  The United States attaches to this statement of interest the following documents relating to
Submission Number 2011-2187:  Exhibit 2a (the June 8, 2011 cover letter from Florida to the
Department); Exhibit 2b (Chapter 2011-40, with changes); Exhibit 2c (a summary of the bill's
provisions); and Exhibit 2d (the Aug. 8, 2011 letter from the Department to Florida).

- 9 -

In support of the State's request for preclearance, Florida submitted a chart it prepared that outlined the 2011 changes. *See* Exhibit 2c. The chart identified only the use of the Social Security database as a new source of information for the removal of deceased voters under Fla. Stat. 98.075. *See id.* at 5. The Department precleared the use of the Social Security database and the authority provided to the Secretary of State.[5] *See* Exhibit 2d. The 2011 submission did not identify new citizenship database verification procedures.

### C.      The Requirements of the Help America Vote Act

The Help America Vote Act ("HAVA") requires that states implement a statewide computerized voter registration list of all voters, *see* 42 U.S.C. § 15483, but as discussed further below, it does not specifically require the citizen database matching that the State has now undertaken, nor does it excuse a jurisdiction's failure to comply with the requirements of the Voting Rights Act.

HAVA provides that States must define, maintain, and administer their computerized voter registration lists. 42 U.S.C. § 15483(a)(1)(A).  As part of the database requirements, Section 303(a) contemplates the use of statewide computerized voter registration lists for voter registration and list maintenance activities. 42 U.S.C. §§ 15483(a)(2); 15483(a)(4); 15483(a)(5)(A)(i) & (ii).  HAVA's voter verification provisions, which are set forth at 42 U.S.C. § 15438(a)(5)(A), provide that non-exempt states may not accept or process applications for voter registration unless the applicant includes a driver's license number (for applicants who have a current and valid driver license) or the last four digits of the applicant's social security number (for applicants who do not have a driver license but do have a social security number).

---

[5]  The State withdrew four sets of voting changes, not at issue here, that are subject to litigation in the District Court for the District Columbia. *See Florida v. United States*, 1:11-CV-1428 (D.D.C.).

- 10 -

HAVA's voter verification provisions also require that non-exempt states share information in databases to "verify the accuracy of the information provided on applications for voter registration" using driver license or social security information. 42 U.S.C. §§ 15483(a)(5)(B)(i)-(ii); 15483(a)(5)(D). Under HAVA, each "State[s] shall determine whether the information provided by an individual is sufficient to meet . . . [HAVA's requirements], in accordance with State law.[6] 42 U.S.C. § 15483(a)(5)(A)(iii).

HAVA also has computerized list maintenance provisions. 42 U.S.C. § 15483(a)(2), (4). HAVA's list maintenance provisions require that the appropriate state and local election officials regularly "perform list maintenance with respect to the computerized list" in accordance with the National Voter Registration Act (NVRA). 42 U.S.C. § 15483(a)(2)(A)(i)-(ii). States that are exempt under the NVRA because they do not have a voter registration requirement or allow voter registration at the polling place during general elections for federal office are also required to conduct computerized list maintenance activities "in accordance with State law." 42 U.S.C. § 15483(a)(2)(A)(iii). As a result, all states must have "[s]tate election systems . . . [that] include provisions that ensure that voter registration records . . . are accurate and updated regularly. . . ." 42 U.S.C. § 15483(a)(4).

Computerized list maintenance conducted by a State must be performed "in a manner that ensures that . . . the name of each registered voter appears in the computerized list; . . . only voters who are not registered or who are not eligible to vote are removed from the computerized list; and . . . duplicate names are eliminated from the computerized list." 42 U.S.C. § 15483(a)(2)(B). State election system provisions must also include "[a] system of file

---

[6]  When Florida implemented HAVA, the State submitted those changes to the Department for preclearance under Section 5. *See, e.g.,* Submission Number 2003-2929. These provisions of HAVA and the State's implementation of them do not include the database matching based on citizenship.

- 11 -

maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters" that is consistent with NVRA and employs "[s]afeguards to ensure that eligible voters are not removed in error from the official list of eligible voters." 42 U.S.C. § 15483(a)(4)(A)-(B).

HAVA neither mandates nor precludes a State's attempts to conduct citizenship list maintenance activities. *See* 42 U.S.C §§ 15483(a)(2), (4). HAVA's requirements do not "prevent a State from establishing election . . . administration requirements that are more strict" than HAVA's requirements . . ." so long as such State requirements are not inconsistent with federal law. 42 U.S.C. § 15484. To that end, HAVA gives states discretion to determine how they will satisfy the statute's mandates, 42 U.S.C. § 15485, provided that the State must still comply with the requirements of the Voting Rights Act and other federal statutes. 42 U.S.C. § 15545.

