**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

MI FAMILIA VOTA EDUCATION FUND,
as an organization; MURAT LIMAGE;
PAMELA GOMEZ,

      Plaintiffs,

v.                            Civil Action No.: 08:12-cv-01294

KEN DETZNER, in his official capacity as
Florida Secretary of State,

      Defendant.

_____/

## THE SECRETARY'S MOTION TO DISMISS FIRST AMENDED COMPLAINT

Defendant Florida Secretary of State Kenneth W. Detzner ("Secretary") respectfully moves, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss Plaintiffs' First Amended Complaint (DE 20). Plaintiffs' Amended Complaint "fail[s] to state a claim upon which relief can be granted," Fed. R. Civ. P. 12(b)(6), because the State is not a covered jurisdiction under Section 5 of the Voting Rights Act, Plaintiffs have failed to identify *any* change in voting practice or procedure subject to Section 5 preclearance, and Plaintiffs seek to bootstrap a statewide injunction based on an alleged Section 5 violation that exists, even under their own theory, in only five of Florida's 67 counties.

### PRELIMINARY STATEMENT

As the United States Department of Justice recently emphasized before the Supreme Court, "the federal and state governments have a compelling interest in excluding foreign citizens" from the political process. Motion of the United States to Dismiss or Affirm at 11, *Bluman v. FEC*, 132 S. Ct. 1087 (2012) (No. 11-275), 2011 WL 5548718. Such an exclusion is neither an "invidious attack" on these individuals nor "a deficiency in the democratic system";

rather, it is "a necessary consequence of the community's process of political self-definition." *Id.* at 15 (quoting *Cabell v. Chave-Salido*, 454 U.S. 432, 439 (1981)).

Plaintiffs acknowledge that "[t]he State of Florida requires that, in order to vote in any election conducted in th[e] state, an individual must be a citizen of the United States of America." Am. Compl. ¶ 19. Plaintiffs also acknowledge that Florida law validly requires the Secretary to "ensure the maintenance of accurate and current voter registration records" and the Supervisors of Elections in each county ("county supervisors") to "conduct uniform, non-discriminatory registration list maintenance." *Id.* ¶ 20. Moreover, though Plaintiffs fail to mention it, Florida law mandates a notice-and-hearing procedure before an individual may be removed from the voter registration list. *See* § 98.075(7), Fla. Stat.

All of these state laws have been precleared under Section 5. *See* June 6, 2012 Letter to DOJ (Ex. 1) (referenced at Am. Compl. ¶ 38); *see also* A Compilation Of The Election Laws Of The State Of Florida, *available at* http://election.dos.state.fl.us/publications/pdf/2011/2011ElectionLaws_04-12-2012.pdf (last visited July 5, 2012). Plaintiffs therefore do not challenge any of these requirements or the Secretary's compliance with them. *See* Am. Compl. ¶¶ 18–34. And Plaintiffs do *not* allege that the Secretary sought to change *any* requirement of voter eligibility or the precleared notice-and-hearing removal procedure. *See id.*

Instead, Plaintiffs allege that the "change" purportedly requiring Section 5 preclearance is the Secretary's use of *a new source of information* to confirm compliance with Florida's valid voter eligibility requirements. *Id.* ¶ 45. In particular, Plaintiffs claimed that the Secretary violated Section 5 when he matched the voter registration list against citizenship data from the Florida Department of Highway Safety and Motor Vehicles' ("DHSMV") MAN Driver and Vehicle Express ("MDAVE") database to identify potential non-citizens, and then transmitted

that data to county supervisors, who were to initiate the statutory notice-and-hearing removal procedure where warranted. *See id.* ¶¶ 18–34. As Plaintiffs recognize, however, the Secretary has discontinued this MDAVE data matching. *See id.* ¶ 40.

Indeed, the Secretary determined that use of more recent citizenship data would facilitate more efficient identification of non-citizens registered to vote. The Secretary thus repeatedly sought—but was wrongfully and illegally denied—access to the Systematic Alien Verification for Entitlements Program database ("SAVE") maintained by the Department of Homeland Security ("DHS"). *See id.* ¶ 42. As Plaintiffs recount, the Secretary filed suit on June 11, 2012, seeking access to SAVE, and DHS finally committed to providing that access on July 9, 2012. *See id.* ¶¶ 42–43; *see also Fla. Dep't of State v. U.S. Dep't of Homeland Security*, No. 1:12-CV-00960 (D.D.C.). The Secretary intends to institute an additional safeguard by using SAVE to verify the current citizenship status of individuals identified as potential non-citizens through the MDAVE data matching and for whom the Secretary has unique identifiers required for SAVE verification. Only information about registered voters confirmed by SAVE as non-citizens would be transmitted to county supervisors for initiation of the statutory notice-and-hearing procedure.

Plaintiffs now allege that this SAVE data matching is a Section 5 "change" (*see* Am. Compl. ¶¶ 42–46), but this tortured claim fails for at least three simple reasons. *First*, as Plaintiffs concede, the State is *not* a "covered jurisdiction" under Section 5 (*see id.* ¶¶ 48, 50, 62; 28 C.F.R. Part 51 Appendix)—so Section 5 does *not* provide a cause of action against the State. As Plaintiffs further concede, only five of Florida's 67 counties are covered jurisdictions (*see* Am. Compl. ¶¶ 48, 50, 62), so Plaintiffs' Section 5 claim runs, if at all, *only* against those

counties. Yet the Secretary, in his official capacity on behalf of the non-covered State, is the *only* defendant that Plaintiffs joined and against whom they seek relief. *See id.* ¶ 18.

