UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| MI FAMILIA VOTA EDUCATION FUND, as an organization; MURAT LIMAGE; PAMELA GOMEZ, <br><br> Plaintiffs. <br><br> v. <br><br> KEN DETZNER, in his official capacity as Florida Secretary of State, <br><br> Defendant. | CIVIL ACTION <br><br> FILE NO. 8:12-CV-1294-T-27 JDW- JSM-CRW |

## SUPPLEMENTAL STATEMENT OF INTEREST OF THE UNITED STATES

I. **INTRODUCTION**

The United States files this Supplemental Statement of Interest in opposition to Defendant's motion to dismiss Plaintiffs' first amended complaint, ECF No. 25, pursuant to 28 U.S.C. § 517, because this case presents an important question regarding the proper construction of Section 5 of the Voting Rights Act, 42 U.S.C. 1973c ("Section 5").[1] On July 27, 2012, the United States filed a Statement of Interest, ECF No. 22, in opposition to Defendant's initial motion to dismiss, ECF No. 16. The United States incorporates by reference its prior arguments in that Statement and the exhibits attached to ECF No. 22.

The State of Florida has adopted new database matching programs that result in the identification of registered voters who are subject to potential removal from the voter rolls on the basis of new citizenship verification procedures. These new practices and procedures have not been submitted for administrative or judicial preclearance pursuant to Section 5 of the Voting Rights Act. Despite a lack of preclearance, the initial version of Florida's new citizenship verification and removal procedures was implemented in Florida's covered counties.[2] Moreover, covered jurisdictions will continue to receive state directives and information resulting from the State's second database matching practices, using the Systematic Alien Verification for Entitlements ("SAVE") Program maintained by the Department of Homeland Security. ECF No.

---

[1] Pursuant to 28 U.S.C. § 517, "[t]he Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States. . . ." Under this provision, "[t]he United States Executive has the statutory authority, in any case in which it is interested, to file a statement of interest[.]" *Gross v. German Found. Indus. Initiative*, 456 F.3d 363, 384 (3d Cir. 2006).

[2] This Statement refers to the State's first or initial version of its database matching program (comparing records in the Florida Voter Registration System with data in the possession of the Florida Department of Highway Safety and Motor Vehicles) and to the State's second or subsequent database matching program (using data contained in the Department of Homeland Security's Systematic Alien Verification for Entitlements Program).

25 at 3. These practices and procedures are subject to preclearance under Section 5. In this case, as in all Section 5 enforcement actions, the United States has a strong interest in ensuring that Section 5 is vigorously and uniformly enforced. The United States therefore urges the Court to deny the Florida Secretary of State's motion to dismiss Plaintiffs' first amended complaint.

## II. LEGAL BACKGROUND

Florida's new voter registration list maintenance practices and procedures are voting changes that must be submitted for review before they can be implemented in the five counties subject to Section 5—Collier, Hardee, Hendry, Hillsborough, and Monroe Counties. Even though the State represents that it has stopped additional implementation of its first database matching program to identify registered voters subject to citizenship verification by Supervisors of Elections, some covered counties already implemented this unprecleared change, impacting voters (including voters being removed from the voter rolls). In addition, the State has entered into a Memorandum of Agreement with the Department of Homeland Security to access the SAVE Program as part of a new set of citizenship verification procedures. Going forward, the results of the second version of Florida's new citizenship verification procedures, which incorporate SAVE, will be distributed to Florida's Supervisors of Elections, including supervisors in the five covered jurisdictions. The United States respectfully submits that Defendant's arguments that Section 5 does not apply to these voting changes in the covered counties are contrary to the plain language of Section 5 and would lead to results that would undermine Congress's intent that all voting changes impacting covered jurisdictions must be submitted either to the U.S. Department of Justice for administrative review, or to a three-judge panel in the District Court of the District of Columbia for judicial review.

