UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MI FAMILIA VOTA EDUCATION FUND,
as an organization; MURAT LIMAGE;
PAMELA GOMEZ,

    Plaintiffs,

v.                                        Civil Action No.: 08:12-cv-01294

KEN DETZNER, in his official capacity as
Florida Secretary of State,

    Defendant.
_____/

**THE SECRETARY'S REPLY IN SUPPORT OF MOTION TO DISMISS**
**FIRST AMENDED COMPLAINT**

        Plaintiffs' Opposition to Defendant's Motion to Dismiss ("Opp.") and the Department of Justice's Supplemental Statement of Interest ("Supp. SOI") offer no coherent construction of Section 5 to support, much less justify, Plaintiffs' decision to file suit against the non-covered State instead of the Supervisors of Elections ("supervisors") in Florida's five covered counties. In fact, Plaintiffs and the Department have confirmed that the Section 5 "change" they allege is reliance on a new source of information to "administer" Florida's precleared notice-and-hearing procedure for removing ineligible voters (*see* Opp. at 9–12, Supp. SOI at 6–10)—but that procedure is administered by county supervisors alone, not the Secretary. And even though the Amended Complaint sought a statewide injunction ordering the Secretary to cease data matching and to prevent use of the data matching results by county supervisors in "any" county (*see* Am. Compl. ¶¶ B–C (DE 20)), Plaintiffs have belatedly awoken to the statutory and constitutional limits on Section 5's scope, and now seek only "an injunction against enforcement of the changes in the [five] covered counties" (Opp. at 12). Thus, under Plaintiffs' own theory, they

would have *no* Section 5 claim if the five covered counties had not relied on the data matching results to initiate the precleared notice-and-hearing procedure to remove ineligible individuals. *See id.* at 9–12. The fact that *covered counties did* initiate that procedure does not transform *the State* into a covered jurisdiction or trigger a right of action against it, and Plaintiffs' Amended Complaint should be dismissed. *See* Def's Mot. to Dismiss at 10–14 (DE 25) ("Mot.").

Plaintiffs and the Department also nowhere dispute that their construction of Section 5's "change" element would freeze local authorities into relying on outdated, less reliable sources of information to confirm voter eligibility unless and until new sources received preclearance. *See* Mot. at 20. Indeed, the Department appears to embrace this reading because it contends that the Secretary's commonsense recommendation that county supervisors confirm citizenship status with U.S. Customs and Immigration Services ("USCIS") before removing individuals from the voter rolls was itself a change requiring preclearance. *See* Supp. SOI at 10. Yet this interpretation of Section 5 contravenes the governing law, unduly burdens local authorities, and actually undermines the effective exercise of the right to vote by all citizens, minority and otherwise, whose votes are diluted by ineligible individuals' illegal voting. Thus, even if the Court holds that Section 5 provides a cause of action against the non-covered State, it should reject Plaintiffs' contorted reading of the statute and dismiss the Amended Complaint.

## I. SECTION 5 DOES NOT PROVIDE A CLAIM AGAINST THE STATE

As the Secretary has explained (*see* Mot. at 10–14), the Court should dismiss the Amended Complaint because Section 5 does not provide a cause of action against the non-covered State or the Secretary in his official capacity as "the chief election officer of Florida" (Am. Compl. ¶ 18). Instead, Plaintiffs' Section 5 claim runs, if at all, only against the county supervisors in Florida's five covered counties—yet Plaintiffs have declined to sue any such supervisor. *See* Mot. at 10–14.

Plaintiffs and the Department nowhere explain why Plaintiffs decided to sue the non-covered State and Secretary instead of the supervisors in the covered counties, even though a suit against those county officials—it is undisputed—would provide full relief for their claimed Section 5 violation. Rather, they offer five arguments in an attempt to avoid the dismissal required by that decision, all of which fail. *First*, Plaintiffs and the Department belabor the undisputed point that the Secretary is "the chief election officer of Florida, and as such, is responsible for the administration of state laws affecting voting." Opp. at 7; *see also* Supp. SOI at 11–12. But this truism is irrelevant because the State is *not* a covered jurisdiction—so the Secretary's authority to administer *state* law does not vest Plaintiffs with a Section 5 claim against him. *See, e.g.*, Mot. at 12.