## III. FLORIDA'S DATABASE MATCHING PROGRAM IS A CHANGE AFFECTING VOTING THAT MUST BE SUBMITTED FOR PRECLEARANCE PURSUANT TO SECTION 5

### A. The Practice at Issue Here is a Change Subject to Section 5 Review

Florida implemented new non-citizen voter verification practices and procedures that are unsubmitted changes that differ from the State's benchmark procedures previously in force or effect. These voter list maintenance procedures are directly related to voting and the ability to have a cast ballot properly counted. *See* 42 U.S.C.1973*l*; *see also Presley*, 502 U.S. at 509 ("Our prior cases hold, and we reaffirm today, that every change in rules governing voting must be precleared."); *Allen*, 393 U.S. at 565 ("The Voting Rights Act was aimed at the subtle, as well as the obvious, state regulations which have the effect of denying citizens their right to vote because of their race"). Unlike *Presley*, which held that changes affecting "the allocation of power

- 12 -

among governmental officials" was not a covered change, Florida's new non-citizen list

maintenance practice and procedures "bear a direct relation to voting itself." *See* 502 U.S. at

510. Indeed, removing voters from the list of registered voters, which makes them ineligible to

cast a ballot, is a change "in the composition of the electorate." *Id.* at 502-03.

States are required to identify changes with specificity for administrative review. 28

C.F.R. §§ 51.26 to 51.27; *Clark v. Roemer*, 500 U.S. at 658; *see also McCain v. Lybrand*, 465

U.S. 236, 249-50 (1984) ("the Act would plainly be subverted if the Attorney General could ever

be deemed to have approved a voting change when the proposal was neither properly submitted

nor in fact evaluated by him."). Thus, "the submission of legislation for administrative

preclearance under § 5 defines the scope of the preclearance request." *See Clark*, 500 U.S. at

656.

Florida's 2005 and 2011 Section 5 submissions did not identify the new citizenship list

maintenance practices initiated by the State and implemented by Supervisors of Elections under

Defendant's direction as a change being submitted for review. *See* Exhibits 1a, 1c, 2a, & 2c.

Further, the assertion that the Secretary's new activities are precleared because they are related to

previously precleared changes is incorrect. *See McCain*, 465 U.S. at 256-57. Nor has the

Secretary of State made a Section 5 submission of these changes.[7] *NAACP v. Hampton County*

---

[7]   The State references a decision in the Northern District of Florida denying a motion for
temporary restraining order against the State's program. *See* Order Denying a Temporary
Restraining Order, *United States v. Florida*, 4:12-CV-285 (N.D. Fla. June 28, 2012) (*see* ECF
16-2). In denying the TRO, the Court explained that the doctrine of voluntary cessation created a
rebuttable presumption that the challenged conduct will not recur. *Id.* at 10-11. The court
recognized that the State's voter verification program had "major flaws," including the fact that
it "identified many properly registered citizens as potential noncitizens." *Id.* at 2, 9. Finally, the
court noted that the list maintenance program "probably ran afoul" of NVRA Section 8(b), 42
U.S.C. § 1973gg-6(b), which requires state voter list maintenance programs to be "uniform" and
"nondiscriminatory." *Id.* at 9. The decision in *United States v. Florida* does not address Section
5 of the Voting Rights Act, the implementation of the database matching program that had

- 13 -

*Election Comm'n*, 470 U.S. 166, 182 (1985) ("[T]he change must be submitted 'in some

unambiguous and recordable manner.'") (internal citations omitted); *see also* 28 C.F.R. §§51.26-

51.28.

Nothing in Florida's 2011 submission provides that the Secretary of State can create a

new non-citizen category of individuals under 98.093 for which it can "access . . . information

from state and federal officials and entities," *see* Fla. Stat. 98.093(1), distribute the results of the

Department of State's data comparisons as a "source" of information that a voter is "not a United

States citizen" under Fla. Stat. 98.075(6), and direct Supervisors of Elections to initiate voter

removal procedures. The identified categories for the use of data obtained from "state and

federal officials or entities" were unaltered in the 2011 submission. *See* Exhibits 2b at 15; *see*

*also* Exhibit 7 (2001-1693 submission); Fla. Stat. 98.093. Because the benchmark is clearly

outlined in Florida's code and its submission materials, Defendant's new practices and

procedures constitute a voting change.