*Second*, even if the State were a covered jurisdiction, Plaintiffs fail to identify *any* change in voting practice or procedure requiring Section 5 preclearance. Indeed, Plaintiffs' theory makes no sense because it would freeze the Secretary into using antiquated, unreliable sources of information to implement the State's valid voter eligibility requirements unless and until more current and reliable sources received preclearance. Such a regime would impede, rather than advance, the efficient administration of precleared election laws.

Plaintiffs allege that the Secretary's data matching was discriminatory because it generated "false positives" of registered voters who were actually citizens. *See id.* ¶ 36. Yet the *reason* that the Secretary sought SAVE data is that such data is *more* reliable and uniform than previously available data. Plaintiffs thus seek to prohibit the Secretary from using increasingly more accurate data to assess citizenship.

In any event, even if the State were a covered jurisdiction, the Secretary's data matching is not a Section 5 "change" because it simply is one of many ongoing implementations of a Florida law that has already been precleared. Florida law authorizes the Secretary to access information from state and federal officials "[i]n order to identify ineligible registered voters and maintain accurate and current voter registration records," § 98.093, Fla. Stat., and directs him to share with the county supervisor any information indicating "that a registered voter is ineligible because he or she . . . is not a United States citizen," *id.* § 98.075(6). The Secretary regularly receives and transmits to county supervisors data relating to voter eligibility from a host of state and federal agencies—and merely continues that practice with the SAVE data matching.

Plaintiffs, moreover, plainly do not believe that the Secretary's data matching is a change in any *covered* county because they have not even joined any such county as a defendant.  *See* Am. Compl. ¶ 18.  In fact, the *only* actions by covered counties that Plaintiffs identify are Hillsborough County's use of the matched data under the now-discontinued MDAVE process "as the basis for a mailing to demand that the recipients provide proof of their citizenship" (*id.* ¶ 34) and Collier County's "remov[al]" of individuals "from the voting rolls" (*id.* ¶ 39).  But, as Plaintiffs acknowledge with their citation to "Fla. Stat. § 98.075(7)," Hillsborough County's mailing was *required* by Florida's precleared notice-and-hearing removal procedure (*id.* ¶ 34)— and Plaintiffs do not allege that any citizen was erroneously removed from the rolls in Collier County or anywhere else (*id.* ¶ 39).  Thus, the *Secretary's* reliance on a new source of data has changed precisely nothing in the five covered counties, which continue to act on information received from the Secretary and to remove individuals that the county supervisors determine are ineligible in accordance with Florida's precleared notice-and-hearing procedure.

In a last-ditch effort to save their "change" argument, Plaintiffs attempt to leverage a letter from the Justice Department espousing the view that the Secretary's MDAVE data matching was a Section 5 change.  *See id.* ¶ 37.  Yet when the Justice Department filed its *own* suit challenging the Secretary's MDAVE data matching, it did not advance any Section 5 claim.  *See United States v. Florida*, No. 4:12cv285, Order Denying A Temporary Restraining Order at 1 (N.D. Fla. June 28, 2012) ("DOJ Order") (Ex. 2).  In any event, the Justice Department's letter and its "Statement of Interest" ("SOI") merely repeat the fatal flaws in Plaintiffs' position.

The Court should reject Plaintiffs' Section 5 claim and dismiss Plaintiffs' Amended Complaint in its entirety.  In the alternative, and at a minimum, the Court should reject Plaintiffs' attempt to transform the alleged Section 5 violation in five covered counties into a statewide

injunction prohibiting the Secretary from implementing data matching and ordering him to "advis[e] the Supervisors of Elections," regardless of county, to cease relying on the results from that matching. Am. Compl. ¶¶ B–C. Such a claim for relief in *non*-covered jurisdictions is beyond the Court's Section 5 remedial authority and should be dismissed.

## BACKGROUND

### A. The Secretary's Data Matching

As Plaintiffs recognize (Am. Compl. ¶ 19), Florida requires a voter in any election in the State to be "a citizen of the United States." § 97.041(1)(a)(2), Fla. Stat. Florida law further directs the Secretary to "protect the integrity of the electoral process by ensuring the maintenance of accurate and current voter registration records," *id.* § 98.075(1), and authorizes the Secretary to access information from state and federal officials "[i]n order to identify ineligible registered voters and maintain accurate and current voter registration records," *id.* § 98.093. It further provides that if the Secretary or a county supervisor "receives information . . . that a registered voter is ineligible because he or she . . . is not a United States citizen," the supervisor must initiate the statutory notice-and-hearing procedure and—if the supervisor determines after that process that the registered voter is, in fact, ineligible—must remove the individual from the statewide voter registration list. *Id.* §§ 98.075(6)–(7). All of these state laws have been precleared under Section 5 of the Voting Rights Act. *See* June 6, 2012 Letter to DOJ; A Compilation Of The Election Laws Of The State Of Florida.

Congress, through the Help America Vote Act (HAVA), has imposed similar duties on the Secretary. HAVA requires the Secretary "to ensure that voter registration records in the State are accurate and are updated regularly" in order to "remove registrants who are ineligible to vote from the official list of eligible voters." 42 U.S.C. § 15483(a)(4). HAVA also places a specific non-discretionary duty on the Secretary to "match information in the database of the statewide

voter registration system with information in the database of the [State's] motor vehicle authority" in order "to verify the accuracy" of voter registration information. *Id.* § 15483(a)(5)(B)(i).

The Secretary and county supervisors regularly engage in data collection efforts to identify ineligible voters on the State's voter registration list. For example, the Secretary receives monthly reports of: deceased adults from the Florida Department of Health; persons adjudicated mentally incompetent from each clerk of the circuit court; and persons who have become licensed to drive in other states from DHSMV. The Secretary also receives information from the United States Social Security Administration about registered voters who are deceased. And the Florida Department of Law Enforcement identifies persons on the voter rolls who have been convicted of a felony. *See generally* §§ 98.075, 98.093, Fla. Stat.