Section 5 applies to all changes of "any voting qualification or prerequisite to voting, or standard, practice or procedure with respect to voting" adopted or sought to be implemented by covered jurisdictions, and the Act defines the term "voting" very broadly. 42 U.S.C. §§ 1973c, 1973*l*(c)(1). The Supreme Court has made clear that, in covered jurisdictions, "all changes in voting must be precleared." *Presley v. Etowah Cnty Comm'n*, 502 U.S. 491, 501 (1992). In this case, the State of Florida had previously submitted voting changes related to its implementation of voter registration list maintenance procedures involving the use of database matching. *See* ECF No. 22 at 2, 6-9.

Pursuant to Sections 12(d) and (f) of the Voting Rights Act, 42 U.S.C. § 1973j(d) & (f), the United States or private plaintiffs can bring coverage actions to enjoin enforcement of unprecleared changes. Coverage actions are heard by three-judge federal district courts convened in jurisdictions covered by Section 5. Such courts may consider only "coverage" questions, determining "whether a particular state enactment is subject to the provisions of the Voting Rights Act, and therefore must be submitted for approval before enforcement." *Allen v. State Bd. of Elections*, 393 U.S. 544, 559-60 (1969). In such coverage cases, a court "lacks authority to consider the discriminatory purpose or nature of the changes." *Lopez v. Monterey County*, 519 U.S. 9, 23 (1996) (*Lopez I*). The Supreme Court has repeatedly held that there are only three issues to be decided in a coverage action: "whether § 5 covers a contested change, whether § 5's approval requirements were satisfied, and if the requirements were not satisfied, what temporary remedy, if any, is appropriate" until the change is precleared or abandoned. *Id.*; *see also McCain v. Lybrand*, 465 U.S. 236, 251 n. 17 (1984) (same); *City of Lockhart v. United States*, 460 U.S. 125, 129 n. 3 (1983) (same). This three-part test must be applied in a Section 5 enforcement action such as the present case.

The language of Section 5 is clear: "any voting qualification or prerequisite to voting or standard, practice or procedure with respect to voting" adopted or sought to be implemented by covered jurisdictions must be submitted for preclearance. 42 U.S.C. § 1973c(a); *Presley*, 502 U.S. at 501; *see also Allen*, 393 U.S. at 566 ("Congress intended to reach any state enactment which altered the election law of a covered State in even a minor way"); *Clark v. Roemer*, 500 U.S. 646, 652 (1991) (voting changes in covered jurisdictions "will not be effective as law until and unless [pre]cleared.") (internal quotations and citations omitted).

In this case, Collier, Hardee, Hendry, Hillsborough, and Monroe Counties are subject to the preclearance requirements of Section 5. *See* 40 Fed. Reg. 43,746 (1975); 41 Fed. Reg. 34,329 (1976). In states that are partially covered by Section 5, the Supreme Court has recognized that "§ 5's preclearance requirement applies to a covered county's nondiscretionary efforts to implement a voting change required by state law, notwithstanding the fact that the State is not itself a covered jurisdiction." *Lopez v. Monterey Cnty*, 525 U.S. 266, 282 (1999) (*Lopez II*). Further, "[a] State, whether partially or fully covered, has authority to submit any voting change on behalf of its covered jurisdictions and political subunits," and indeed, submissions by the State serve its interests in that "the State is better able to explain to the Attorney General the purpose and effect of voting changes it enacts than are the individual covered jurisdictions." 28 C.F.R. § 51.23. As a majority of a three-judge panel in *Bone Shirt v. Hazeltine*, 200 F. Supp. 2d 1150, 1156 (D.S.D. 2002) found, "Congress intended that either the legislative body that enacted the legislation or the executive body that was responsible for administering the legislation would be responsible for obtaining preclearance." The Court in that case concluded that the State was the appropriate defendant for a Section 5 enforcement action, even though only two counties in South Dakota were subject to Section 5's requirements. *Id.* (holding that "[u]nder the plain

meaning of the Voting Rights Act, the State of South Dakota is an entity that must secure preclearance from the Attorney General or bring a declaratory judgment action" for review of a law passed by the state legislature that impacts voting in the covered counties); *see also Haith v. Martin*, 618 F. Supp. 410, 412 (E.D. N.C. 1985) (noting, with regard to the partially-covered State of North Carolina, that state "[d]efendants must submit . . . changes for preclearance"), *aff'd*, 477 U.S. 901 (1986); *Clayton v. North Carolina Bd. of Elections*, 317 F. Supp. 915, 919 (E.D. N.C. 1970) (enjoining, in covered counties, an unprecleared state law in a partially covered state in a case filed against state actors). Florida is the appropriate authority to submit the changes at issue here.