Plaintiffs' and the Department's position that Plaintiffs have a cause of action against the non-covered State not only contorts the plain terms of Section 5, but also is fundamentally irreconcilable with their theory of the case. Plaintiffs and the Department acknowledge that the underlying statewide Florida statutes, sections 98.075 and 98.093, have been precleared under Section 5. *See, e.g.*, Opp. at 11–12; Supp. SOI at 7–8. They therefore challenge only the *administration* of those statutes to remove ineligible individuals from the voter rolls based on the results of the Secretary's data matching and in accordance with the precleared notice-and-hearing procedure. *See* Opp. at 9–12; Supp. SOI at 6–10. At the same time, Plaintiffs have amended their operative pleading on the fly to abandon any prayer for a statewide injunction. *See* Opp. at 12. Thus, Plaintiffs seek redress for an alleged Section 5 violation that pertains to a purported change in the administration of a precleared law only in Florida's five covered counties. *See* Opp. at 9–12; *see also* Supp. SOI at 6–10.

This theory of liability affirmatively forecloses Plaintiffs' suit against the State because

3

the Secretary is *not* responsible for administering the precleared notice-and-hearing procedure or removing any ineligible individual from the voter rolls. Rather, the county supervisor alone performs those functions. *See* §§ 98.075(6)–(7), Fla. Stat. Thus, Plaintiffs' real complaint is with the supervisors in covered counties who, to the extent they have taken *any* action, have simply complied with their duty under precleared Florida law to initiate notice-and-hearing procedures whenever they receive information that an individual is ineligible to vote. *See id.*; Opp. at 9–12. Indeed, under Plaintiffs' theory, if the supervisors in the covered counties had done nothing with the results of the Secretary's data matching, Plaintiffs would have no Section 5 cause of action *at all*, let alone against the non-covered State. *See* Opp. at 9–12. The only difference here is that those supervisors in the covered counties who received information regarding potential ineligibility fulfilled their statutory duty under precleared state law—but that action does not transform the State into a covered jurisdiction or a proper defendant. Plaintiffs' failure to sue the supervisors instead of the State is therefore fatal to this suit. *See* Mot. at 10–14.

*Second*, Plaintiffs and the Department recycle their citation to *Bone Shirt v. Hazeltine*, 200 F. Supp. 2d 1150 (D.S.D. 2002) (three-judge panel) (*see* Opp. at 7; Supp. SOI at 4–5, 11)—but that case only underscores that Plaintiffs have no Section 5 claim against the Secretary (*see* Mot. at 13–14). The question there was whether South Dakota could be ordered to submit for preclearance a legislative enactment adopting a new statewide redistricting plan. *See* 200 F. Supp. 2d at 1154–57. As Plaintiffs' and the Department's own quotations illustrate, the two-judge majority concluded that such an order could issue because, under Section 5, "either the legislative body *that enacted the legislation* or the executive body that was *responsible for administering it* [is] responsible for obtaining preclearance." *Id.* at 1156 (emphasis added) (quoted at Opp. at 7; Supp. SOI at 4). Thus, because the South Dakota Legislature had

4

"enact[ed] [the] legislation," the State of South Dakota was a proper Section 5 defendant. *Id.*

Here, by contrast, Plaintiffs and the Department concede that the *legislation* has been precleared and therefore challenge only an alleged "change" in the administration of the precleared notice-and-hearing procedure. *See* Opp. at 9–12; Supp. SOI at 6–10. But county supervisors, not the Secretary, are "responsible for" administering that procedure and any changes to it. *See id.*; *see also* Mot. at 14–23. Thus, far from granting Plaintiffs a Section 5 claim against the non-covered State, *Bone Shirt* confirms that Plaintiffs have no such claim and that the Amended Complaint should be dismissed.