Neither the Attorney General's preclearance of Fla. Stat. 98.075 or 98.093, nor

Defendant's assertion that it has voluntarily ceased its database comparisons, eliminate the

State's responsibility to submit its new discretionary voting practices and procedures for

preclearance under Section 5, as those changes have been implemented in the covered counties.

*See, e.g.*, Exhibit 3 (news article on implementation of this change in Collier County). Thus, the

Secretary of State cannot now allege that the voting practice he initiated (and that the covered

counties implemented at his direction), is completely abandoned, because the change has already

affected voters in the covered counties. The implementation of these new practices and

procedures without preclearance violates Section 5. *Connor v. Waller*, 421 U.S. 656 (1975) (per

---

already occurred in the covered counties, or the fate of the voters who were removed pursuant to
that program.

curium) ("Those Acts are not now and will not be effective as laws until and unless [pre]cleared

pursuant to § 5."); *see also* Exhibit 4 (May 31, 2012 Letter from Department to Florida

identifying unprecleared change with regards to the State's database matching program).

**B.    The State of Florida and Other Jurisdictions Have Submitted New Database Matching Programs for Review Pursuant to Section 5**

Database matching programs are required to be submitted for Section 5 review, *see, e.g.,*

*Curtis v. Smith*, 121 F. Supp. 2d 1054, 1060 (E.D. Tex. 2000) (upon review of *en masse*

challenges of residency, the court determined that "[s]uch an action, representing a change from

'more than one' to over 9,000 in one fell swoop, coupled with the timing of the challenges before

us, must be precleared in accordance with § 5 of the Voting Rights Act."); Order, *Morales v.*

*Handel*, 1:08-CV-3172, at 21-22 (N.D. Ga. Oct. 27, 2008) (holding that the State's "comparison

of information [between two] databases that results in the identification of applicants whose

eligibility could not be verified" constitutes a voting change and must be submitted for Section 5

review) (Exhibit 5).  And in fact, the State of Florida has previously made such submissions.

*See, e.g.,* Exhibit 1c; Exhibit 2c at 5; Exhibit 7.

In 2001, when Florida contemplated database match procedures for the removal of

registered voters, the Department of Justice requested more information to identify "with

specificity 'the other computer databases' . . . and the 'other relevant sources' available to the

State," for determining ineligibility.  Exhibit 6 at 2 (Dec. 17, 2001 letter from Department to

Florida).  The State responded by identifying the database sources used for determining the

continued eligibility of voters on the registration list.  Exhibit 7 (Jan. 29, 2002 letter from Florida

to Department).  With the additional information, the Department precleared the relevant

provisions of the submission on March 28, 2002.  Exhibit 8.  And when Florida added the Social

Security Administration as a source for conducting database comparisons to identify deceased

- 15 -

persons in 2011, the State submitted the change for Section 5 review. *See* Exhibit 2c at 5 (Chart

prepared by Florida identifying 2011 changes).

Other covered jurisdictions have also submitted their voter database comparisons

concerning citizenship for preclearance. In 2006, for example, Arizona submitted the use of the

SAVE database to assist in determining eligibility of voter registration applicants. *See* Exhibit 9

(2006 submission from Arizona at 6). Georgia also submitted its database matching program for

identifying potential non-citizens for Section 5 review following a Section 5 enforcement action;

the district court in that case held that this program was a change that needed to be submitted.

*See* Exhibit 5 at pp. 21, 22. The database matching procedures at issue here, implemented in the

covered counties, require Section 5 review.

### C.   The State Is an Appropriate Defendant Here as the Counties Have Implemented the Change at the Direction of the State

Statewide voting changes in non-covered states that include covered jurisdictions are

subject to preclearance. *See Lopez II,* 525 U.S. at 282; *see also Bone Shirt v. Hazeltine*, 200 F.

Supp. 2d 1150, 155-56 (D.S.D. 2002) (state required to submit changes affecting its two covered

counties); *Haith v. Martin*, 618 F. Supp. 410 (E.D. N.C. 1985) (holding that state defendants in

North Carolina, a partially covered state, must submit statewide voting changes for

preclearance).