In 2011, as authorized by state law and mandated by HAVA, the Secretary worked with DHSMV to locate records in MDAVE pertaining to registered voters. This data matching produced DHSMV records of registered voters containing information preliminarily indicating that the individuals may be non-citizens, such as a foreign passport, green card, or U.S. visa. The Secretary distributed a small sample consisting of roughly 2,600 such names to county supervisors, who were to provide the identified individuals notice and an opportunity to be heard. *See* Am. Compl. ¶¶ 25–32.

> In distributing the sample of names, the Secretary reminded supervisors:
>
> The list that you will be receiving represents only non-immigrants initially identified in DHSMV's DAVE . . . . Please remember that you are still responsible for contacting these individuals and going through the process of verifying citizenship status before making a determination of eligibility for voter registration. You must follow the same procedures, in law, that you have in the past whenever you receive information that a registered voter of yours is ineligible to be registered to vote.

Apr. 2, 2012 E-mail To County Supervisors (Ex. 3).

Most county supervisors complied with their legal duty to "[n]otify the registered voter of his or her potential ineligibility by mail within 7 days." § 98.075(7), Fla. Stat. Over 400 voters who were notified have confirmed their eligibility to vote. Since April 4, 2012, county supervisors of elections have removed over 100 registered voters from the voter rolls after determining that those persons were non-citizens. Many of these individuals had a record of voting in prior elections. The Secretary is not aware of, and Plaintiffs do not identify, any citizen appearing on the 2,600-person sample who has been wrongfully removed from the voter registration rolls, or any individual who was removed without a supervisor complying with the notice-and-hearing procedure and determining by a preponderance of the evidence that the individual was ineligible. *See, e.g.*, Am. Compl. ¶¶ 39, 49.

The Secretary determined that use of more recent citizenship information contained in SAVE would facilitate more accurate identification of non-citizens registered to vote. Thus, on April 30, 2012, the Secretary decided not to forward any more MDAVE data to county supervisors. *See* June 6, 2012 Letter to DOJ. After DHS repeatedly and illegally denied the Secretary access to SAVE data, the Secretary filed suit seeking immediate access to that data on June 11, 2012. *See Fla. Dep't of State v. U.S. Dep't of Homeland Security*, No. 1:12-CV-00960 (D.D.C.). DHS finally agreed to grant the Secretary the SAVE access to which he is legally entitled on July 9, 2012. *See* Am. Compl. ¶¶ 42–43; *see also* Press Release: Florida Department of State Receives Commitment from U.S. Department of Homeland Security to Provide Access to Citizenship Database (July 14, 2012) (Ex. 4); Press Release: U.S. Department of Homeland Security Agrees To Terms With Florida Department Of State Over Legal Status Checks Of Potential Non-Citizen Voters (Aug. 16, 2012) (Ex. 5).

Consistent with his duties under precleared state law and federal law, the Secretary intends to verify the citizenship status of the individuals identified as potential non-citizens through the MDAVE data matching against SAVE, and where that verification confirms that a registered voter is not a U.S. citizen, transmit the results of that verification to county supervisors to initiate the notice-and-hearing procedure for review and, where warranted, removal of ineligible individuals from the voting rolls.

**B.    Plaintiffs' Complaint And First Amended Complaint**

Plaintiffs filed their initial Complaint on June 8, 2012, alleging that the Secretary's MDAVE data matching was a Section 5 change.  *See* Compl. ¶¶ 22–31.  The Secretary moved to dismiss the Complaint on several grounds, including the fact that he had discontinued the MDAVE data matching more than a month before Plaintiffs filed the Complaint.  *See* DE 16.  Plaintiffs responded to that motion to dismiss by filing the Amended Complaint on July 27, 2012.  *See* Amend. Compl.  That same day, the Department of Justice filed its Statement of Interest responding to the Secretary's motion to dismiss.  *See* DE 22.  The Court denied the Secretary's motion to dismiss as moot on July 30, 2012.

Plaintiffs allege to be residents of Hillsborough County and a non-profit organization.  *See* Am. Compl. ¶¶ 14–17.  Plaintiffs recognize that the State is not a covered jurisdiction under Section 5 and that only five of Florida's 67 counties—Collier, Hardee, Hendry, Hillsborough, and Monroe—are covered jurisdictions.  *Id.* ¶¶ 48, 50, 62.  Plaintiffs nonetheless have sued and sought relief against only the Secretary, in his official capacity on behalf of the State, and have not sued any covered jurisdiction.  *See id.* ¶ 18.

Plaintiffs acknowledge that "Florida requires that, in order to vote in any election conducted in that state, an individual must be a citizen of the United States of America."  *Id.* ¶ 19.  Plaintiffs do not challenge this citizenship requirement or allege that the Secretary's data

matching changed the qualifications for voter eligibility. Plaintiffs, moreover, do not mention the notice-and-hearing procedure that Florida law requires to remove an ineligible individual from the voter registration list, and make no allegation that the Secretary or any other Florida official sought to change those requirements.