### III. FLORIDA'S DATABASE MATCHING PROGRAMS ARE CHANGES AFFECTING VOTING THAT MUST BE SUBMITTED FOR PRECLEARANCE PURSUANT TO SECTION 5

Both versions of Florida's new non-citizen voter verification practices and procedures are unsubmitted changes that differ from the State's benchmark procedures previously in force or effect. These procedures are directly related to voting and the ability to have a cast ballot properly counted. *See* 42 U.S.C.1973*l*(c)(1); *see also Presley*, 502 U.S. at 509 ("Our prior cases hold, and we reaffirm today, that every change in rules governing voting must be precleared."); *Allen*, 393 U.S. at 565 ("The Voting Rights Act was aimed at the subtle, as well as the obvious, state regulations which have the effect of denying citizens their right to vote because of their race"). Unlike *Presley*, which held that changes affecting "the allocation of power among governmental officials" was not a covered change, Florida's new non-citizen list maintenance practice and procedures "bear a direct relation to voting itself." *See* 502 U.S. at 510. Indeed, practices and procedures directly related to removing registered voters from the list of eligible voters is a change "in the composition of the electorate." *See id.* at 502-03.

A.       **The Practice at Issue Here is a Change Subject to Section 5 Review**

Practices and procedures that impact determinations regarding voter qualifications are subject to preclearance under Section 5. In *Presley*, the Supreme Court agreed that "all changes in voting must be precleared and . . . that the scope of § 5 is expansive within its sphere of operation. That sphere comprehends all changes to rules governing voting, changes effected through any of the mechanisms described in the statute. Those mechanisms are any 'qualification or prerequisite' or any 'standard, practice, or procedure with respect to voting.'" 502 U.S. at 501-02. But Defendant asserts that there is no change in voting practices or procedures because the Florida Department of State's new citizenship verification programs relate to an established voting qualification—citizenship. *See* ECF No. 25 at 15, 22. Because voting qualifications determine who is registered to vote, however, changes to procedures concerning who is an eligible voter must be reviewed pursuant to Section 5. *See* 42 U.S.C. § 1973c(a).

Defendant also argues that no change has occurred because it "merely" changed the "information relied upon to confirm compliance with valid voter eligibility requirements." *See* ECF No. 25 at 16-18 (citing *Lopez v. City of Houston*, 2009 WL 1456487 (S.D. Tex. 2009), *aff'd* 617 F.3d 336 (5th Cir. 2010) (finding claims were moot and not ripe)). A voting change occurs, however, when the challenged practice differs from the practice in effect before the challenged practice was implemented. *See Presley*, 502 U.S. at 495 ("To determine whether there have been changes with respect to voting, we must compare the challenged practices with those in existence before they were adopted"). And even minor changes that reflect policy choices made by state officials require preclearance. *Young v. Fordice*, 520 U.S. 273, 284 (1997).

Defendant's reliance on *Lopez v. City of Houston* therefore is misplaced. The district court's finding in *City of Houston* concerned an interpretation of the city charter and whether the city met certain population thresholds that required the addition of two new seats; in that case, the jurisdiction had failed to take any action to add two new seats. *See City of Houston*, 2009 WL 1456487 at *7-8 (finding that the benchmark practice "is to be determined from the practice or standard actually followed by the defendant jurisdiction" and that "it is undisputed that . . . the City Council has not increased the number of Council positions."). In *City of Houston*, the *status quo* remained the same, in that the City had not taken any action, even though plaintiffs believed that available data showed that the population threshold had been met and warranted the addition of two new seats. Here, in contrast, the State has affirmatively changed the status quo by taking actions directly impacting the eligibility of voters in the covered counties: the State has implemented new practices and procedures for identifying a category of registered voters, distributing the results of such practices as a basis for the removal of registered voters, and removing those identified voters if they do not comply with new citizenship verification procedures. As a result, registered voters in covered jurisdictions have been impacted by the unprecleared changes enacted by Defendant. *See* ECF No. 22, Exhibit 3. The State plans to repeat this process with its subsequent SAVE database matching program. Unlike *City of Houston*, Florida's new citizenship verification practices and procedures (both its first and second versions) are squarely within the scope of Section 5.