*Third*, Plaintiffs' invocation of the decision in *Janis v. Nelson*, No. 09-5019, 2009 WL 5216902 (D.S.D. Dec. 30, 2009) (cited at Opp. 8), merely repeats their misreading of the governing law. There, citing *Bone Shirt*, the court held that state officials could be joined in a Section 5 suit also naming local officials because they were the executive officials responsible for administering challenged "rules pertaining to voting matters, including the uniformity of election procedures, voter file maintenance, and implementation of the NVRA." *Id.* at *7 (citing *Bone Shirt*, 200 F. Supp. 2d at 1156). Here, the supervisors in the covered counties, rather than the State, are responsible for administering the alleged change that Plaintiffs challenge, so *Janis* again confirms that Plaintiffs' claim runs, if at all, against the supervisors in the covered counties.

*Fourth*, the Department contends that "[i]t would be highly unusual for Florida to be the appropriate plaintiff to bring a Section 5 lawsuit seeking judicial preclearance but not be an appropriate defendant for a Section 5 enforcement action." Supp. SOI at 12. Yet the Section 5 action that the State filed and the Department cites was brought on behalf of the five covered counties and involved statewide legislation enacted by the Florida Legislature, not a county supervisor's administration of a precleared statute. *See Florida v. United States*, _ F. Supp. 2d _,

5

2012 WL 3538298 (D.D.C. Aug. 16, 2012). It therefore is precisely the kind of Section 5 action implicating the non-covered State, *see Bone Shirt*, 200 F. Supp. 2d at 1156, and proves precisely nothing, let alone something "unusual" (Supp. SOI at 12), about the conclusion that Plaintiffs have no Section 5 cause of action against the State here.

In any event, states have a direct interest in upholding the validity of statewide legislation, including its administration by the counties—and because counties are creatures of the state, a state also has an interest in advocating on their behalf. Yet the conclusion that a state may assert the interests of a covered county does not rewrite Section 5 or otherwise transform a non-covered state into a covered entity against whom a Section 5 claim may be brought or Section 5 relief may be compelled.

*Finally*, the Department reveals the true motivation for insisting on a suit against the State with its contention that "only the State can fully explain" the data matching and "all of the information regarding the development of the initial citizenship list maintenance requirement . . . [and] the new citizenship procedures and practices that use the SAVE Program is exclusively in the Secretary's control." Supp. SOI at 12. But Plaintiffs' and the Department's request for a fishing expedition into the Secretary's activities is a sleight of hand. Information regarding how the Secretary conducted and developed the data matching is wholly irrelevant because, on Plaintiffs' theory, *any* unprecleared use of the data matching results as a basis for the county supervisors' removal of ineligible individuals is a Section 5 violation. *See, e.g.*, Opp. at 9–12; Supp. SOI at 6–10. Thus, the only question presented is the purely legal one whether the county supervisors' use of those results is a Section 5 change—a question on which the particulars of the Secretary's data matching has absolutely no bearing. *See, e.g., Allen v. State Bd. of Elections*, 393 U.S. 544, 558–59 (1969) (holding that the threshold "coverage" question examines only

"whether a particular state enactment is subject to the provisions of the Voting Rights Act"); *Lopez v. Monterey Cnty.*, 519 U.S. 9, 23 (1996) (holding that the inquiry in an *Allen* suit is "whether § 5 covers a contested change"). Plaintiffs and the Department therefore have no right or reason to obtain discovery into the activities of the non-covered State, and the Court should reject the gratuitous expansion of the statutory text offered to justify it. *See* Mot. at 10–14.

## II. THE SECRETARY'S DATA MATCHING IS NOT A CHANGE REQUIRING SECTION 5 PRECLEARANCE

Even if Plaintiffs had a Section 5 cause of action against the non-covered State, the Court still should dismiss the Amended Complaint because the Secretary's data matching and provision of results to county supervisors, whether based on MDAVE, SAVE, or some other new source, is not a change subject to preclearance. *See* Mot. at 14–23. Plaintiffs and the Department nowhere dispute the Secretary's showing that "under Plaintiffs' theory, *any* time the Secretary obtained information bearing on voter eligibility from a new source—whether a new government database, a newspaper article, or a tip from a private citizen—he would be required to obtain preclearance before providing that information to a county supervisor." *Id.* at 20 (emphasis in original). In fact, instead of offering a limiting principle for their reading of Section 5, Plaintiffs and the Department rehash four arguments why the Court should countenance this freezing of the efficient discharge of precleared election laws, none of which is persuasive.