Here, the Florida Department of State exercised its discretion and instituted a new

practice and procedure to compare the statewide voter registration database to another database

for the purpose of identifying and removing voters from the voter registration list. *See* Exhibit

10 (April 2012 PowerPoint presentation). The Florida Secretary of State has the authority to

establish written practices, and the State has previously submitted written directions, practices,

and procedures concerning Florida's database matching programs, similar to the one here, for

preclearance. *See, e.g.*, Exhibit 1c at 5-7; Exhibit 2c at 5; *Wexler v. Lepore*, 342 F. Supp. 2d 1097, 1099 (2004), *aff'd Wexler v. Anderson*, 452 F.3d 1226 (11th Cir. 2006) ("Florida's election system consists of the Legislature, the Department of State, and the Supervisors of Elections for Florida's sixty-seven counties. Within the statutory framework governing elections, the Legislature has authorized the Department of State to issue binding interpretations of the election laws."). The Secretary of State is the appropriate state election official to submit the new citizenship list maintenance provisions on behalf of the covered counties for another practical reason—only the Secretary can fully "explain to the Attorney General the purpose and effect of voting changes it enact[ed]." *See* 28 C.F.R. § 51.23. In fact, all of the information regarding the development of the new citizenship list maintenance requirement is in the Secretary's control, because the county supervisors of elections in the covered jurisdictions did not develop the list maintenance practices and procedures.

### D.     The Matter Is Not Moot, as the Change Has Been Implemented Already

The State argues that its discontinuation of the data matching procedure obviates the need to submit this change for preclearance. ECF 16 at 3, 12-13. However, the change has been implemented in covered counties, *see* Exhibit 3, even though preclearance has not been obtained and has already affected voters. Further, to the extent that the State now intends to implement a new data matching procedure using the Systematic Alien Verification of Entitlement ("SAVE") federal database, *see* ECF 16 at pp. 12-13, that matching procedure also requires pre-clearance before it can be implemented in the covered counties. *See, e.g.*, Exhibit 9 at 6 (State of Arizona's submission of its SAVE database matching program for new registrants).

## IV.  HAVA NEITHER REQUIRES THE STATE'S SPECIFIC PROGRAM NOR EXEMPTS COMPLIANCE FROM SECTION 5'S REQUIREMENTS

Congress adopted HAVA in 2002, with certain requirements about the creation and maintenance of state-wide voter registration databases.  HAVA does not require Florida's new citizenship list maintenance practices and cannot serve as the benchmark for determining whether the State has implemented a voting change.  HAVA requires that states create a statewide voter registration database.  42 U.S.C. § 15483.  HAVA also imposes limited list maintenance requirements for existing registrants in accordance with the established provisions of the National Voter Registration Act ("NVRA").  *See* 42 U.S.C. § 15483(a)(2)(A)-(B)(ii) ("For purposes of removing names of ineligible voters [under the NVRA], . . . the State shall coordinate the computerized list with State agency records on felony status . . . and death.").  HAVA also requires certain steps to verify the identity of new registrants through comparisons with state driver license databases and federal Social Security databases.  42 U.S.C. § 15483(a)(5).  By the terms of the plain text of the statute, none of these provisions of HAVA imposes a non-discretionary duty for Florida to initiate its new citizenship list maintenance program, despite the State's arguments to the contrary.  *See* ECF 16 at pp. 5, 7, 22.  HAVA allows discretion for states to adopt more strict provisions not required or mentioned in the text of HAVA, such as citizenship verification, but it does not require it.  And such discretion is the touchstone that requires preclearance under Section 5.  Moreover, in any event, HAVA expressly requires compliance with the Voting Rights Act and other federal laws.  42 U.S.C. § 15484 ("The requirements established by this title are minimum requirements and nothing in this title shall be construed to prevent a State from establishing . . . administration requirements that are more strict . . . so long as such State requirements are not inconsistent with . . . any law described in section 906."); 42 U.S.C. § 15545(a) ("nothing in this chapter may be construed to authorize

- 18 -

or require conduct prohibited under" or "to supersede, restrict, or limit the application of" the

Voting Rights Act, among other federal laws). *See also Fordice*, 520 U.S. at 284 (noting that

preclearance is required even when "the changes are made in an effort to comply with federal

law"); Order, *Morales v. Handel*, at 21 ("Though these [changes] could both be characterized as

exercises of local discretion, permitted under federal and state law, in response to the federal

mandate of HAVA, this does not shield them from review under Section 5.") (Exhibit 5).

In *Young v. Fordice*, the Supreme Court unanimously held that the discretionary aspects

of a jurisdiction's attempt to comply with a federal law mandate (in that case, the NVRA) were

subject to review under Section 5 of the Voting Rights Act. *See* 520 U.S. 273, 290-91 (1997).