The gravamen of Plaintiffs' sole claim, therefore, is that the Secretary's "institut[ion] [of] voter list maintenance procedures based upon motor vehicles data matching and SAVE database matching constitute changes affecting voting that require Section 5 preclearance." *Id.* ¶ 49. Yet Plaintiffs recognize that Florida law requires supervisors to "conduct uniform, non-discriminatory registration list maintenance" and the Secretary to "ensure the maintenance of accurate and current voter registration records." *Id.* ¶ 20. At the same time, Plaintiffs fail to make even a single reference to precleared state law's express authorization to the Secretary to obtain information from state or federal agencies in order to confirm voter eligibility. *See id.*

Plaintiffs nonetheless contend that the SAVE data matching is "void" because the Secretary did not seek preclearance before relying on a new source of information to confirm voter eligibility. Plaintiffs further seek a statewide injunction prohibiting the Secretary from engaging in the SAVE data matching and ordering him to direct "county Supervisors of Elections," regardless of location, to cease initiating notice-and-hearing procedures based on the results of that data matching. *Id.* ¶¶ 63–66, B–C.

## ARGUMENT

## I. SECTION 5 DOES NOT PROVIDE A CAUSE OF ACTION AGAINST THE STATE

Section 5 requires preclearance "*only* to the extent" that the change in voting practice or procedure "affects voting in jurisdictions properly designated for coverage." *Lopez v. Monterey Cnty.*, 525 U.S. 266, 284–86 (1999) ("*Lopez II*") (emphasis added); *see also* 42 U.S.C. §

1973c(a); *Holder v. Hall*, 512 U.S. 874, 883(1994) (plurality op.) ("Section 5 applies only in certain jurisdictions specified by Congress."); *LaRouche v. Fowler*, 77 F. Supp. 2d 80, 86 (D. D.C. 1999) (three-judge court), *aff'd*, 529 U.S. 1035 (2000). In other words, Section 5 extends only to those "jurisdiction[s] covered by section 4(b) of the [Voting Rights] Act." 28 C.F.R. § 51.1(a). Section 5, therefore, obviously does not apply to a *non*-covered jurisdiction; such jurisdictions therefore are free to make changes in voting practice or procedure without first obtaining preclearance. *Lopez II*, 525 U.S. at 284.

Thus, Section 5 may be enforced—and provides a cause of action—only against a covered jurisdiction, not a non-covered jurisdiction. *See, e.g.*, *Allen v. State Bd. of Elections*, 393 U.S. 544 (1969) (actions against officers of covered states of Mississippi and Virginia); *Presley v. Etowah Cnty. Comm'n*, 502 U.S. 491 (1992) (action against commission of covered political subdivision); *Young v. Fordice*, 520 U.S. 273 (1997) (action against officer of covered state of Mississippi); *Lopez II*, 525 U.S. 266 (action against covered political subdivision). This rule applies even where a *non*-covered state, by state law, enacts changes to voting practices or procedures to be implemented by a *covered* political subdivision. *See, e.g.*, *Lopez II*, 525 U.S. at 274–77. In that scenario, Section 5 provides no claim against the non-covered state, which participates in the litigation, if at all, as an intervenor. *See, e.g.*, *id.* at 274 (noting non-covered state's intervention in Section 5 suit against covered county).

As Plaintiffs acknowledge, the State of Florida is not a Section 5 covered jurisdiction, and the Secretary of State is "the chief election officer of Florida." Am. Compl. ¶ 18; *see also id.* ¶¶ 48, 50, 62; 28 C.F.R. Part 51 Appendix. Section 5 therefore provides no cause of action against the State. *See, e.g.*, *Lopez II*, 525 U.S. 274–77. In fact, as Plaintiffs also acknowledge, only five of Florida's 67 counties are covered jurisdictions. *See* Am. Compl. ¶¶ 48, 50, 62; *see*

*also* 28 C.F.R. Part 51 Appendix. Thus, Plaintiffs' Section 5 claim runs, if at all, only against those counties. *See, e.g.*, *Lopez II*, 525 U.S. 274–77; *Allen*, 393 U.S. 544; *Presley*, 502 U.S. 491; *Young*, 520 U.S. 273. Yet Plaintiffs assert their Section 5 claim only against the Secretary in his official capacity on behalf of the State. *See* Am. Compl. ¶ 18. Plaintiffs thus have failed to state a valid claim upon which this Court can grant relief, and their Amended Complaint should be dismissed.

Plaintiffs' allegation that the Secretary "is required to provide written direction and opinions to the Supervisor of Elections on the performance of their official duties," *id.*, does not cure this pleading failure. A state legislature also provides direction, in the form of binding state law, to county election officials—yet such state laws do not transform a *non*-covered state into a *covered* jurisdiction against which a Section 5 claim may be brought. *See, e.g.*, *Lopez II*, 525 U.S. 274–77. Moreover, a County "Supervisor of Elections is a constitutional officer who operates not entirely within the Secretary's control." DOJ Order at 2. Thus, Plaintiffs' choice to sue only the Secretary and failure to join any covered jurisdiction is doubly fatal, and the Court should dismiss the Amended Complaint.

The Justice Department nonetheless contends (s*ee* SOI at 5–6) that the Secretary is a proper Section 5 defendant because a covered county's voting change is subject to Section 5 preclearance even when it is mandated by the law of a non-covered state (*see id.* at 6 (citing *Lopez II*, 525 U.S. at 282)), and because a non-covered state has *authority* to *submit* a voting change for preclearance (*see id.* (citing 28 C.F.R. § 51.23)). But neither of these truisms suggests that a non-covered State is the proper *defendant* in a suit seeking to enforce Section 5's preclearance requirement with respect to an alleged voting change in a covered jurisdiction. The dispositive point is that only a *covered* jurisdiction—whether county or state—is subject to

Section 5 and therefore the only entity that can potentially violate it (by seeking to administer a non-precleared change). "Florida" is no more a covered jurisdiction than "Utah" or other states without covered counties within their borders, so it cannot be enjoined to "conform" to a law which does not even *apply* to it. The fact that a *county's* change is subject to preclearance, even when the county's action is required by state law, and that states *may submit* changes *on behalf* of covered counties (because it is more convenient and the State is better informed) in no way changes this dispositive fact. The State is still not subject to Section 5, so any injunction requiring it to conform with the inapplicable law is inherently *ultra vires*.