    **1.**    **The Department Has Not Precleared Either the State's Initial or Subsequent Procedures Using Database Matching to Identify and Remove Voters Based on Citizenship Grounds**

The United States' prior Statement of Interest outlined the previous submissions under Section 5 of the Voting Rights Act by the State of Florida in 2005 and 2011 that address database

matching pursuant to State law, and as explained in that Statement, these submissions did not identify any new citizenship database verification procedures for which the State sought preclearance. ECF No. 22 at 6-9; *see also* ECF No. 22, Exhibits 1a-1c, 2a-2c. On September 6, 2005, the Department precleared certain submitted changes but specifically noted that "Chapter 287, Section 20 (2005) that amends F.S. 98.075, which pertains to voter registration record maintenance activities" was "enabling in nature[ ] . . . [t]herefore, the State of Florida is not relieved of its responsibility to seek Section 5 review of any changes affecting voting proposed to be implemented pursuant to this legislation." *See* ECF No. 22, Exhibit 1d at Att. A, p. 7 (¶ 89) and pp. 1-2 (noting that enabling legislation is identified with an asterisk in the attachment). A subsequent submission by the State, of portions of Chapter 2011-40, identified additional sources of information pertaining to the removal of deceased registrants and persons with felony convictions or mental incapacitation adjudications whose voting rights were not restored. The State's submission of Chapter 2011-40 did not, however, address database matching programs designed to identify non-citizens. On August 8, 2011, the Department precleared portions of Chapter 2011-40 for which the State sought administrative preclearance and noted that "Chapter 2011-40 include[ed] provisions that [were] enabling in nature. Therefore, any changes affecting voting that are adopted pursuant to this legislation will be subject to Section 5 review." ECF No. 22, Exhibit 2d.

As a result, new programs to check citizenship eligibility (whether the State's initial database matching program or its new program using SAVE) are changes that require Section 5 review, and the precleared amendments to F.S. 98.075 in 2005 were "enabling" in nature. *See* Procedures for the Administration of Section 5 of the Voting Rights Act, 28 C.F.R. § 51.15 ("With respect to legislation (1) that enables or permits the State or its political subunits to

institute a voting change . . . the failure of the Attorney General to interpose an objection does not exempt from the preclearance requirement the implementation of the particular voting change that is enabled, permitted, or required, unless that implementation is explicitly included and described in the submission of such parent legislation."); *see also Fordice*, 520 U.S. at 285 ("Insofar as [voting practices and procedures] embody discretionary decisions that have a potential for a discriminatory impact, they are appropriate matters for review under §5's preclearance process").

New database matching programs are required to be submitted for Section 5 review. *See, e.g.*, Order, *Morales v. Handel*, 1:08-CV-3172, at 21-22 (N.D. Ga. Oct. 27, 2008) (holding that the State's "comparison of information [between two] databases that results in the identification of applicants whose eligibility could not be verified" constitutes a voting change and must be submitted for Section 5 review) (ECF No. 22, Exhibit 5); *see also Curtis v. Smith*, 121 F. Supp. 2d 1054, 1060 (E.D. Tex. 2000) (upon review of *en masse* challenges of residency, the court determined that "[s]uch an action, representing a change from 'more than one' to over 9,000 in one fell swoop, coupled with the timing of the challenges before us, must be precleared in accordance with § 5 of the Voting Rights Act.");. And as outlined in the initial Statement of Interest, Florida and other jurisdictions have submitted their database matching procedures for Section 5 review. *See* ECF No. 22 at 14-15. The State must therefore submit its new database matching procedures for Section 5 review here, as well.