*First*, the Department observes that "[b]ecause voting qualifications determine who is registered to vote, . . . changes to procedures concerning who is an eligible voter must be reviewed pursuant to Section 5." SOI Supp. at 6. Yet regardless of the truth of that observation, it is wholly inapposite here because the Secretary did *not* change any "voting qualifications" or "procedures concerning who is an eligible voter." *Id.* Rather, the Secretary matched new sources of information to confirm eligibility under the *existing* citizenship qualification, and

7

transmitted the results of that matching to county supervisors.

For this same reason, Plaintiffs are simply incorrect when they attempt to shoehorn this case into the controlling framework of *Presley v. Etowah County Comm'n*, 502 U.S. 491 (1992), with the assertion that the Secretary's data matching has "a direct impact on 'the manner of voting' and 'the composition of the electorate.'" Opp. at 10 (quoting *Presley*, 502 U.S. at 502–03). The flaw in this assertion is the assumption that ineligible non-citizens have the right to vote and form a protected part of the electorate, when in fact their attempt to register or to vote is a criminal offense. *See* § 97.041(2)(b), Fla. Stat. Thus, far from retrogressing the exercise of "the right to vote" of "any citizens of the United States," the Secretary's data matching and the county supervisors' reliance on the results to remove ineligible individuals after notice and a hearing *preserves* that hallowed right by remedying the dilution of citizen voting power caused by ineligible non-citizens' illegal voting. 42 U.S.C. § 1973c(b); *see also Anderson v. United States*, 417 U.S. 221, 227 (1974) ("Every voter . . . has a right under the Constitution to have his vote fairly counted, without its being distorted by fraudulently cast votes."); *Purcell v. Gonzales*, 549 U.S. 1, 3 (2006) ("Voters who fear their legitimate votes will be outweighed by fraudulent ones will feel disenfranchised."); Mot. at 14–23. (And, again, any *removal* of voters affecting the "composition of the electorate" is done by the covered *counties*, not the State.)

*Second*, Plaintiffs and the Department attempt to avoid the decision in *Lopez v. City of Houston*, 2009 WL 1456487 (S.D. Tex. 2009), *aff'd*, 617 F.3d 336 (5th Cir. 2010), on meritless grounds. The Department contends that *City of Houston* is distinguishable because the City's failure to add two seats to the City Council meant that "the *status quo* remained the same." Supp. SOI at 7. But the plaintiffs' allegation in *City of Houston* was that the status quo had *not* remained the same because "the City Council ha[d] changed the standard for triggering [the

8

charter's] mandate to increase the size of the Council from fourteen to sixteen members." *City of Houston*, 2009 WL 1456487, *6. Specifically, the plaintiffs contended that the City Council previously had relied on population estimates to trigger the size provision, and without preclearance shifted to reliance on nine year-old census data. *See id.* *6–7. Thus, contrary to the Department's mischaracterization, the issue was not whether the City Council had changed the *number of seats*, but instead the *information relied on* to trigger such a change. *See id.* And the Southern District of Texas squarely held that "[m]erely *changing the information relied upon*" was not a Section 5 change. *Id.* at *9 (emphasis added).[1]

Here as well, neither Plaintiffs nor the Department allege that the Secretary or a county supervisor has changed *any* voting qualification. Instead, they at most have "chang[ed] the information relied upon" to ensure compliance with *existing* qualifications. *Id.* As *City of Houston* establishes, this shift to a more reliable source of information to administer a precleared law is not subject to Section 5. *See id.*; *see also* Mot. at 14–23.