The Court reiterated its long standing holding that "minor, as well as major, changes require

preclearance . . . so long as those changes reflect policy choices made by state or local officials."

*Id.* at 284. Here, as in *Young*, Florida's discretionary decision to implement a new list

maintenance practice and distribute the results as a "source" for determining ineligibility under

Fla. Stat. 98.075(6) is a change that must be submitted for review. *See McDaniel v. Sanchez*,

452 U.S. 130, 153 (1981) (whenever "a proposal reflect[s] the policy choices of the elected

representatives of the people . . . the Voting Rights Act is applicable"); *Fordice*, 52 U.S. at 290.

Accordingly, the Department of Justice informed Florida that the changes challenged here are

subject to coverage under Section 5. *See* Exhibit 4; *see also* Exhibits 1d & 2d.[8]

## V.   THE APPROPRIATE REMEDY FOR UNPRECLEARED CHANGES

The text of Section 5 is unambiguous: "unless and until" preclearance for a new voting

practice is obtained from the United States District Court in the District of Columbia or the

Attorney General, "no person shall be denied the right to vote for failure to comply with such"

---

[8] The Supreme Court has observed that the Attorney General's interpretation of Section 5 is
entitled to substantial deference. *Lopez II*, 525 U.S. at 281.

practice. 42 U.S.C. § 1973c. The U.S. Supreme Court has aptly described this as the "guarantee of § 5 that no person shall be denied the right to vote for failure to comply with an unapproved new enactment subject to § 5." *Allen*, 393 U.S. at 557.

As such, the Supreme Court has repeatedly held that a voting change that has not been precleared cannot legally be implemented. The application of Section 5 in this regard is set forth in the Supreme Court's unanimous decisions in *Lopez I*, 519 U.S. 9, and *Clark v. Roemer*, 500 U.S. 646 (1991). "A jurisdiction subject to § 5's requirements must obtain either judicial or administrative preclearance before implementing a voting change." *Lopez I*, 519 U.S. at 20. "A voting change in a covered jurisdiction 'will not be effective as la[w] until and unless cleared' pursuant to one of these two methods." *Clark*, 500 U.S. at 652 (quoting *Connor v. Waller*, 421 U.S. 656 (1975)). "Failure to obtain either judicial or administrative preclearance 'renders the change unenforceable.'" *Id.* (quoting *Hathorn v. Lovorn*, 457 U.S. 255, 269 (1982)). "If a voting change subject to § 5 has not been precleared, § 5 plaintiffs are entitled to an injunction prohibiting implementation of the change." *Lopez I*, 519 U.S. at 20; *see also Clark*, 500 U.S. at 652-53; *Allen*, 393 U.S. at 571-72.

The Court should deny the State's motion to dismiss this case. Because the unprecleared database matching program has already resulted in changes to the voter registration lists in the covered counties, a live controversy exists.

## VI.    CONCLUSION

For the foregoing reasons, the United States respectfully requests that this Court deny the State's motion to dismiss and find that Florida's new list maintenance practices and procedures must be submitted to the Department of Justice or the District Court of the District of Columbia

- 20 -

for Section 5 review, since they are unprecleared changes that have been implemented in the

covered counties subject to Section 5.


Date:   July 27, 2012                               Respectfully submitted,

                                                    THOMAS E. PEREZ
                                                    Assistant Attorney General
                                                    Civil Rights Division


                                                    /s/ John Albert Russ IV
                                                    _____
                                                    T. CHRISTIAN HERREN JR
                                                    JOHN ALBERT RUSS, IV
                                                    California Bar No. 192471
                                                    ELISE SANDRA SHORE
                                                    Georgia Bar No. 557131
                                                    JENIGH J. GARRETT
                                                    New York Bar No. 4230124
                                                    Attorneys, Voting Section
                                                    Civil Rights Division
                                                    U.S. Department of Justice
                                                    950 Pennsylvania Avenue, N.W.
                                                    Washington, D.C. 20530
                                                    Tel:  (202) 305-0070
                                                    Tel:  (202) 353-7738
                                                    Fax:  (202) 307-3961
                                                    john.russ@usdoj.gov
                                                    elise.shore@usdoj.gov
                                                    jenigh.garrett@usdoj.gov


## Certificate of Service

        I certify that a true and correct copy of the foregoing will be sent electronically to the
registered participants (filed through EM/ECF system), on this the 27th day of July, 2012.

                                    /s/ John Albert Russ IV
                                    _____
                                    JOHN ALBERT RUSS IV
                                    Special Litigation Counsel
                                    Voting Section