Nor is this a situation where the State is somehow needed for complete or effective relief—an injunction against the five covered counties proscribing implementation of the unprecleared "change" would fully preclude any potential Section 5 violation. Indeed, as this very suit reflects, the *only* reason to name the State is to impermissibly constrain its activities in the 62 Florida counties not covered by Section 5, improperly transporting Section 5's restrictions outside the covered counties.

The lone case the Department cites, *Bone Shirt v. Hazeltine*, 200 F. Supp. 2d 1150, 1156 (D.S.D. 2002) (three-judge court) (cited at SOI at 5–6), only underscores that Plaintiffs have no Section 5 claim against the Secretary. The question in *Bone Shirt* was whether South Dakota could be ordered to submit for preclearance a law adopting a new statewide redistricting plan. *See id.* at 1154–57. Reasoning that "[u]nder the South Dakota constitution, the state legislature is responsible for enacting legislation to reapportion the legislative districts and it is the South Dakota legislature that has the authority to make the appropriate changes to overcome objections that arise during the preclearance process," the two-judge majority concluded that "either the legislative body that enacted the legislation or the executive body that was responsible for

administering it [is] responsible for obtaining preclearance." *Id.* at 1156. The two-judge majority therefore ordered South Dakota to submit the redistricting plan for preclearance. *See id.* One judge dissented on the view that "[a]ffirmatively requiring South Dakota to comply with a federal statute which does not apply to that State" is an overly "intrusive equitable remedy." *Id.* at 1161 (Loken, J., dissenting).

Here, the Secretary is *not* "responsible for" for any alleged change to the precleared notice-and-hearing procedure for removing ineligible individuals from the voting rolls because the Secretary is merely verifying citizenship status and transmitting the results of that verification to county supervisors. *Id.* at 1156. As Plaintiffs recognize, the county supervisors, not the Secretary, have responsibility for initiating and administering the notice-and-hearing procedure. *See* Am. Compl. ¶¶ 26–39. Thus, the Secretary's data matching does not cause *any* of the purported changes or deficiencies in that procedure that Plaintiffs (incorrectly) allege. *See id.* at ¶¶ 34–39. The Secretary therefore is not the proper defendant here, and Plaintiffs' Section 5 claim runs, if at all, against the supervisors in the covered counties who are "responsible for" the notice-and-hearing procedure and any "changes" in its administration. *Bone Shirt*, 200 F. Supp. 2d at 1156.

Moreover, in all events, the SAVE data matching, unlike a statewide redistricting plan, is *not* a Section 5 change and, thus, does not require preclearance in any event. As explained below, *see infra* Part II, the Secretary has not enacted any new law, but instead is only discharging his statutory list maintenance duty, and *nothing* has changed with regard to his or the county supervisors' practices and procedures under precleared state law and federal law.

## II.    THE SECRETARY'S DATA MATCHING IS NOT A CHANGE REQUIRING SECTION 5 PRECLEARANCE

Even if Plaintiffs had a Section 5 cause of action against the non-covered State, the Court still should dismiss the Amended Complaint because the Secretary's use of a new source of information to confirm voter eligibility, whether MDAVE, SAVE, or some other source, is not a change subject to preclearance.  By its express terms, Section 5 requires preclearance only where a covered jurisdiction "enact[s] or seek[s] to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting *different from*" one that already has been precleared.  42 U.S.C. § 1973c(a) (emphasis added).  Section 5 thus extends "only to proposed *changes* in voting procedures," *Beer v. United States*, 425 U.S. 130, 138 (1976) (emphasis added), resulting in a "*new* voting *practice*," *Lopez v. Monterey Cnty.*, 519 U.S. 9, 20 (1996) ("*Lopez I*"), that may retrogress the exercise of "the right to vote" of "any citizens of the United States," 42 U.S.C. § 1973c(b) (emphasis added); *see also Lopez I*, 519 U.S. at 11 ("Section 5 governs *changes* in voting procedures, with the purpose of preventing jurisdictions covered by its requirements from enacting or seeking to administer voting *changes* that have a discriminatory purpose or effect." (emphases added)).

Here, the "voting qualification" is the obvious one of citizenship and the long-standing "standard, practice or procedure" is enforcing this qualification by excluding non-citizens from the voting rolls.  42 U.S.C. 1973c(a).  This basic practice—universally followed and mandated by federal law—is hardly new or a change from prior practice.  The fact that the county supervisors are now provided with information on citizenship that is derived from a different *source* than their prior information does not remotely "change" either the citizenship "qualification" or the long-standing "practice" of inquiring into a registered voter's citizenship status when there is reason to do so.

Thus, Plaintiffs' theory that the Secretary or the counties need to seek Section 5 preclearance whenever they rely on a *new source of information* to enforce the unquestionably valid voter eligibility requirements is flawed on multiple levels. In the first place, even for the non-covered State, merely changing the information relied upon to confirm compliance with valid voter eligibility requirements is not a change. Moreover, the Secretary's data matching is assuredly not a change in how Florida's covered counties "administer" voting procedures, because, on Plaintiffs' own allegations, the counties are simply continuing to enforce Florida's valid voter eligibility requirements through the precleared notice-and-hearing procedure. Because there has been no "change[] in voting procedure" anywhere, *Beer*, 425 U.S. at 138, Section 5 is inapplicable and Plaintiffs' Amended Complaint should be dismissed.