### 2. Defendant Established New Procedures for the Removal of Registered Voters

Defendant asserts that the Department of State's new practices and procedures do "not in any way 'remove voters' or change the qualifications for voting or the procedures for removing voters," but this assertion does not reflect the actual practices and procedures implemented by

Defendant. *See* ECF No. 25 at 22. In April 2012, the Florida Department of State prepared a power point presentation entitled "Processing Ineligible Registered Voters-Non-Immigrants." ECF No. 22, Exhibit 10. In a series of slides entitled "What to Do," Defendant instructed Supervisors of Election on the new procedures and practices for verifying citizenship based on the information provided by the Secretary of State. *See id.* at 8-19. Significantly, Florida instructed its Supervisors of Elections to accept five documents as proof of citizenship for registered voters who received letters as a result of Florida's citizenship verification program. *See id.* at 14. The instructions directed Supervisors to "contact USCIS for confirmation" of the citizenship of certain persons, including persons born in certain U.S. territories, such as Puerto Rico. *Id.* Defendant also directed Supervisors of Elections to require documentation for name changes if a registered voter appeared on the Secretary of State's list and noted that "the voter will have to provide [the] court order or marriage license showing authorized name change." *Id.* All of these procedures are new, instituted at the direction of the Defendant, and not included or identified in the submissions of precleared statutes, practices, and procedures. *See* ECF No. 22, Exhibits 1a-1d, 2a-2d. Changes must be unambiguously submitted in order to receive Section 5 preclearance. *NAACP v. Hampton Cnty Election Comm'n*, 470 U.S. 166, 182 (1985) ("The Attorney General cannot be said to have validated these changes, retroactively or otherwise, because they were never before him."). Because the benchmark is clearly outlined in Florida's code and its previous submission materials, Defendant's new practices and procedures constitute new voting changes subject to preclearance. *See McCain*, 465 U.S. at 256-57. The implementation of these new practices and procedures without preclearance violates Section 5. *Connor v. Waller*, 421 U.S. 656 (1975) (per curiam) ("Those Acts are not now and will not be effective as laws until and unless [pre]cleared pursuant to § 5.").

**B.     The State Is an Appropriate Defendant Here as the Counties Have Implemented the Change at the Direction of the State**

Statewide voting changes in non-covered states that include covered jurisdictions are subject to preclearance. *See Lopez II*, 525 U.S. at 282. The Florida Secretary of State is the appropriate defendant in this Section 5 enforcement action. *See Bone Shirt*, 200 F. Supp. 2d at 1155-56; *Haith*, 618 F. Supp. 410; *see also Clayton*, 317 F. Supp. at 919. First, the Florida Secretary of State has the authority to establish written practices, and the State has previously submitted written directions, practices, and procedures concerning Florida's database matching programs, similar to the one here, for preclearance. *See, e.g.*, ECF No. 22, Exhibit 1c at 5-7 & Exhibit 2c at 5. Second, "Florida's election system consists of the Legislature, the Department of State, and the Supervisors of Elections for Florida's sixty-seven counties. Within the statutory framework governing elections, the Legislature has authorized the Department of State to issue binding interpretations of the election laws." *Wexler v. Lepore*, 342 F. Supp. 2d 1097, 1099 (S.D. Fla. 2004), *aff'd Wexler v. Anderson*, 452 F.3d 1226 (11th Cir. 2006). Third, Defendant has exercised his discretion and instituted a new practice and procedure to compare the statewide voter registration database to another database for the purpose of identifying voters for removal from the voter registration list. *See* ECF No. 22, Exhibit 10 (April PowerPoint presentations). In the subsequent version of the program, the State's new citizenship verification practices and procedures include the use of data maintained by the SAVE Program. The incorporation of a different database as part of the State's new citizenship verification practices and procedures does not mean, however, that the entire citizenship program is not a change. In fact, state officials provided directives concerning the types of documents to accept as proof of citizenship, and supervisors followed these directives. The Secretary of State therefore is the appropriate

state election official to submit the new citizenship list maintenance provisions on behalf of the covered counties.