*Third*, Plaintiffs and the Department fall back on two inapposite cases, *Curtis v. Smith*, 121 F. Supp. 2d 1054 (E.D. Tex. 2000) and *Morales v. Handel*, 1:08-cv-3172 (N.D. Ga. Oct. 27. 2008). *See* Opp. at 9 n.2; Supp. SOI at 9. In *Curtis*, the court held the covered jurisdiction's acceptance of an eleventh-hour affidavit challenging "en masse" the residency of 9,000 registered voters was a change from the precleared statute's authorization of timely affidavits challenging the residency of "more than one" registered voter based on personal knowledge. *See* 121 F. Supp. 2d at 1060. Here, however, there is no such departure from the precleared statute because county supervisors are continuing to provide each registered individual the notice and

---

[1] Plaintiffs are correct that the Fifth Circuit affirmed dismissal of *City of Houston* on mootness grounds. *See* 617 F.3d at 340; *see also* Opp. at 10. But Plaintiffs ignore that, instead of vacating the lower court's judgment, the Fifth Circuit affirmed it. *See* 617 F.3d at 342.

9

opportunity to be heard required under precleared Florida law. *See* Mot. at 14–23.

In *Morales*, the covered State of Georgia "did not have an automated system for verifying registration application information nor any standards for operating that system." *Morales* Order at 21 (DE 22 Ex. 5). The three-judge court therefore held that its implementation of automated data matching constituted a change requiring Section 5 preclearance. *See id.* at 21–22. In other words, the State of Georgia did not "[m]erely *chang[e] the information relied upon*" to confirm voter eligibility but adopted an entirely new *process* for conducting such confirmation. *City of Houston*, 2009 WL 1456487, *9 (emphasis added). The State of Florida, by contrast, *does* have a baseline procedure of matching data from various federal and state governmental agencies to confirm voter eligibility. The Secretary's data matching thus is merely a "change in the information" plugged into that preexisting process, not a creation of an entirely new procedure that has not yet been precleared. *Id.*; *see also* Mot. at 20–21.

*Finally*, the Department grasps at straws with the contention that the Secretary provided county supervisors "new practices and procedures for verifying citizenship." Supp. SOI at 10. But the "five documents" that county supervisors were reminded could suffice as proof of citizenship were used to prove citizenship *before* the Secretary instituted the data matching Plaintiffs now challenge. *Id.* And, even on the Department's characterization, that reminder and the commonsense recommendations to confirm citizenship with USCIS and to require documentation for name changes did nothing more than "chang[e] the information relied upon" to confirm voter eligibility and, thus, are not Section 5 changes in the covered counties. *City of Houston*, 2009 WL 1456487, *9 (emphasis added).

## CONCLUSION

The Court should dismiss Plaintiffs' First Amended Complaint.

10

Dated: September 11, 2012

Respectfully submitted,

/s/ Michael A. Carvin

| | |
|---|---|
| Daniel E. Nordby (Fla. Bar No. 14588)<br>General Counsel<br>Ashley E. Davis (Fla. Bar No. 48032)<br>Assistant General Counsel<br>Florida Department Of State<br>R.A. Gray Building<br>500 South Bronough Street, Suite 100<br>Tallahassee, FL 32399-0250<br>Telephone: (850) 245-6536<br>Facsimile: (850) 245-6127<br>Daniel.Nordby@DOS.MyFlorida.com<br>Ashley.Davis@DOS.MyFlorida.com | Michael A. Carvin (D.C. Bar No. 366784)<br>John M. Gore (D.C. Bar No. 502057)<br>JONES DAY<br>51 Louisiana Ave., N.W.<br>Washington, D.C. 20001<br>Telephone: (202) 879-3939<br>Facsimile: (202) 626-1700<br>macarvin@jonesday.com<br>jmgore@jonesday.com |

Counsel for Defendant
Secretary of State Ken Detzner

**CERTIFICATE OF SERVICE**

I hereby certify that on this 11th day of September, 2012, a true and correct copy of the foregoing will be sent electronically to the registered participants through the Court's CM/ECF system.

/s/ Michael A. Carvin