### A.     The Secretary's Data Matching Is Not A Change In Voting Practice Or Procedure

"In order to determine whether an election practice constitutes a 'change' as that term is defined in . . . § 5," a court must "compare the practice with the covered jurisdiction's 'baseline.'" *Riley v. Kennedy*, 553 U.S. 406, 421 (2008). The "baseline" is "the most recent practice that was both precleared and 'in force or effect'—or, absent any change since the jurisdiction's coverage date, the practice that was 'in force or effect' on that date." *Id.* "The question is whether the [covered jurisdiction] has enacted or is seeking to administer a practice or procedure that is different enough from the baseline to qualify as a change." *Id.*

The Supreme Court applied this requirement in *Presley v. Etowah County Commission*, 502 U.S. 491 (1992). There, a group of plaintiffs brought suit alleging that certain changes in county governance were subject to, but had not properly received, Section 5 preclearance. *See id.* at 493–95. Specifically, the plaintiffs challenged a county resolution and a state law that

altered the authority and duties of various county officials, contending that these changes related to voting and had a potentially retrogressive effect on minority voters. *See id.* at 495–499.

The Supreme Court rejected that contention. *See id.* at 510. The Supreme Court pointed out that its prior cases had identified "four factual contexts" triggering Section 5's preclearance requirement: where changes in the covered jurisdiction (i) "involve[] the manner of voting," (ii) "involve[] candidacy requirements and qualifications," (iii) "concern[] . . . the composition of the electorate," or (iv) "affect[] the creation or abolition of an elective office." *Id.* at 502–03. The changes in county officials' authority did not fall within any of these categories because "[t]hey had no impact on the substantive question whether a particular office would be elective or the procedural question how an election would be conducted." *Id.* at 510.

The Southern District of Texas recently applied *Presley* to reject a Section 5 challenge substantially similar to the one Plaintiffs advance. *See Lopez v. City of Houston*, No. H-09-0420, 2009 WL 1456487 (S.D. Tex. 2009), *aff'd* 617 F.3d 336 (5th Cir. 2010). The City of Houston Charter provided for a fourteen-member City Council, and required addition of two seats "if a determination [was] made pursuant to the Charter that the population of Houston is greater than or equal to 2.1 million people." *Id.* at *1. The plaintiffs in *Lopez* brought suit alleging that, even though the City Controller had determined, pursuant to the Charter, that the City's population exceeded 2.1 million people, the City Council had relied on nine year-old Census data to conclude that the City's population remained below that threshold and, thus, that no new seats should be created. *See id.* The plaintiffs claimed that the City Council's reliance on old Census data, rather than more recent population estimates, was a "change" in voting procedure requiring Section 5 preclearance. *See id.*

The Southern District of Texas rejected that claim for two reasons. *First*, the court held that the plaintiffs had failed to establish a "change" in procedure at all. *See id.* at *7–*8. The plaintiffs pointed to various provisions of the City Charter related to the population determination—but they failed to identify the City's "baseline" procedure for that determination. *See id.* at *8. Because "[t]he plaintiffs have failed to allege that the City . . . has ever actually implemented or followed the standard that they assert is the baseline," they could not prove that the City's population determination was a "change" requiring preclearance. *Id.*

*Second*, the court held that, even if the City's approach constituted a "change," the plaintiffs still failed to state a claim because "*merely changing the information relied upon* or changing the procedure for determining whether a change in the size of the City Council is required is not the type of change that is subject to § 5's preclearance requirements." *Id.* at *9 (emphasis added). The court reasoned that such a change did not "fit within any of the four categories of covered changes listed in *Presley*" because it did "not even arguably relate to the manner of voting or candidacy requirements." *Id.* And even though "[e]xpanding the number of council positions would clearly fit within the fourth [*Presley*] category" and "redistricting" the council districts "would fit within the third category," changing the *information* relied on "to determine when the expansion of the Council and concomitant redistricting must be implemented does not have the requisite 'direct relation to voting and the election process' to be subject to Section 5 preclearance." *Id.* (quoting *Presley*, 502 U.S. at 503).

## 1.     The Secretary's Data Matching Is Not A Change For The Non-Covered State

Even if the State were a covered jurisdiction, the Secretary's data matching does not qualify as a "change" subject to Section 5 preclearance because it does not depart from the State's precleared benchmark and, in any event, has no "direct relation to voting and the election

process." *Presley*, 502 U.S. at 503. *First*, the Secretary's data matching "[m]erely *chang[es] the information relied upon*" to comply with the governing state statutes, *Lopez*, 2009 WL 1456487 at *9 (emphasis added), which require determination of who on the voter registration list might be an ineligible non-citizen and, thus, subject to removal after notice and a hearing, *see* § 97.041(1)(a)(2), Fla. Stat.; *id.* § 98.075(7).

As Plaintiffs recognize, Florida law limits the right to vote to citizens and requires the Secretary and supervisors to "conduct uniform, non-discriminatory registration list maintenance" and to "ensure maintenance of accurate and current voter registration records." Am. Compl. ¶¶ 19–20. Moreover, Section 98.075 requires the Secretary to "protect the integrity of the electoral process by ensuring the maintenance of accurate and current voter registration records." § 98.075(1), Fla. Stat. It further provides that if the Secretary or a county supervisor "receives information . . . that a registered voter is ineligible because he or she . . . is not a United States citizen," the supervisor is to remove the voter from the statewide voter rolls in compliance with the statutory notice and hearing procedure. *Id.* §§ 98.075(6), (7). And Section 98.093 authorizes the Secretary to access information from state and federal officials "[i]n order to identify ineligible registered voters and maintain accurate and current voter registration records." *Id.* § 98.093. All of these provisions have been precleared under Section 5. *See* June 6, 2012 Letter to DOJ; A Compilation Of The Election Laws Of The State Of Florida.