In addition, state officials from partially covered jurisdictions have standing to act as a plaintiff in a Section 5 declaratory judgment action in the District Court of the District of Columbia. For example, the State of Florida filed such an action relating to other voting changes in 2011. *See, e.g., Florida v. United States*, --- F. Supp. 2d ---, 2012 WL 3538298 (D.D.C. Aug. 16, 2012) (three-judge court). It would be highly unusual for Florida to be the appropriate plaintiff to bring a Section 5 lawsuit seeking judicial preclearance but not be an appropriate defendant for a Section 5 enforcement action. And only the State can fully "explain to the Attorney General the purpose and effect of voting changes it enact[ed]." *See* 28 C.F.R. § 51.23. In fact, all of the information regarding the development of the initial citizenship list maintenance requirement is within the Secretary's control because Supervisors in the covered jurisdictions did not develop the list maintenance practices or the procedures ultimately implemented. Similarly, all information concerning the new citizenship procedures and practices that use the SAVE Program is exclusively in the Secretary's control because the covered jurisdictions are not parties to the Memorandum of Agreement with the U.S. Department of Homeland Security concerning access to the SAVE Program and have no role in the creation of the procedures used when accessing SAVE.

### IV. HAVA NEITHER REQUIRES THE STATE'S SPECIFIC PROGRAM NOR EXEMPTS COMPLIANCE FROM SECTION 5'S REQUIREMENTS

Finally, as explained in greater detail in the United States' initial Statement of Interest, *see* ECF No. 22 at 9-11, 17-18, the Help America Vote Act ("HAVA") does not require the citizenship verification procedures implemented by the Defendant. None of HAVA's provisions impose a non-discretionary duty for Florida to initiate its new citizenship list maintenance

program. *See* ECF No. 22 at 17-18. HAVA allows discretion for states to adopt more strict provisions not required or mentioned by HAVA, and such discretionary efforts are still subject to review under Section 5 of the Voting Rights Act. *See Fordice*, 520 U.S. at 290-91. Here, as in *Fordice*, Florida's discretionary decision to implement a new list maintenance practice and distribute the results as a "source" for determining ineligibility under Fla. Stat. 98.075(6) is a change that must be submitted for review. *See McDaniel v. Sanchez*, 452 U.S. 130, 153 (1981) (whenever "a proposal reflect[s] the policy choices of the elected representatives of the people . . . the Voting Rights Act is applicable"); *Fordice*, 520 U.S. at 290. Accordingly, the Department of Justice informed Florida that the changes at issue in this litigation are subject to Section 5. *See* ECF No. 22, Exhibit 4; *see also* ECF No. 22, Exhibits 1d & 2d. And the Supreme Court has observed that the Attorney General's interpretation of Section 5 is entitled to substantial deference. *Lopez II*, 525 U.S. at 281.

## V. CONCLUSION

The initial unprecleared citizenship verification program resulted in changes to the voter registration lists in the covered counties, and the new database matching program and removal procedures, incorporating the SAVE Program, will also apply to covered jurisdictions. These changes have not been precleared. Section 5 is unambiguous. Unless and until preclearance for a new voting practice is obtained from the United States District Court in the District of Columbia or the Attorney General, "no person shall be denied the right to vote for failure to comply with such" practice. 42 U.S.C. § 1973c. "If a voting change subject to § 5 has not been precleared, § 5 plaintiffs are entitled to an injunction prohibiting implementation of the change." *Lopez I*, 519 U.S. at 20; *see also Clark*, 500 U.S. at 652-53; *Allen*, 393 U.S. at 571-72. For the foregoing reasons, the Court should deny the State's motion to dismiss.

Date:  September 4, 2012

Respectfully submitted,

THOMAS E. PEREZ
Assistant Attorney General
Civil Rights Division


*/s/ Jenigh J. Garrett*

_____

T. CHRISTIAN HERREN JR
JOHN ALBERT RUSS, IV
California Bar No. 192471
ELISE SANDRA SHORE
Georgia Bar No. 557131
JENIGH J. GARRETT
New York Bar No. 4230124
Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
Tel:  (202) 305-0070
Tel:  (202) 353-7738
Fax:  (202) 307-3961
john.russ@usdoj.gov
elise.shore@usdoj.gov
jenigh.garrett@usdoj.gov

## Certificate of Service

I certify that a true and correct copy of the foregoing will be sent electronically to the registered participants (filed through EM/ECF system), on this the 4th day of September, 2012:

*/s/ Jenigh J. Garrett*
_____
Jenigh J. Garrett