The Secretary long has implemented this statutory authority to obtain information bearing on voter eligibility from state and federal agencies and to transmit that information to county supervisors. The relevant precleared statutes specifically reference non-citizenship, along with out-of-state residence, mental incapacity, and felony convictions, as bases for removing ineligible individuals from the voter registration list. *See* § 98.075, Fla. Stat. Moreover, the

relevant precleared statute specifically authorizes the Secretary and supervisors of elections to receive information regarding voter ineligibility from new sources and to act on that information by following the statutory notice-and-hearing procedure. *See id.* § 98.075(6) (referring generally to "information from sources other than those identified in subsections (2)–(5)"). SAVE data matching is nothing more than the use of newly available sources of information to carry out the Secretary's statutory duty to verify voter eligibility and to maintain the voter registration list. *See id.*; *see also id.* § 98.093. Such a legally authorized effort is not a "change" to procedure *at all*, much less a change requiring preclearance. *Beer*, 425 U.S. at 138.

Indeed, under Plaintiffs' theory, *any* time the Secretary obtained information bearing on voter eligibility from a new source—whether a new government database, a newspaper article or internet report, or a tip from a private citizen—he would be required to obtain preclearance before providing that information to a county supervisor. This, of course, is not the law, *see Lopez*, 2009 WL 1456487 at *9, and directly contravenes the Secretary's precleared authorization to act on any "information . . . that a registered voter is ineligible because he or she . . . is not a United States citizen." § 98.075(6), Fla. Stat.

And this theory makes no sense because it would hamstring local authorities into using antiquated, unreliable sources of information to implement precleared voting practices and procedures unless and until it received preclearance to use new, more reliable sources of information. Such a freezing of local authorities would impede, rather than advance, the efficient discharge of precleared election laws. Indeed, creating such headwinds to excluding *ineligible* persons *impedes* Section 5's substantive goals because it *diminishes* the voting power of "citizens"—minority and nonminority—that is protected by Section 5. 42 U.S.C. § 1973c(b).

As this reflects, the *reason* the Secretary has sought SAVE data is that it is *more* accurate than the previously available data, and thus would *reduce* the number of "false positives" and the potential for *ad hoc*, subjective enforcement of the citizenship qualification. *See* Am. Compl. ¶ 36. On Plaintiffs' construction, however, Section 5 would prevent the State from using more reliable data to assess citizenship. *See id.*

The Justice Department acknowledges that precleared § 98.075 "provide[s] that the Department of State and Supervisors of Election could receive information from sources that [a]re not expressly identified in the statute to determine other bases of eligibility, including citizenship." SOI at 7. It then argues that preclearance of this "enabling legislation" does not prospectively preclear "any *changes affecting voting* proposed to be implemented pursuant to this legislation." *Id.* (emphasis added). This is true, but simply assumes the conclusion that a new source of information for a preexisting, precleared voting practice is itself a "change affecting voting." Here, the precleared "standard, practice or procedure," 42 U.S.C. § 1973c(a), is using government databases as information concerning whether persons on the voting rolls possess the requisite qualifications, including citizenship. Selecting among the subset of government databases so utilized is not a change from that precleared procedure; it is simply a fully contemplated implementation of that procedure. Gathering drivers license information from a different agency than that utilized at the time § 98.075 was precleared does not *change* any *procedure* affecting voting; it utilizes the *same* procedure with additional, new information.

The Justice Department's own Section 5 regulations confirm this obvious point. While those regulations list, for example, changes in "qualifications or eligibility for voting" as changes covered by Section 5, they provide no hint that changing the source of information for checking such eligibility could even potentially be a covered change. *See* 28 C.F.R. § 51.13. And, of

course, the fact that some jurisdictions, out of an abundance of caution or concern with costly litigation against the Justice Department over changes that cannot rationally be denied preclearance, have submitted data matching activities for preclearance (*see* SOI at 14–15) does not suggest that such preclearance was *required*.

*Second*, the Secretary's data matching does not fit within *any* of the four *Presley* categories and, thus, does not have the "direct relation to voting and the election process" required to trigger Section 5. *Presley*, 502 U.S. at 503. On its face, the Secretary's data matching did not "involve[] the manner of voting" or "candidacy requirements and qualifications," and did not "affect[] the creation or abolition of an elective office." *Id.* at 502–03. And while changing the *qualifications* for voter eligibility affects "the composition of the electorate," *id.* at 503, "[m]erely *changing the information relied upon*" to determine compliance with *existing* qualifications does not, *Lopez*, 2009 WL 1456487 at *9 (emphasis added). Plaintiffs concede as much because they do not allege that *every* administrative determination of ineligibility under Section 98.075(7) is itself subject to preclearance. The Justice Department asserts that "removing voters from the list of registered voters" is "a change in the composition of the electorate." SOI at 12. But, again, the Secretary's utilization of a citizen database does not in any way "remove voters" or change the qualifications for voting or the procedures for removing voters. All those stay the same; the only thing that changes is the data which is plugged into those preexisting procedures for removing ineligible voters. And, in any event, surely the Department is not suggesting that *improving* that data somehow *impermissibly* alters

the "composition of the electorate" by removing those who commit a federal crime if they try and illegally become part of the "electorate." *See* § 97.041(2)(b), Fla. Stat.[1]

Accordingly, the Secretary's data matching "had no impact on the . . . procedural question how an election would be conducted," *Presley*, 502 at 510, and did "not even arguably relate to the manner of voting or candidacy requirements," *Lopez*, 2009 WL 1456487 at *9. The Court should dismiss Plaintiffs' Amended Complaint.

2.    **The Secretary's Data Matching Is Not A Change In Any Covered County**

Regardless of whether the Secretary's data matching is a change on the *non*-covered state level, it is *not* a change to the "baseline" practice in any *covered county*. *Riley*, 553 U.S. at 421. For starters, Plaintiffs apparently agree that no covered county has implemented a change because they have not joined any such jurisdiction as a defendant in this case. *See* Am. Compl. ¶ 18. Moreover, Plaintiffs do not allege that any covered county has changed the qualifications for voter eligibility or the notice-and-hearing procedure for removing an ineligible individual from the voter registration list. *See id.* ¶¶ 34, 39.

Instead, the only actions by a covered jurisdiction that Plaintiffs identify are Hillsborough County's use of the matched data under the now-discontinued MDAVE process "as the basis for a mailing to demand that the recipients provide proof of their citizenship" (*id.* ¶ 34) and Collier County's "remov[al]" of individuals "from the voting rolls" (*id.* ¶ 39). But, as Plaintiffs acknowledge with their citation to "Fla. Stat. § 98.075(7)," Hillsborough County's mailing was

---

[1] While the Supreme Court in *Allen* gave "a broad interpretation to the right to vote," the Secretary's data matching does not trigger Section 5 even under that construction because it does not "alter[] the election law of a covered jurisdiction," relate to "the qualification of candidates or to state decisions as to which offices shall be elective," 393 U.S. at 564–66, or, as discussed *infra*, fit within any of the four *Presley* categories.

*required* by Florida's precleared notice-and-hearing removal procedure (*id.* ¶ 34)—and Plaintiffs do not allege that any citizen was erroneously removed from the rolls in Collier County or anywhere else (*id.* ¶ 39).  Indeed, *nothing* has changed for the county supervisors in the covered jurisdictions, which, even on Plaintiffs' theory, simply have implemented their baseline duty to initiate proceedings to remove "a registered voter" whenever they "receive[] information . . . that [he or she] is ineligible because he or she . . . is not a United States citizen."  § 98.075(6), Fla. Stat.; Am. Compl. ¶ 34; *see also Riley*, 553 U.S. at 421; *Lopez*, 2009 WL 1456487 at *8. Because no covered county has effected any "*change[]* in voting procedures," *Beer*, 425 U.S. at 138 (emphasis added), the Court should dismiss Plaintiffs' Amended Complaint.

## III.    PLAINTIFFS' REQUEST FOR STATEWIDE RELIEF SHOULD BE DISMISSED

Finally, in the alternative, and at a minimum, the Court should reject Plaintiffs' attempt to expand an alleged Section 5 violation in five Florida counties into a statewide injunction prohibiting the Secretary from implementing data matching and ordering him to "rescind[] [his] previous correspondence to county Supervisors of Elections," regardless of their location, and "advis[e]" them "that the distributed lists should not be used for any purpose.  Am. Compl. ¶¶ B–C; *see also* SOI at 18–19 (seeking to leverage purported "changes . . . in the covered counties" into a statewide injunction).  Because Section 5 provides a cause of action against only covered jurisdictions, *see supra* Part I, it authorizes relief only against those jurisdictions.  *Lopez II*, 525 U.S. at 284–86.  Section 5, therefore, does not authorize relief "to the extent" that an alleged change in voting practice or procedure affects a non-covered jurisdiction.  *Id.* at 284.  Indeed, a judicial extension of Section 5 to non-covered jurisdictions—jurisdictions for which Congress has developed no record and made no findings that would justify the extraordinary prophylactic remedy of preclearance—would likely be unconstitutional.  *Nw. Austin Mun. Utility Water Dist. v. Holder*, 129 S.Ct. 2504, 2511-12 (2009).  Thus, even if Plaintiffs could establish that the

Secretary's data matching pursuant to precleared state law were a "change" requiring

preclearance—which they cannot—they would not be entitled to any relief in the 62 non-covered

counties. At a minimum, the Court should dismiss all such requests for relief.[2]

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' First Amended Complaint

(DE 20).


Dated: August 20, 2012

Respectfully submitted,

/s/ Michael A. Carvin

| | |
|---|---|
| Daniel E. Nordby (Fla. Bar No. 14588) | Michael A. Carvin (D.C. Bar No. 366784) |
| General Counsel | John M. Gore (D.C. Bar No. 502057) |
| *Ashley E. Davis (Fla. Bar No. 48032) | JONES DAY |
| Assistant General Counsel | 51 Louisiana Ave., N.W. |
| Florida Department Of State | Washington, D.C. 20001 |
| R.A. Gray Building | Telephone: (202) 879-3939 |
| 500 South Bronough Street, Suite 100 | Facsimile: (202) 626-1700 |
| Tallahassee, FL 32399-0250 | macarvin@jonesday.com |
| Telephone: (850) 245-6536 | jmgore@jonesday.com |
| Facsimile: (850) 245-6127 | |
| Daniel.Nordby@DOS.MyFlorida.com | |
| Ashley.Davis@DOS.MyFlorida.com | |

*Middle District admission pending

Counsel for Defendant
Secretary of State Ken Detzner

---

[2] Moreover, because Plaintiffs allege to be residents of Hillsborough County (*see* Compl. ¶¶ 14–15), they suffer no harm from the Secretary's data matching in any other county and, thus, lack standing to challenge it. *See, e.g.*, *Sullivan v. Scott*, No. 11-10047, 2011 WL 4954261 (S.D. Fla. Oct. 18, 2011) (dismissing statewide Section 5 claim); *see generally Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992); *City of Los Angeles v. Lyons*, 461 U.S. 95, 101–02 (1983).

**CERTIFICATE OF SERVICE**

I hereby certify that on this 20th day of August, 2012, a true and correct copy of the foregoing will be sent electronically to the registered participants through the Court's CM/ECF system.

/s/ Michael A. Carvin