Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## SHELBY COUNTY, ALABAMA *v.* HOLDER, ATTORNEY GENERAL, ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 12–96. Argued February 27, 2013—Decided June 25, 2013

The Voting Rights Act of 1965 was enacted to address entrenched racial discrimination in voting, "an insidious and pervasive evil which had been perpetuated in certain parts of our country through unremitting and ingenious defiance of the Constitution." *South Carolina* v. *Katzenbach*, 383 U. S. 301, 309. Section 2 of the Act, which bans any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen . . . to vote on account of race or color," 42 U. S. C. §1973(a), applies nationwide, is permanent, and is not at issue in this case. Other sections apply only to some parts of the country. Section 4 of the Act provides the "coverage formula," defining the "covered jurisdictions" as States or political subdivisions that maintained tests or devices as prerequisites to voting, and had low voter registration or turnout, in the 1960s and early 1970s. §1973b(b). In those covered jurisdictions, §5 of the Act provides that no change in voting procedures can take effect until approved by specified federal authorities in Washington, D. C. §1973c(a). Such approval is known as "preclearance."

The coverage formula and preclearance requirement were initially set to expire after five years, but the Act has been reauthorized several times. In 2006, the Act was reauthorized for an additional 25 years, but the coverage formula was not changed. Coverage still turned on whether a jurisdiction had a voting test in the 1960s or 1970s, and had low voter registration or turnout at that time. Shortly after the 2006 reauthorization, a Texas utility district sought to bail out from the Act's coverage and, in the alternative, challenged the Act's constitutionality. This Court resolved the challenge on statutory grounds, but expressed serious doubts about the Act's con-

tinued constitutionality. See *Northwest Austin Municipal Util. Dist. No. One* v. *Holder,* 557 U. S. 193.

Petitioner Shelby County, in the covered jurisdiction of Alabama, sued the Attorney General in Federal District Court in Washington, D. C., seeking a declaratory judgment that sections 4(b) and 5 are facially unconstitutional, as well as a permanent injunction against their enforcement. The District Court upheld the Act, finding that the evidence before Congress in 2006 was sufficient to justify reauthorizing §5 and continuing §4(b)'s coverage formula. The D. C. Circuit affirmed. After surveying the evidence in the record, that court accepted Congress's conclusion that §2 litigation remained inadequate in the covered jurisdictions to protect the rights of minority voters, that §5 was therefore still necessary, and that the coverage formula continued to pass constitutional muster.

*Held*: Section 4 of the Voting Rights Act is unconstitutional; its formula can no longer be used as a basis for subjecting jurisdictions to preclearance. Pp. 9–25.

(a) In *Northwest Austin,* this Court noted that the Voting Rights Act "imposes current burdens and must be justified by current needs" and concluded that "a departure from the fundamental principle of equal sovereignty requires a showing that a statute's disparate geographic coverage is sufficiently related to the problem that it targets." 557 U. S., at 203. These basic principles guide review of the question presented here. Pp. 9–17.

(1) State legislation may not contravene federal law. States retain broad autonomy, however, in structuring their governments and pursuing legislative objectives. Indeed, the Tenth Amendment reserves to the States all powers not specifically granted to the Federal Government, including "the power to regulate elections." *Gregory* v. *Ashcroft,* 501 U. S. 452, 461–462. There is also a "fundamental principle of equal sovereignty" among the States, which is highly pertinent in assessing disparate treatment of States. *Northwest Austin*, *supra,* at 203.

The Voting Rights Act sharply departs from these basic principles. It requires States to beseech the Federal Government for permission to implement laws that they would otherwise have the right to enact and execute on their own. And despite the tradition of equal sovereignty, the Act applies to only nine States (and additional counties). That is why, in 1966, this Court described the Act as "stringent" and "potent," *Katzenbach,* 383 U. S., at 308, 315, 337. The Court nonetheless upheld the Act, concluding that such an "uncommon exercise of congressional power" could be justified by "exceptional conditions." *Id.,* at 334. Pp. 9–12.

(2) In 1966, these departures were justified by the "blight of ra-

cial discrimination in voting" that had "infected the electoral process in parts of our country for nearly a century," *Katzenbach*, 383 U. S., at 308. At the time, the coverage formula—the means of linking the exercise of the unprecedented authority with the problem that warranted it—made sense. The Act was limited to areas where Congress found "evidence of actual voting discrimination," and the covered jurisdictions shared two characteristics: "the use of tests and devices for voter registration, and a voting rate in the 1964 presidential election at least 12 points below the national average." *Id.,* at 330. The Court explained that "[t]ests and devices are relevant to voting discrimination because of their long history as a tool for perpetrating the evil; a low voting rate is pertinent for the obvious reason that widespread disenfranchisement must inevitably affect the number of actual voters." *Ibid.* The Court therefore concluded that "the coverage formula [was] rational in both practice and theory." *Ibid.* Pp. 12–13.

(3) Nearly 50 years later, things have changed dramatically. Largely because of the Voting Rights Act, "[v]oter turnout and registration rates" in covered jurisdictions "now approach parity. Blatantly discriminatory evasions of federal decrees are rare. And minority candidates hold office at unprecedented levels." *Northwest Austin, supra,* at 202. The tests and devices that blocked ballot access have been forbidden nationwide for over 40 years**.** Yet the Act has not eased §5's restrictions or narrowed the scope of §4's coverage formula along the way. Instead those extraordinary and unprecedented features have been reauthorized as if nothing has changed, and they have grown even stronger. Because §5 applies only to those jurisdictions singled out by §4, the Court turns to consider that provision. Pp. 13–17.

(b) Section 4's formula is unconstitutional in light of current conditions. Pp. 17–25.

(1) In 1966, the coverage formula was "rational in both practice and theory." *Katzenbach, supra,* at 330. It looked to cause (discriminatory tests) and effect (low voter registration and turnout), and tailored the remedy (preclearance) to those jurisdictions exhibiting both. By 2009, however, the "coverage formula raise[d] serious constitutional questions." *Northwest Austin, supra,* at 204. Coverage today is based on decades-old data and eradicated practices. The formula captures States by reference to literacy tests and low voter registration and turnout in the 1960s and early 1970s. But such tests have been banned for over 40 years. And voter registration and turnout numbers in covered States have risen dramatically. In 1965, the States could be divided into those with a recent history of voting tests and low voter registration and turnout and those without those char-

acteristics. Congress based its coverage formula on that distinction. Today the Nation is no longer divided along those lines, yet the Voting Rights Act continues to treat it as if it were. Pp. 17–18.

(2) The Government attempts to defend the formula on grounds that it is "reverse-engineered"—Congress identified the jurisdictions to be covered and *then* came up with criteria to describe them. *Katzenbach* did not sanction such an approach, reasoning instead that the coverage formula was rational because the "formula . . . was relevant to the problem." 383 U. S., at 329, 330. The Government has a fallback argument—because the formula was relevant in 1965, its continued use is permissible so long as any discrimination remains in the States identified in 1965. But this does not look to "current political conditions," *Northwest Austin, supra,* at 203, instead relying on a comparison between the States in 1965. But history did not end in 1965. In assessing the "current need[ ]" for a preclearance system treating States differently from one another today, history since 1965 cannot be ignored. The Fifteenth Amendment is not designed to punish for the past; its purpose is to ensure a better future. To serve that purpose, Congress—if it is to divide the States—must identify those jurisdictions to be singled out on a basis that makes sense in light of current conditions. Pp. 18–21.

(3) Respondents also rely heavily on data from the record compiled by Congress before reauthorizing the Act. Regardless of how one looks at that record, no one can fairly say that it shows anything approaching the "pervasive," "flagrant," "widespread," and "rampant" discrimination that clearly distinguished the covered jurisdictions from the rest of the Nation in 1965. *Katzenbach*, *supra*, at 308, 315, 331. But a more fundamental problem remains: Congress did not use that record to fashion a coverage formula grounded in current conditions. It instead re-enacted a formula based on 40-year-old facts having no logical relation to the present day. Pp. 21–22.

679 F. 3d 848, reversed.

ROBERTS, C. J., delivered the opinion of the Court, in which SCALIA, KENNEDY, THOMAS, and ALITO, JJ., joined. THOMAS, J., filed a concurring opinion. GINSBURG, J., filed a dissenting opinion, in which BREYER, SOTOMAYOR, and KAGAN, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

————

No. 12–96

————

## SHELBY COUNTY, ALABAMA, PETITIONER *v.* ERIC H. HOLDER, JR., ATTORNEY GENERAL, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[June 25, 2013]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

The Voting Rights Act of 1965 employed extraordinary measures to address an extraordinary problem. Section 5 of the Act required States to obtain federal permission before enacting any law related to voting—a drastic departure from basic principles of federalism. And §4 of the Act applied that requirement only to some States—an equally dramatic departure from the principle that all States enjoy equal sovereignty. This was strong medicine, but Congress determined it was needed to address entrenched racial discrimination in voting, "an insidious and pervasive evil which had been perpetuated in certain parts of our country through unremitting and ingenious defiance of the Constitution." *South Carolina* v. *Katzenbach*, 383 U. S. 301, 309 (1966). As we explained in upholding the law, "exceptional conditions can justify legislative measures not otherwise appropriate." *Id.,* at 334. Reflecting the unprecedented nature of these measures, they were scheduled to expire after five years. See Voting Rights Act of 1965, §4(a), 79 Stat. 438.

Nearly 50 years later, they are still in effect; indeed, they have been made more stringent, and are now scheduled to last until 2031. There is no denying, however, that the conditions that originally justified these measures no longer characterize voting in the covered jurisdictions. By 2009, "the racial gap in voter registration and turnout [was] lower in the States originally covered by §5 than it [was] nationwide." *Northwest Austin Municipal Util. Dist. No. One* v. *Holder*, 557 U. S. 193, 203–204 (2009). Since that time, Census Bureau data indicate that African-American voter turnout has come to exceed white voter turnout in five of the six States originally covered by §5, with a gap in the sixth State of less than one half of one percent. See Dept. of Commerce, Census Bureau, Reported Voting and Registration, by Sex, Race and Hispanic Origin, for States (Nov. 2012) (Table 4b).

At the same time, voting discrimination still exists; no one doubts that. The question is whether the Act's extraordinary measures, including its disparate treatment of the States, continue to satisfy constitutional requirements. As we put it a short time ago, "the Act imposes current burdens and must be justified by current needs." *Northwest Austin*, 557 U. S., at 203.

## I

### A

The Fifteenth Amendment was ratified in 1870, in the wake of the Civil War. It provides that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude," and it gives Congress the "power to enforce this article by appropriate legislation."

"The first century of congressional enforcement of the Amendment, however, can only be regarded as a failure." *Id.*, at 197. In the 1890s, Alabama, Georgia, Louisiana,

Mississippi, North Carolina, South Carolina, and Virginia began to enact literacy tests for voter registration and to employ other methods designed to prevent African-Americans from voting. *Katzenbach*, 383 U. S., at 310. Congress passed statutes outlawing some of these practices and facilitating litigation against them, but litigation remained slow and expensive, and the States came up with new ways to discriminate as soon as existing ones were struck down. Voter registration of African-Americans barely improved. *Id.,* at 313–314.

Inspired to action by the civil rights movement, Congress responded in 1965 with the Voting Rights Act. Section 2 was enacted to forbid, in all 50 States, any "standard, practice, or procedure . . . imposed or applied . . . to deny or abridge the right of any citizen of the United States to vote on account of race or color." 79 Stat. 437. The current version forbids any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 42 U. S. C. §1973(a). Both the Federal Government and individuals have sued to enforce §2, see, *e.g., Johnson* v. *De Grandy*, 512 U. S. 997 (1994), and injunctive relief is available in appropriate cases to block voting laws from going into effect, see 42 U. S. C. §1973j(d). Section 2 is permanent, applies nationwide, and is not at issue in this case.

Other sections targeted only some parts of the country. At the time of the Act's passage, these "covered" jurisdictions were those States or political subdivisions that had maintained a test or device as a prerequisite to voting as of November 1, 1964, and had less than 50 percent voter registration or turnout in the 1964 Presidential election. §4(b), 79 Stat. 438. Such tests or devices included literacy and knowledge tests, good moral character requirements, the need for vouchers from registered voters, and the like. §4(c), *id.,* at 438–439. A covered jurisdiction could "bail

out" of coverage if it had not used a test or device in the preceding five years "for the purpose or with the effect of denying or abridging the right to vote on account of race or color." §4(a), *id.,* at 438. In 1965, the covered States included Alabama, Georgia, Louisiana, Mississippi, South Carolina, and Virginia. The additional covered subdivisions included 39 counties in North Carolina and one in Arizona. See 28 CFR pt. 51, App. (2012).

In those jurisdictions, §4 of the Act banned all such tests or devices. §4(a), 79 Stat. 438. Section 5 provided that no change in voting procedures could take effect until it was approved by federal authorities in Washington, D. C.— either the Attorney General or a court of three judges. *Id.,* at 439. A jurisdiction could obtain such "preclearance" only by proving that the change had neither "the purpose [nor] the effect of denying or abridging the right to vote on account of race or color." *Ibid.*

Sections 4 and 5 were intended to be temporary; they were set to expire after five years. See §4(a), *id.,* at 438; *Northwest Austin, supra,* at 199. In *South Carolina* v. *Katzenbach,* we upheld the 1965 Act against constitutional challenge, explaining that it was justified to address "voting discrimination where it persists on a pervasive scale." 383 U. S.*,* at 308.

In 1970, Congress reauthorized the Act for another five years, and extended the coverage formula in §4(b) to jurisdictions that had a voting test and less than 50 percent voter registration or turnout as of 1968. Voting Rights Act Amendments of 1970, §§3–4, 84 Stat. 315. That swept in several counties in California, New Hampshire, and New York. See 28 CFR pt. 51, App. Congress also extended the ban in §4(a) on tests and devices nationwide. §6, 84 Stat. 315.

In 1975, Congress reauthorized the Act for seven more years, and extended its coverage to jurisdictions that had a voting test and less than 50 percent voter registration or

turnout as of 1972. Voting Rights Act Amendments of 1975, §§101, 202, 89 Stat. 400, 401. Congress also amended the definition of "test or device" to include the practice of providing English-only voting materials in places where over five percent of voting-age citizens spoke a single language other than English. §203, *id.*, at 401–402. As a result of these amendments, the States of Alaska, Arizona, and Texas, as well as several counties in California, Florida, Michigan, New York, North Carolina, and South Dakota, became covered jurisdictions. See 28 CFR pt. 51, App. Congress correspondingly amended sections 2 and 5 to forbid voting discrimination on the basis of membership in a language minority group, in addition to discrimination on the basis of race or color. §§203, 206, 89 Stat. 401, 402. Finally, Congress made the nationwide ban on tests and devices permanent. §102, *id.*, at 400.

In 1982, Congress reauthorized the Act for 25 years, but did not alter its coverage formula. See Voting Rights Act Amendments, 96 Stat. 131. Congress did, however, amend the bailout provisions, allowing political subdivisions of covered jurisdictions to bail out. Among other prerequisites for bailout, jurisdictions and their subdivisions must not have used a forbidden test or device, failed to receive preclearance, or lost a §2 suit, in the ten years prior to seeking bailout. §2, *id.,* at 131–133.

We upheld each of these reauthorizations against constitutional challenge. See *Georgia* v. *United States*, 411 U. S. 526 (1973); *City of Rome* v. *United States*, 446 U. S. 156 (1980); *Lopez* v. *Monterey County*, 525 U. S. 266 (1999).

In 2006, Congress again reauthorized the Voting Rights Act for 25 years, again without change to its coverage formula. Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act, 120 Stat. 577. Congress also amended §5 to prohibit more conduct than before. §5, *id.,* at 580–

581; see *Reno* v. *Bossier Parish School Bd.*, 528 U. S. 320, 341 (2000) (*Bossier II*); *Georgia* v. *Ashcroft*, 539 U. S. 461, 479 (2003). Section 5 now forbids voting changes with "any discriminatory purpose" as well as voting changes that diminish the ability of citizens, on account of race, color, or language minority status, "to elect their preferred candidates of choice." 42 U. S. C. §§1973c(b)–(d).

Shortly after this reauthorization, a Texas utility district brought suit, seeking to bail out from the Act's coverage and, in the alternative, challenging the Act's constitutionality. See *Northwest Austin*, 557 U. S., at 200–201. A three-judge District Court explained that only a State or political subdivision was eligible to seek bailout under the statute, and concluded that the utility district was not a political subdivision, a term that encompassed only "counties, parishes, and voter-registering subunits." *Northwest Austin Municipal Util. Dist. No. One* v. *Mukasey*, 573 F. Supp. 2d 221, 232 (DC 2008). The District Court also rejected the constitutional challenge. *Id.,* at 283.

We reversed. We explained that "'normally the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case.'" *Northwest Austin, supra*, at 205 (quoting *Escambia County* v. *McMillan*, 466 U. S. 48, 51 (1984) (*per curiam*)). Concluding that "underlying constitutional concerns," among other things, "compel[led] a broader reading of the bailout provision," we construed the statute to allow the utility district to seek bailout. *Northwest Austin*, 557 U. S., at 207. In doing so we expressed serious doubts about the Act's continued constitutionality.

We explained that §5 "imposes substantial federalism costs" and "differentiates between the States, despite our historic tradition that all the States enjoy equal sovereignty." *Id.,* at 202, 203 (internal quotation marks omitted). We also noted that "[t]hings have changed in the South. Voter turnout and registration rates now approach parity.

Blatantly discriminatory evasions of federal decrees are rare. And minority candidates hold office at unprecedented levels." *Id.,* at 202. Finally, we questioned whether the problems that §5 meant to address were still "concentrated in the jurisdictions singled out for preclearance." *Id.,* at 203.

Eight Members of the Court subscribed to these views, and the remaining Member would have held the Act unconstitutional. Ultimately, however, the Court's construction of the bailout provision left the constitutional issues for another day.

## B

Shelby County is located in Alabama, a covered jurisdiction. It has not sought bailout, as the Attorney General has recently objected to voting changes proposed from within the county. See App. 87a–92a. Instead, in 2010, the county sued the Attorney General in Federal District Court in Washington, D. C., seeking a declaratory judgment that sections 4(b) and 5 of the Voting Rights Act are facially unconstitutional, as well as a permanent injunction against their enforcement. The District Court ruled against the county and upheld the Act. 811 F. Supp. 2d 424, 508 (2011). The court found that the evidence before Congress in 2006 was sufficient to justify reauthorizing §5 and continuing the §4(b) coverage formula.

The Court of Appeals for the D. C. Circuit affirmed. In assessing §5, the D. C. Circuit considered six primary categories of evidence: Attorney General objections to voting changes, Attorney General requests for more information regarding voting changes, successful §2 suits in covered jurisdictions, the dispatching of federal observers to monitor elections in covered jurisdictions, §5 preclearance suits involving covered jurisdictions, and the deterrent effect of §5. See 679 F. 3d 848, 862–863 (2012). After extensive analysis of the record, the court accepted Con-

gress's conclusion that §2 litigation remained inadequate in the covered jurisdictions to protect the rights of minority voters, and that §5 was therefore still necessary. *Id.,* at 873.

Turning to §4, the D. C. Circuit noted that the evidence for singling out the covered jurisdictions was "less robust" and that the issue presented "a close question." *Id.*, at 879. But the court looked to data comparing the number of successful §2 suits in the different parts of the country. Coupling that evidence with the deterrent effect of §5, the court concluded that the statute continued "to single out the jurisdictions in which discrimination is concentrated," and thus held that the coverage formula passed constitutional muster. *Id.,* at 883.

Judge Williams dissented. He found "no positive correlation between inclusion in §4(b)'s coverage formula and low black registration or turnout." *Id.,* at 891. Rather, to the extent there was any correlation, it actually went the other way: "condemnation under §4(b) is a marker of *higher* black registration and turnout." *Ibid.* (emphasis added). Judge Williams also found that "[c]overed jurisdictions have *far more* black officeholders as a proportion of the black population than do uncovered ones." *Id.*, at 892. As to the evidence of successful §2 suits, Judge Williams disaggregated the reported cases by State, and concluded that "[t]he five worst uncovered jurisdictions . . . have worse records than eight of the covered jurisdictions." *Id.,* at 897. He also noted that two covered jurisdictions—Arizona and Alaska—had not had any successful reported §2 suit brought against them during the entire 24 years covered by the data. *Ibid.* Judge Williams would have held the coverage formula of §4(b) "irrational" and unconstitutional. *Id.,* at 885.

We granted certiorari. 568 U. S. ___ (2012).

II

In *Northwest Austin*, we stated that "the Act imposes current burdens and must be justified by current needs." 557 U. S., at 203. And we concluded that "a departure from the fundamental principle of equal sovereignty requires a showing that a statute's disparate geographic coverage is sufficiently related to the problem that it targets." *Ibid.* These basic principles guide our review of the question before us.[1]

A

The Constitution and laws of the United States are "the supreme Law of the Land." U. S. Const., Art. VI, cl. 2. State legislation may not contravene federal law. The Federal Government does not, however, have a general right to review and veto state enactments before they go into effect. A proposal to grant such authority to "negative" state laws was considered at the Constitutional Convention, but rejected in favor of allowing state laws to take effect, subject to later challenge under the Supremacy Clause. See 1 Records of the Federal Convention of 1787, pp. 21, 164–168 (M. Farrand ed. 1911); 2 *id.,* at 27–29, 390–392.

Outside the strictures of the Supremacy Clause, States retain broad autonomy in structuring their governments and pursuing legislative objectives. Indeed, the Constitution provides that all powers not specifically granted to the Federal Government are reserved to the States or citizens. Amdt. 10. This "allocation of powers in our federal system preserves the integrity, dignity, and residual sovereignty of the States." *Bond* v. *United States*, 564 U. S. ___, ___

——————

[1] Both the Fourteenth and Fifteenth Amendments were at issue in *Northwest Austin*, see Juris. Statement i, and Brief for Federal Appellee 29–30, in *Northwest Austin Municipal Util. Dist. No. One* v. *Holder*, O. T. 2008, No. 08–322, and accordingly *Northwest Austin* guides our review under both Amendments in this case.

(2011) (slip op., at 9). But the federal balance "is not just an end in itself: Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power." *Ibid.* (internal quotation marks omitted).

More specifically, "'the Framers of the Constitution intended the States to keep for themselves, as provided in the Tenth Amendment, the power to regulate elections.'" *Gregory* v. *Ashcroft*, 501 U. S. 452, 461–462 (1991) (quoting *Sugarman* v. *Dougall*, 413 U. S. 634, 647 (1973); some internal quotation marks omitted). Of course, the Federal Government retains significant control over federal elections. For instance, the Constitution authorizes Congress to establish the time and manner for electing Senators and Representatives. Art. I, §4, cl. 1; see also *Arizona* v. *Inter Tribal Council of Ariz., Inc.*, *ante*, at 4–6. But States have "broad powers to determine the conditions under which the right of suffrage may be exercised." *Carrington* v. *Rash*, 380 U. S. 89, 91 (1965) (internal quotation marks omitted); see also *Arizona*, *ante*, at 13–15. And "[e]ach State has the power to prescribe the qualifications of its officers and the manner in which they shall be chosen." *Boyd* v. *Nebraska ex rel. Thayer*, 143 U. S. 135, 161 (1892). Drawing lines for congressional districts is likewise "primarily the duty and responsibility of the State." *Perry* v. *Perez*, 565 U. S. ___, ___ (2012) (*per curiam*) (slip op., at 3) (internal quotation marks omitted).

Not only do States retain sovereignty under the Constitution, there is also a "fundamental principle of *equal* sovereignty" among the States. *Northwest Austin, supra*, at 203 (citing *United States* v. *Louisiana*, 363 U. S. 1, 16 (1960); *Lessee of Pollard* v. *Hagan*, 3 How. 212, 223 (1845); and *Texas* v. *White*, 7 Wall. 700, 725–726 (1869); emphasis added). Over a hundred years ago, this Court explained that our Nation "was and is a union of States, equal in power, dignity and authority." *Coyle* v. *Smith*, 221 U. S. 559, 567 (1911). Indeed, "the constitutional equality of the

States is essential to the harmonious operation of the scheme upon which the Republic was organized." *Id.,* at 580. *Coyle* concerned the admission of new States, and *Katzenbach* rejected the notion that the principle operated as a *bar* on differential treatment outside that context. 383 U. S., at 328–329. At the same time, as we made clear in *Northwest Austin,* the fundamental principle of equal sovereignty remains highly pertinent in assessing subsequent disparate treatment of States. 557 U. S., at 203.

The Voting Rights Act sharply departs from these basic principles. It suspends "*all* changes to state election law— however innocuous—until they have been precleared by federal authorities in Washington, D. C." *Id.,* at 202. States must beseech the Federal Government for permission to implement laws that they would otherwise have the right to enact and execute on their own, subject of course to any injunction in a §2 action. The Attorney General has 60 days to object to a preclearance request, longer if he requests more information. See 28 CFR §§51.9, 51.37. If a State seeks preclearance from a three-judge court, the process can take years.

And despite the tradition of equal sovereignty, the Act applies to only nine States (and several additional counties). While one State waits months or years and expends funds to implement a validly enacted law, its neighbor can typically put the same law into effect immediately, through the normal legislative process. Even if a noncovered jurisdiction is sued, there are important differences between those proceedings and preclearance proceedings; the preclearance proceeding "not only switches the burden of proof to the supplicant jurisdiction, but also applies substantive standards quite different from those governing the rest of the nation." 679 F. 3d, at 884 (Williams, J., dissenting) (case below).

All this explains why, when we first upheld the Act in 1966, we described it as "stringent" and "potent." *Katzen-*

*bach,* 383 U. S., at 308, 315, 337. We recognized that it "may have been an uncommon exercise of congressional power," but concluded that "legislative measures not otherwise appropriate" could be justified by "exceptional conditions." *Id.,* at 334. We have since noted that the Act "authorizes federal intrusion into sensitive areas of state and local policymaking," *Lopez,* 525 U. S., at 282, and represents an "extraordinary departure from the traditional course of relations between the States and the Federal Government," *Presley* v. *Etowah County Comm'n,* 502 U. S. 491, 500–501 (1992). As we reiterated in *Northwest Austin,* the Act constitutes "extraordinary legislation otherwise unfamiliar to our federal system." 557 U. S., at 211.

## B

In 1966, we found these departures from the basic features of our system of government justified. The "blight of racial discrimination in voting" had "infected the electoral process in parts of our country for nearly a century." *Katzenbach,* 383 U. S., at 308. Several States had enacted a variety of requirements and tests "specifically designed to prevent" African-Americans from voting. *Id.,* at 310. Case-by-case litigation had proved inadequate to prevent such racial discrimination in voting, in part because States "merely switched to discriminatory devices not covered by the federal decrees," "enacted difficult new tests," or simply "defied and evaded court orders." *Id.,* at 314. Shortly before enactment of the Voting Rights Act, only 19.4 percent of African-Americans of voting age were registered to vote in Alabama, only 31.8 percent in Louisiana, and only 6.4 percent in Mississippi. *Id.,* at 313. Those figures were roughly 50 percentage points or more below the figures for whites. *Ibid.*

In short, we concluded that "[u]nder the compulsion of these unique circumstances, Congress responded in a

permissibly decisive manner." *Id.,* at 334, 335. We also noted then and have emphasized since that this extraordinary legislation was intended to be temporary, set to expire after five years. *Id.,* at 333; *Northwest Austin, supra,* at 199.

At the time, the coverage formula—the means of linking the exercise of the unprecedented authority with the problem that warranted it—made sense. We found that "Congress chose to limit its attention to the geographic areas where immediate action seemed necessary." *Katzenbach,* 383 U. S., at 328. The areas where Congress found "evidence of actual voting discrimination" shared two characteristics: "the use of tests and devices for voter registration, and a voting rate in the 1964 presidential election at least 12 points below the national average." *Id.,* at 330. We explained that "[t]ests and devices are relevant to voting discrimination because of their long history as a tool for perpetrating the evil; a low voting rate is pertinent for the obvious reason that widespread disenfranchisement must inevitably affect the number of actual voters." *Ibid.* We therefore concluded that "the coverage formula [was] rational in both practice and theory." *Ibid.* It accurately reflected those jurisdictions uniquely characterized by voting discrimination "on a pervasive scale," linking coverage to the devices used to effectuate discrimination and to the resulting disenfranchisement. *Id.,* at 308. The formula ensured that the "stringent remedies [were] aimed at areas where voting discrimination ha[d] been most flagrant." *Id.,* at 315.

## C

Nearly 50 years later, things have changed dramatically. Shelby County contends that the preclearance requirement, even without regard to its disparate coverage, is now unconstitutional. Its arguments have a good deal of force. In the covered jurisdictions, "[v]oter turnout and

registration rates now approach parity. Blatantly discrim-
inatory evasions of federal decrees are rare. And minority
candidates hold office at unprecedented levels." *Northwest
Austin*, 557 U. S., at 202. The tests and devices that
blocked access to the ballot have been forbidden nation-
wide for over 40 years. See §6, 84 Stat. 315; §102, 89 Stat.
400.

Those conclusions are not ours alone. Congress said the
same when it reauthorized the Act in 2006, writing that
"[s]ignificant progress has been made in eliminating first
generation barriers experienced by minority voters, in-
cluding increased numbers of registered minority voters,
minority voter turnout, and minority representation in
Congress, State legislatures, and local elected offices."
§2(b)(1), 120 Stat. 577. The House Report elaborated that
"the number of African-Americans who are registered and
who turn out to cast ballots has increased significantly
over the last 40 years, particularly since 1982," and noted
that "[i]n some circumstances, minorities register to vote
and cast ballots at levels that surpass those of white vot-
ers." H. R. Rep. No. 109–478, p. 12 (2006). That Report
also explained that there have been "significant increases
in the number of African-Americans serving in elected
offices"; more specifically, there has been approximately
a 1,000 percent increase since 1965 in the number of
African-American elected officials in the six States origi-
nally covered by the Voting Rights Act. *Id.,* at 18.

The following chart, compiled from the Senate and
House Reports, compares voter registration numbers from
1965 to those from 2004 in the six originally covered
States. These are the numbers that were before Congress
when it reauthorized the Act in 2006:

|          | 1965 | | | 2004 | | |
|----------|-------|-------|------|-------|-------|------|
|          | White | Black | Gap | White | Black | Gap |
| Alabama | 69.2 | 19.3 | 49.9 | 73.8 | 72.9 | 0.9 |
| Georgia | 62.[6] | 27.4 | 35.2 | 63.5 | 64.2 | -0.7 |
| Louisiana | 80.5 | 31.6 | 48.9 | 75.1 | 71.1 | 4.0 |
| Mississippi | 69.9 | 6.7 | 63.2 | 72.3 | 76.1 | -3.8 |
| South Carolina | 75.7 | 37.3 | 38.4 | 74.4 | 71.1 | 3.3 |
| Virginia | 61.1 | 38.3 | 22.8 | 68.2 | 57.4 | 10.8 |

See S. Rep. No. 109–295, p. 11 (2006); H. R. Rep. No. 109–478, at 12. The 2004 figures come from the Census Bureau. Census Bureau data from the most recent election indicate that African-American voter turnout exceeded white voter turnout in five of the six States originally covered by §5, with a gap in the sixth State of less than one half of one percent. See Dept. of Commerce, Census Bureau, Reported Voting and Registration, by Sex, Race and Hispanic Origin, for States (Table 4b). The preclearance statistics are also illuminating. In the first decade after enactment of §5, the Attorney General objected to 14.2 percent of proposed voting changes. H. R Rep. No. 109–478, at 22. In the last decade before reenactment, the Attorney General objected to a mere 0.16 percent. S. Rep. No. 109–295, at 13.

There is no doubt that these improvements are in large part *because of* the Voting Rights Act. The Act has proved immensely successful at redressing racial discrimination and integrating the voting process. See §2(b)(1), 120 Stat. 577. During the "Freedom Summer" of 1964, in Philadelphia, Mississippi, three men were murdered while working in the area to register African-American voters. See *United States* v. *Price*, 383 U. S. 787, 790 (1966). On "Bloody Sunday" in 1965, in Selma, Alabama, police beat

and used tear gas against hundreds marching in sup-
port of African-American enfranchisement. See *Northwest
Austin*, *supra*, at 220, n. 3 (THOMAS, J., concurring in
judgment in part and dissenting in part). Today both of
those towns are governed by African-American mayors.
Problems remain in these States and others, but there is
no denying that, due to the Voting Rights Act, our Nation
has made great strides.

   Yet the Act has not eased the restrictions in §5 or nar-
rowed the scope of the coverage formula in §4(b) along the
way.   Those extraordinary and unprecedented features
were reauthorized—as if nothing had changed.   In fact,
the Act's unusual remedies have grown even stronger.
When Congress reauthorized the Act in 2006, it did so for
another 25 years on top of the previous 40—a far cry from
the initial five-year period.  See 42 U. S. C. §1973b(a)(8).
Congress also expanded the prohibitions in §5.  We had
previously interpreted §5 to prohibit only those redistrict-
ing plans that would have the purpose or effect of worsen-
ing the position of minority groups.  See *Bossier II*, 528
U. S., at 324, 335–336.  In 2006, Congress amended §5
to prohibit laws that could have favored such groups but
did not do so because of a discriminatory purpose, see 42
U. S. C. §1973c(c), even though we had stated that such
broadening of §5 coverage would "exacerbate the substan-
tial federalism costs that the preclearance procedure
already exacts, perhaps to the extent of raising concerns
about §5's constitutionality," *Bossier II*, *supra,* at 336
(citation and internal quotation marks omitted).  In addi-
tion, Congress expanded §5 to prohibit any voting law
"that has the purpose of or will have the effect of diminish-
ing the ability of any citizens of the United States," on
account of race, color, or language minority status, "to
elect their preferred candidates of choice." §1973c(b).  In
light of those two amendments, the bar that covered juris-
dictions must clear has been raised even as the conditions

justifying that requirement have dramatically improved.

We have also previously highlighted the concern that "the preclearance requirements in one State [might] be unconstitutional in another." *Northwest Austin*, 557 U. S., at 203; see *Georgia* v. *Ashcroft*, 539 U. S., at 491 (KENNEDY, J., concurring) ("considerations of race that would doom a redistricting plan under the Fourteenth Amendment or §2 [of the Voting Rights Act] seem to be what save it under §5"). Nothing has happened since to alleviate this troubling concern about the current application of §5.

Respondents do not deny that there have been improvements on the ground, but argue that much of this can be attributed to the deterrent effect of §5, which dissuades covered jurisdictions from engaging in discrimination that they would resume should §5 be struck down. Under this theory, however, §5 would be effectively immune from scrutiny; no matter how "clean" the record of covered jurisdictions, the argument could always be made that it was deterrence that accounted for the good behavior.

The provisions of §5 apply only to those jurisdictions singled out by §4. We now consider whether that coverage formula is constitutional in light of current conditions.

### III
### A

When upholding the constitutionality of the coverage formula in 1966, we concluded that it was "rational in both practice and theory." *Katzenbach*, 383 U. S., at 330. The formula looked to cause (discriminatory tests) and effect (low voter registration and turnout), and tailored the remedy (preclearance) to those jurisdictions exhibiting both.

By 2009, however, we concluded that the "coverage formula raise[d] serious constitutional questions." *North-*

*west Austin*, 557 U. S., at 204. As we explained, a statute's "current burdens" must be justified by "current needs," and any "disparate geographic coverage" must be "sufficiently related to the problem that it targets." *Id.,* at 203. The coverage formula met that test in 1965, but no longer does so.

Coverage today is based on decades-old data and eradicated practices. The formula captures States by reference to literacy tests and low voter registration and turnout in the 1960s and early 1970s. But such tests have been banned nationwide for over 40 years. §6, 84 Stat. 315; §102, 89 Stat. 400. And voter registration and turnout numbers in the covered States have risen dramatically in the years since. H. R. Rep. No. 109–478, at 12. Racial disparity in those numbers was compelling evidence justifying the preclearance remedy and the coverage formula. See, *e.g., Katzenbach, supra*, at 313, 329–330. There is no longer such a disparity.

In 1965, the States could be divided into two groups: those with a recent history of voting tests and low voter registration and turnout, and those without those characteristics. Congress based its coverage formula on that distinction. Today the Nation is no longer divided along those lines, yet the Voting Rights Act continues to treat it as if it were.

B

The Government's defense of the formula is limited. First, the Government contends that the formula is "reverse-engineered": Congress identified the jurisdictions to be covered and *then* came up with criteria to describe them. Brief for Federal Respondent 48–49. Under that reasoning, there need not be any logical relationship between the criteria in the formula and the reason for coverage; all that is necessary is that the formula happen to capture the jurisdictions Congress wanted to single out.

The Government suggests that *Katzenbach* sanctioned such an approach, but the analysis in *Katzenbach* was quite different. *Katzenbach* reasoned that the coverage formula was rational because the "formula . . . was relevant to the problem": "Tests and devices are relevant to voting discrimination because of their long history as a tool for perpetrating the evil; a low voting rate is pertinent for the obvious reason that widespread disenfranchisement must inevitably affect the number of actual voters." 383 U. S., at 329, 330.

Here, by contrast, the Government's reverse-engineering argument does not even attempt to demonstrate the continued relevance of the formula to the problem it targets. And in the context of a decision as significant as this one—subjecting a disfavored subset of States to "extraordinary legislation otherwise unfamiliar to our federal system," *Northwest Austin*, *supra,* at 211—that failure to establish even relevance is fatal.

The Government falls back to the argument that because the formula was relevant in 1965, its continued use is permissible so long as any discrimination remains in the States Congress identified back then—regardless of how that discrimination compares to discrimination in States unburdened by coverage. Brief for Federal Respondent 49–50. This argument does not look to "current political conditions," *Northwest Austin*, *supra,* at 203, but instead relies on a comparison between the States in 1965. That comparison reflected the different histories of the North and South. It was in the South that slavery was upheld by law until uprooted by the Civil War, that the reign of Jim Crow denied African-Americans the most basic freedoms, and that state and local governments worked tirelessly to disenfranchise citizens on the basis of race. The Court invoked that history—rightly so—in sustaining the disparate coverage of the Voting Rights Act in 1966. See *Katzenbach*, *supra,* at 308 ("The constitutional propriety of

the Voting Rights Act of 1965 must be judged with reference to the historical experience which it reflects.").

But history did not end in 1965. By the time the Act was reauthorized in 2006, there had been 40 more years of it. In assessing the "current need[]" for a preclearance system that treats States differently from one another today, that history cannot be ignored. During that time, largely because of the Voting Rights Act, voting tests were abolished, disparities in voter registration and turnout due to race were erased, and African-Americans attained political office in record numbers. And yet the coverage formula that Congress reauthorized in 2006 ignores these developments, keeping the focus on decades-old data relevant to decades-old problems, rather than current data reflecting current needs.

The Fifteenth Amendment commands that the right to vote shall not be denied or abridged on account of race or color, and it gives Congress the power to enforce that command. The Amendment is not designed to punish for the past; its purpose is to ensure a better future. See *Rice* v. *Cayetano*, 528 U. S. 495, 512 (2000) ("Consistent with the design of the Constitution, the [Fifteenth] Amendment is cast in fundamental terms, terms transcending the particular controversy which was the immediate impetus for its enactment."). To serve that purpose, Congress—if it is to divide the States—must identify those jurisdictions to be singled out on a basis that makes sense in light of current conditions. It cannot rely simply on the past. We made that clear in *Northwest Austin*, and we make it clear again today.

## C

In defending the coverage formula, the Government, the intervenors, and the dissent also rely heavily on data from the record that they claim justify disparate coverage. Congress compiled thousands of pages of evidence before

reauthorizing the Voting Rights Act. The court below and the parties have debated what that record shows—they have gone back and forth about whether to compare covered to noncovered jurisdictions as blocks, how to disaggregate the data State by State, how to weigh §2 cases as evidence of ongoing discrimination, and whether to consider evidence not before Congress, among other issues. Compare, *e.g.,* 679 F. 3d, at 873–883 (case below), with *id.,* at 889–902 (Williams, J., dissenting). Regardless of how to look at the record, however, no one can fairly say that it shows anything approaching the "pervasive," "flagrant," "widespread," and "rampant" discrimination that faced Congress in 1965, and that clearly distinguished the covered jurisdictions from the rest of the Nation at that time. *Katzenbach, supra,* at 308, 315, 331; *Northwest Austin,* 557 U. S., at 201.

But a more fundamental problem remains: Congress did not use the record it compiled to shape a coverage formula grounded in current conditions. It instead reenacted a formula based on 40-year-old facts having no logical relation to the present day. The dissent relies on "second-generation barriers," which are not impediments to the casting of ballots, but rather electoral arrangements that affect the weight of minority votes. That does not cure the problem. Viewing the preclearance requirements as targeting such efforts simply highlights the irrationality of continued reliance on the §4 coverage formula, which is based on voting tests and access to the ballot, not vote dilution. We cannot pretend that we are reviewing an updated statute, or try our hand at updating the statute ourselves, based on the new record compiled by Congress. Contrary to the dissent's contention, see *post,* at 23, we are not ignoring the record; we are simply recognizing that it played no role in shaping the statutory formula before us today.

The dissent also turns to the record to argue that, in

light of voting discrimination in Shelby County, the county cannot complain about the provisions that subject it to preclearance. *Post,* at 23–30. But that is like saying that a driver pulled over pursuant to a policy of stopping all redheads cannot complain about that policy, if it turns out his license has expired. Shelby County's claim is that the coverage formula here is unconstitutional in all its applications, because of how it selects the jurisdictions subjected to preclearance. The county was selected based on that formula, and may challenge it in court.

## D

The dissent proceeds from a flawed premise. It quotes the famous sentence from *McCulloch* v. *Maryland*, 4 Wheat. 316, 421 (1819), with the following emphasis: "Let the end be legitimate, let it be within the scope of the constitution, and *all means which are appropriate, which are plainly adapted to that end,* which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional." *Post,* at 9 (emphasis in dissent). But this case is about a part of the sentence that the dissent does not emphasize—the part that asks whether a legislative means is "consist[ent] with the letter and spirit of the constitution." The dissent states that "[i]t cannot tenably be maintained" that this is an issue with regard to the Voting Rights Act, *post,* at 9, but four years ago, in an opinion joined by two of today's dissenters, the Court expressly stated that "[t]he Act's preclearance requirement and its coverage formula raise serious constitutional questions." *Northwest Austin*, *supra,* at 204. The dissent does not explain how those "serious constitutional questions" became untenable in four short years.

The dissent treats the Act as if it were just like any other piece of legislation, but this Court has made clear from the beginning that the Voting Rights Act is far from ordinary. At the risk of repetition, *Katzenbach* indicated

that the Act was "uncommon" and "not otherwise appro-
priate," but was justified by "exceptional" and "unique"
conditions. 383 U. S., at 334, 335. Multiple decisions
since have reaffirmed the Act's "extraordinary" nature.
See, *e.g., Northwest Austin, supra*, at 211. Yet the dissent
goes so far as to suggest instead that the preclearance
requirement and disparate treatment of the States should
be upheld into the future "unless there [is] no or almost no
evidence of unconstitutional action by States." *Post,* at 33.

In other ways as well, the dissent analyzes the ques-
tion presented as if our decision in *Northwest Austin* never
happened. For example, the dissent refuses to con-
sider the principle of equal sovereignty, despite *Northwest
Austin*'s emphasis on its significance. *Northwest Austin*
also emphasized the "dramatic" progress since 1965, 557
U. S., at 201, but the dissent describes current levels of
discrimination as "flagrant," "widespread," and "perva-
sive," *post,* at 7, 17 (internal quotation marks omitted).
Despite the fact that *Northwest Austin* requires an Act's
"disparate geographic coverage" to be "sufficiently related"
to its targeted problems, 557 U. S., at 203, the dissent
maintains that an Act's limited coverage actually eases
Congress's burdens, and suggests that a fortuitous rela-
tionship should suffice. Although *Northwest Austin* stated
definitively that "current burdens" must be justified by
"current needs," *ibid.,* the dissent argues that the coverage
formula can be justified by history, and that the required
showing can be weaker on reenactment than when the law
was first passed.

There is no valid reason to insulate the coverage for-
mula from review merely because it was previously enacted
40 years ago. If Congress had started from scratch in
2006, it plainly could not have enacted the present cover-
age formula. It would have been irrational for Congress to
distinguish between States in such a fundamental way
based on 40-year-old data, when today's statistics tell an

entirely different story.  And it would have been irrational
to base coverage on the use of voting tests 40 years ago,
when such tests have been illegal since that time.  But
that is exactly what Congress has done.

*        *        *

Striking down an Act of Congress "is the gravest and
most delicate duty that this Court is called on to perform."
*Blodgett* v. *Holden*, 275 U. S. 142, 148 (1927) (Holmes, J.,
concurring).  We do not do so lightly.  That is why, in 2009,
we took care to avoid ruling on the constitutionality of
the Voting Rights Act when asked to do so, and instead
resolved the case then before us on statutory grounds.  But
in issuing that decision, we expressed our broader con-
cerns about the constitutionality of the Act.  Congress
could have updated the coverage formula at that time, but
did not do so.  Its failure to act leaves us today with no
choice but to declare §4(b) unconstitutional.  The formula
in that section can no longer be used as a basis for subject-
ing jurisdictions to preclearance.

Our decision in no way affects the permanent, nation-
wide ban on racial discrimination in voting found in §2.
We issue no holding on §5 itself, only on the coverage
formula.  Congress may draft another formula based on
current conditions.  Such a formula is an initial prerequi-
site to a determination that exceptional conditions still
exist justifying such an "extraordinary departure from the
traditional course of relations between the States and the
Federal Government." *Presley*, 502 U. S., at 500–501.  Our
country has changed, and while any racial discrimination
in voting is too much, Congress must ensure that the
legislation it passes to remedy that problem speaks to
current conditions.

The judgment of the Court of Appeals is reversed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

———————

No. 12–96

———————

## SHELBY COUNTY, ALABAMA, PETITIONER *v.* ERIC H. HOLDER, JR., ATTORNEY GENERAL, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[June 25, 2013]

JUSTICE THOMAS, concurring.

I join the Court's opinion in full but write separately to explain that I would find §5 of the Voting Rights Act unconstitutional as well. The Court's opinion sets forth the reasons.

"The Voting Rights Act of 1965 employed extraordinary measures to address an extraordinary problem." *Ante,* at 1. In the face of "unremitting and ingenious defiance" of citizens' constitutionally protected right to vote, §5 was necessary to give effect to the Fifteenth Amendment in particular regions of the country. *South Carolina* v. *Katzenbach*, 383 U. S. 301, 309 (1966). Though §5's preclearance requirement represented a "shar[p] depart[ure]" from "basic principles" of federalism and the equal sovereignty of the States, *ante,* at 9, 11, the Court upheld the measure against early constitutional challenges because it was necessary at the time to address "voting discrimination where it persist[ed] on a pervasive scale." *Katzenbach*, *supra,* at 308.

Today, our Nation has changed. "[T]he conditions that originally justified [§5] no longer characterize voting in the covered jurisdictions." *Ante,* at 2. As the Court explains: "'[V]oter turnout and registration rates now approach parity. Blatantly discriminatory evasions of federal de-

crees are rare. And minority candidates hold office at unprecedented levels.'" *Ante,* at 13–14 (quoting *Northwest Austin Municipal Util. Dist. No. One* v. *Holder*, 557 U. S. 193, 202 (2009)).

In spite of these improvements, however, Congress *increased* the already significant burdens of §5. Following its reenactment in 2006, the Voting Rights Act was amended to "prohibit more conduct than before." *Ante,* at 5. "Section 5 now forbids voting changes with 'any discriminatory purpose' as well as voting changes that diminish the ability of citizens, on account of race, color, or language minority status, 'to elect their preferred candidates of choice.'" *Ante,* at 6. While the pre-2006 version of the Act went well beyond protection guaranteed under the Constitution, see *Reno* v. *Bossier Parish School Bd.*, 520 U. S. 471, 480–482 (1997), it now goes even further.

It is, thus, quite fitting that the Court repeatedly points out that this legislation is "extraordinary" and "unprecedented" and recognizes the significant constitutional problems created by Congress' decision to raise "the bar that covered jurisdictions must clear," even as "the conditions justifying that requirement have dramatically improved." *Ante,* at 16–17. However one aggregates the data compiled by Congress, it cannot justify the considerable burdens created by §5. As the Court aptly notes: "[N]o one can fairly say that [the record] shows anything approaching the 'pervasive,' 'flagrant,' 'widespread,' and 'rampant' discrimination that faced Congress in 1965, and that clearly distinguished the covered jurisdictions from the rest of the Nation at that time." *Ante,* at 21. Indeed, circumstances in the covered jurisdictions can no longer be characterized as "exceptional" or "unique." "The extensive pattern of discrimination that led the Court to previously uphold §5 as enforcing the Fifteenth Amendment no longer exists." *Northwest Austin*, *supra*, at 226 (THOMAS, J., concurring in judgment in part and dissenting in part).

Section 5 is, thus, unconstitutional.

While the Court claims to "issue no holding on §5 itself," *ante,* at 24, its own opinion compellingly demonstrates that Congress has failed to justify "'current burdens'" with a record demonstrating "'current needs.'" See *ante,* at 9 (quoting *Northwest Austin*, *supra,* at 203). By leaving the inevitable conclusion unstated, the Court needlessly prolongs the demise of that provision. For the reasons stated in the Court's opinion, I would find §5 unconstitutional.

# SUPREME COURT OF THE UNITED STATES

————————

No. 12–96

————————

## SHELBY COUNTY, ALABAMA, PETITIONER *v.* ERIC H. HOLDER, JR., ATTORNEY GENERAL, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[June 25, 2013]

JUSTICE GINSBURG, with whom JUSTICE BREYER, JUSTICE SOTOMAYOR, and JUSTICE KAGAN join, dissenting.

In the Court's view, the very success of §5 of the Voting Rights Act demands its dormancy. Congress was of another mind. Recognizing that large progress has been made, Congress determined, based on a voluminous record, that the scourge of discrimination was not yet extirpated. The question this case presents is who decides whether, as currently operative, §5 remains justifiable,[1] this Court, or a Congress charged with the obligation to enforce the post-Civil War Amendments "by appropriate legislation." With overwhelming support in both Houses, Congress concluded that, for two prime reasons, §5 should continue in force, unabated. First, continuance would facilitate completion of the impressive gains thus far made; and second, continuance would guard against backsliding. Those assessments were well within Congress' province to make and should elicit this Court's unstinting approbation.

## I

"[V]oting discrimination still exists; no one doubts that."

————————

[1] The Court purports to declare unconstitutional only the coverage formula set out in §4(b). See *ante*, at 24. But without that formula, §5 is immobilized.

*Ante*, at 2. But the Court today terminates the remedy that proved to be best suited to block that discrimination. The Voting Rights Act of 1965 (VRA) has worked to combat voting discrimination where other remedies had been tried and failed. Particularly effective is the VRA's requirement of federal preclearance for all changes to voting laws in the regions of the country with the most aggravated records of rank discrimination against minority voting rights.

A century after the Fourteenth and Fifteenth Amendments guaranteed citizens the right to vote free of discrimination on the basis of race, the "blight of racial discrimination in voting" continued to "infec[t] the electoral process in parts of our country." *South Carolina* v. *Katzenbach*, 383 U. S. 301, 308 (1966). Early attempts to cope with this vile infection resembled battling the Hydra. Whenever one form of voting discrimination was identified and prohibited, others sprang up in its place. This Court repeatedly encountered the remarkable "variety and persistence" of laws disenfranchising minority citizens. *Id.,* at 311. To take just one example, the Court, in 1927, held unconstitutional a Texas law barring black voters from participating in primary elections, *Nixon* v. *Herndon*, 273 U. S. 536, 541; in 1944, the Court struck down a "reenacted" and slightly altered version of the same law, *Smith* v. *Allwright*, 321 U. S. 649, 658; and in 1953, the Court once again confronted an attempt by Texas to "circumven[t]" the Fifteenth Amendment by adopting yet another variant of the all-white primary, *Terry* v. *Adams*, 345 U. S. 461, 469.

During this era, the Court recognized that discrimination against minority voters was a quintessentially political problem requiring a political solution. As Justice Holmes explained: If "the great mass of the white population intends to keep the blacks from voting," "relief from [that] great political wrong, if done, as alleged, by the

people of a State and the State itself, must be given by them or by the legislative and political department of the government of the United States." *Giles* v. *Harris*, 189 U. S. 475, 488 (1903).

Congress learned from experience that laws targeting particular electoral practices or enabling case-by-case litigation were inadequate to the task. In the Civil Rights Acts of 1957, 1960, and 1964, Congress authorized and then expanded the power of "the Attorney General to seek injunctions against public and private interference with the right to vote on racial grounds." *Katzenbach*, 383 U. S., at 313. But circumstances reduced the ameliorative potential of these legislative Acts:

> "Voting suits are unusually onerous to prepare, some-times requiring as many as 6,000 man-hours spent combing through registration records in preparation for trial. Litigation has been exceedingly slow, in part because of the ample opportunities for delay afforded voting officials and others involved in the proceed-ings. Even when favorable decisions have finally been obtained, some of the States affected have merely switched to discriminatory devices not covered by the federal decrees or have enacted difficult new tests de-signed to prolong the existing disparity between white and Negro registration. Alternatively, certain local of-ficials have defied and evaded court orders or have simply closed their registration offices to freeze the voting rolls." *Id.,* at 314 (footnote omitted).

Patently, a new approach was needed.

Answering that need, the Voting Rights Act became one of the most consequential, efficacious, and amply justified exercises of federal legislative power in our Nation's his-tory. Requiring federal preclearance of changes in voting laws in the covered jurisdictions—those States and locali-ties where opposition to the Constitution's commands were

most virulent—the VRA provided a fit solution for minor-
ity voters as well as for States. Under the preclearance
regime established by §5 of the VRA, covered jurisdictions
must submit proposed changes in voting laws or proce-
dures to the Department of Justice (DOJ), which has 60
days to respond to the changes. 79 Stat. 439, codified at
42 U. S. C. §1973c(a). A change will be approved unless
DOJ finds it has "the purpose [or] . . . the effect of denying
or abridging the right to vote on account of race or color."
*Ibid.* In the alternative, the covered jurisdiction may seek
approval by a three-judge District Court in the District of
Columbia.

 After a century's failure to fulfill the promise of the
Fourteenth and Fifteenth Amendments, passage of the
VRA finally led to signal improvement on this front. "The
Justice Department estimated that in the five years after
[the VRA's] passage, almost as many blacks registered [to
vote] in Alabama, Mississippi, Georgia, Louisiana, North
Carolina, and South Carolina as in the entire century
before 1965." Davidson, The Voting Rights Act: A Brief
History, in Controversies in Minority Voting 7, 21 (B.
Grofman & C. Davidson eds. 1992). And in assessing the
overall effects of the VRA in 2006, Congress found that
"[s]ignificant progress has been made in eliminating first
generation barriers experienced by minority voters, in-
cluding increased numbers of registered minority voters,
minority voter turnout, and minority representation in
Congress, State legislatures, and local elected offices. This
progress is the direct result of the Voting Rights Act of
1965." Fannie Lou Hamer, Rosa Parks, and Coretta Scott
King Voting Rights Act Reauthorization and Amendments
Act of 2006 (hereinafter 2006 Reauthorization), §2(b)(1),
120 Stat. 577. On that matter of cause and effects there
can be no genuine doubt.

 Although the VRA wrought dramatic changes in the
realization of minority voting rights, the Act, to date,

surely has not eliminated all vestiges of discrimination against the exercise of the franchise by minority citizens. Jurisdictions covered by the preclearance requirement continued to submit, in large numbers, proposed changes to voting laws that the Attorney General declined to approve, auguring that barriers to minority voting would quickly resurface were the preclearance remedy eliminated. *City of Rome* v. *United States*, 446 U. S. 156, 181 (1980). Congress also found that as "registration and voting of minority citizens increas[ed], other measures may be resorted to which would dilute increasing minority voting strength." *Ibid.* (quoting H. R. Rep. No. 94–196, p. 10 (1975)). See also *Shaw* v. *Reno*, 509 U. S. 630, 640 (1993) ("[I]t soon became apparent that guaranteeing equal access to the polls would not suffice to root out other racially discriminatory voting practices" such as voting dilution). Efforts to reduce the impact of minority votes, in contrast to direct attempts to block access to the ballot, are aptly described as "second-generation barriers" to minority voting.

Second-generation barriers come in various forms. One of the blockages is racial gerrymandering, the redrawing of legislative districts in an "effort to segregate the races for purposes of voting." *Id.,* at 642. Another is adoption of a system of at-large voting in lieu of district-by-district voting in a city with a sizable black minority. By switching to at-large voting, the overall majority could control the election of each city council member, effectively eliminating the potency of the minority's votes. Grofman & Davidson, The Effect of Municipal Election Structure on Black Representation in Eight Southern States, in Quiet Revolution in the South 301, 319 (C. Davidson & B. Grofman eds. 1994) (hereinafter Quiet Revolution). A similar effect could be achieved if the city engaged in discriminatory annexation by incorporating majority-white areas into city limits, thereby decreasing the effect

of VRA-occasioned increases in black voting. Whatever the device employed, this Court has long recognized that vote dilution, when adopted with a discriminatory purpose, cuts down the right to vote as certainly as denial of access to the ballot. *Shaw*, 509 U. S., at 640–641; *Allen* v. *State Bd. of Elections*, 393 U. S. 544, 569 (1969); *Reynolds* v. *Sims*, 377 U. S. 533, 555 (1964). See also H. R. Rep. No. 109–478, p. 6 (2006) (although "[d]iscrimination today is more subtle than the visible methods used in 1965," "the effect and results are the same, namely a diminishing of the minority community's ability to fully participate in the electoral process and to elect their preferred candidates").

In response to evidence of these substituted barriers, Congress reauthorized the VRA for five years in 1970, for seven years in 1975, and for 25 years in 1982. *Ante*, at 4–5. Each time, this Court upheld the reauthorization as a valid exercise of congressional power. *Ante*, at 5. As the 1982 reauthorization approached its 2007 expiration date, Congress again considered whether the VRA's preclearance mechanism remained an appropriate response to the problem of voting discrimination in covered jurisdictions.

Congress did not take this task lightly. Quite the opposite. The 109th Congress that took responsibility for the renewal started early and conscientiously. In October 2005, the House began extensive hearings, which continued into November and resumed in March 2006. S. Rep. No. 109–295, p. 2 (2006). In April 2006, the Senate followed suit, with hearings of its own. *Ibid.* In May 2006, the bills that became the VRA's reauthorization were introduced in both Houses. *Ibid.* The House held further hearings of considerable length, as did the Senate, which continued to hold hearings into June and July. H. R. Rep. 109–478, at 5; S. Rep. 109–295, at 3–4. In mid-July, the House considered and rejected four amendments, then passed the reauthorization by a vote of 390 yeas to 33 nays. 152 Cong. Rec. H5207 (July 13, 2006); Persily, The

Promise and Pitfalls of the New Voting Rights Act, 117 Yale L. J. 174, 182–183 (2007) (hereinafter Persily). The bill was read and debated in the Senate, where it passed by a vote of 98 to 0. 152 Cong. Rec. S8012 (July 20, 2006). President Bush signed it a week later, on July 27, 2006, recognizing the need for "further work . . . in the fight against injustice," and calling the reauthorization "an example of our continued commitment to a united America where every person is valued and treated with dignity and respect." 152 Cong. Rec. S8781 (Aug. 3, 2006).

In the long course of the legislative process, Congress "amassed a sizable record." *Northwest Austin Municipal Util. Dist. No. One* v. *Holder,* 557 U. S. 193, 205 (2009). See also 679 F. 3d 848, 865–873 (CADC 2012) (describing the "extensive record" supporting Congress' determination that "serious and widespread intentional discrimination persisted in covered jurisdictions"). The House and Senate Judiciary Committees held 21 hearings, heard from scores of witnesses, received a number of investigative reports and other written documentation of continuing discrimination in covered jurisdictions. In all, the legislative record Congress compiled filled more than 15,000 pages. H. R. Rep. 109–478, at 5, 11–12; S. Rep. 109–295, at 2–4, 15. The compilation presents countless "examples of flagrant racial discrimination" since the last reauthorization; Congress also brought to light systematic evidence that "intentional racial discrimination in voting remains so serious and widespread in covered jurisdictions that section 5 preclearance is still needed." 679 F. 3d, at 866.

After considering the full legislative record, Congress made the following findings: The VRA has directly caused significant progress in eliminating first-generation barriers to ballot access, leading to a marked increase in minority voter registration and turnout and the number of minority elected officials. 2006 Reauthorization §2(b)(1). But despite this progress, "second generation barriers

constructed to prevent minority voters from fully partici-
pating in the electoral process" continued to exist, as well
as racially polarized voting in the covered jurisdictions,
which increased the political vulnerability of racial and
language minorities in those jurisdictions. §§2(b)(2)–(3),
120 Stat. 577. Extensive "[e]vidence of continued discrim-
ination," Congress concluded, "clearly show[ed] the con-
tinued need for Federal oversight" in covered jurisdictions.
§§2(b)(4)–(5), *id.,* at 577–578. The overall record demon-
strated to the federal lawmakers that, "without the con-
tinuation of the Voting Rights Act of 1965 protections,
racial and language minority citizens will be deprived of
the opportunity to exercise their right to vote, or will have
their votes diluted, undermining the significant gains
made by minorities in the last 40 years." §2(b)(9), *id.,* at
578.

Based on these findings, Congress reauthorized pre-
clearance for another 25 years, while also undertaking to
reconsider the extension after 15 years to ensure that the
provision was still necessary and effective. 42 U. S. C.
§1973b(a)(7), (8) (2006 ed., Supp. V). The question before
the Court is whether Congress had the authority under
the Constitution to act as it did.

## II

In answering this question, the Court does not write on
a clean slate. It is well established that Congress' judg-
ment regarding exercise of its power to enforce the Four-
teenth and Fifteenth Amendments warrants substantial
deference. The VRA addresses the combination of race
discrimination and the right to vote, which is "preserva-
tive of all rights." *Yick Wo* v. *Hopkins,* 118 U. S. 356, 370
(1886). When confronting the most constitutionally invid-
ious form of discrimination, and the most fundamental
right in our democratic system, Congress' power to act is
at its height.

The basis for this deference is firmly rooted in both constitutional text and precedent.  The Fifteenth Amendment, which targets precisely and only racial discrimination in voting rights, states that, in this domain, "Congress shall have power to enforce this article by appropriate legislation."[2]  In choosing this language, the Amendment's framers invoked Chief Justice Marshall's formulation of the scope of Congress' powers under the Necessary and Proper Clause:

> "Let the end be legitimate, let it be within the scope of the constitution, and *all means which are appropriate, which are plainly adapted to that end*, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional."  *McCulloch* v. *Maryland*, 4 Wheat. 316, 421 (1819) (emphasis added).

It cannot tenably be maintained that the VRA, an Act of Congress adopted to shield the right to vote from racial discrimination, is inconsistent with the letter or spirit of the Fifteenth Amendment, or any provision of the Constitution read in light of the Civil War Amendments.  Nowhere in today's opinion, or in *Northwest Austin*,[3] is there

---

[2]The Constitution uses the words "right to vote" in five separate places: the Fourteenth, Fifteenth, Nineteenth, Twenty-Fourth, and Twenty-Sixth Amendments.  Each of these Amendments contains the same broad empowerment of Congress to enact "appropriate legislation" to enforce the protected right.  The implication is unmistakable: Under our constitutional structure, Congress holds the lead rein in making the right to vote equally real for all U. S. citizens.  These Amendments are in line with the special role assigned to Congress in protecting the integrity of the democratic process in federal elections.  U. S. Const., Art. I, §4 ("[T]he Congress may at any time by Law make or alter" regulations concerning the "Times, Places and Manner of holding Elections for Senators and Representatives."); *Arizona* v. *Inter Tribal Council of Ariz., Inc., ante*, at 5–6.

[3]Acknowledging the existence of "serious constitutional questions," see *ante*, at 22 (internal quotation marks omitted), does not suggest how those questions should be answered.

clear recognition of the transformative effect the Fifteenth Amendment aimed to achieve. Notably, "the Founders' first successful amendment told Congress that it could 'make no law' over a certain domain"; in contrast, the Civil War Amendments used "language [that] authorized transformative new federal statutes to uproot all vestiges of unfreedom and inequality" and provided "sweeping enforcement powers . . . to enact 'appropriate' legislation targeting state abuses." A. Amar, America's Constitution: A Biography 361, 363, 399 (2005). See also McConnell, Institutions and Interpretation: A Critique of *City of Boerne v. Flores*, 111 Harv. L. Rev. 153, 182 (1997) (quoting Civil War-era framer that "the remedy for the violation of the fourteenth and fifteenth amendments was expressly not left to the courts. The remedy was legislative.").

The stated purpose of the Civil War Amendments was to arm Congress with the power and authority to protect all persons within the Nation from violations of their rights by the States. In exercising that power, then, Congress may use "all means which are appropriate, which are plainly adapted" to the constitutional ends declared by these Amendments. *McCulloch*, 4 Wheat., at 421. So when Congress acts to enforce the right to vote free from racial discrimination, we ask not whether Congress has chosen the means most wise, but whether Congress has rationally selected means appropriate to a legitimate end. "It is not for us to review the congressional resolution of [the need for its chosen remedy]. It is enough that we be able to perceive a basis upon which the Congress might resolve the conflict as it did." *Katzenbach* v. *Morgan*, 384 U. S. 641, 653 (1966).

Until today, in considering the constitutionality of the VRA, the Court has accorded Congress the full measure of respect its judgments in this domain should garner. *South Carolina* v. *Katzenbach* supplies the standard of review:

"As against the reserved powers of the States, Congress may use any rational means to effectuate the constitutional prohibition of racial discrimination in voting." 383 U. S., at 324. Faced with subsequent reauthorizations of the VRA, the Court has reaffirmed this standard. *E.g., City of Rome*, 446 U. S., at 178. Today's Court does not purport to alter settled precedent establishing that the dispositive question is whether Congress has employed "rational means."

For three reasons, legislation *re*authorizing an existing statute is especially likely to satisfy the minimal requirements of the rational-basis test. First, when reauthorization is at issue, Congress has already assembled a legislative record justifying the initial legislation. Congress is entitled to consider that preexisting record as well as the record before it at the time of the vote on reauthorization. This is especially true where, as here, the Court has repeatedly affirmed the statute's constitutionality and Congress has adhered to the very model the Court has upheld. See *id.*, at 174 ("The appellants are asking us to do nothing less than overrule our decision in *South Carolina* v. *Katzenbach* . . . , in which we upheld the constitutionality of the Act."); *Lopez* v. *Monterey County*, 525 U. S. 266, 283 (1999) (similar).

Second, the very fact that reauthorization is necessary arises because Congress has built a temporal limitation into the Act. It has pledged to review, after a span of years (first 15, then 25) and in light of contemporary evidence, the continued need for the VRA. Cf. *Grutter* v. *Bollinger*, 539 U. S. 306, 343 (2003) (anticipating, but not guaranteeing, that, in 25 years, "the use of racial preferences [in higher education] will no longer be necessary").

Third, a reviewing court should expect the record supporting reauthorization to be less stark than the record originally made. Demand for a record of violations equivalent to the one earlier made would expose Congress to a

catch-22. If the statute was working, there would be less evidence of discrimination, so opponents might argue that Congress should not be allowed to renew the statute. In contrast, if the statute was not working, there would be plenty of evidence of discrimination, but scant reason to renew a failed regulatory regime. See Persily 193–194.

This is not to suggest that congressional power in this area is limitless. It is this Court's responsibility to ensure that Congress has used appropriate means. The question meet for judicial review is whether the chosen means are "adapted to carry out the objects the amendments have in view." *Ex parte Virginia*, 100 U. S. 339, 346 (1880). The Court's role, then, is not to substitute its judgment for that of Congress, but to determine whether the legislative record sufficed to show that "Congress could rationally have determined that [its chosen] provisions were appropriate methods." *City of Rome*, 446 U. S., at 176–177.

In summary, the Constitution vests broad power in Congress to protect the right to vote, and in particular to combat racial discrimination in voting. This Court has repeatedly reaffirmed Congress' prerogative to use any rational means in exercise of its power in this area. And both precedent and logic dictate that the rational-means test should be easier to satisfy, and the burden on the statute's challenger should be higher, when what is at issue is the reauthorization of a remedy that the Court has previously affirmed, and that Congress found, from contemporary evidence, to be working to advance the legislature's legitimate objective.

### III

The 2006 reauthorization of the Voting Rights Act fully satisfies the standard stated in *McCulloch*, 4 Wheat., at 421: Congress may choose any means "appropriate" and "plainly adapted to" a legitimate constitutional end. As we shall see, it is implausible to suggest otherwise.

### A

I begin with the evidence on which Congress based its decision to continue the preclearance remedy. The surest way to evaluate whether that remedy remains in order is to see if preclearance is still effectively preventing discriminatory changes to voting laws. See *City of Rome*, 446 U. S., at 181 (identifying "information on the number and types of submissions made by covered jurisdictions and the number and nature of objections interposed by the Attorney General" as a primary basis for upholding the 1975 reauthorization). On that score, the record before Congress was huge. In fact, Congress found there were *more* DOJ objections between 1982 and 2004 (626) than there were between 1965 and the 1982 reauthorization (490). 1 Voting Rights Act: Evidence of Continued Need, Hearing before the Subcommittee on the Constitution of the House Committee on the Judiciary, 109th Cong., 2d Sess., p. 172 (2006) (hereinafter Evidence of Continued Need).

All told, between 1982 and 2006, DOJ objections blocked over 700 voting changes based on a determination that the changes were discriminatory. H. R. Rep. No. 109–478, at 21. Congress found that the majority of DOJ objections included findings of discriminatory intent, see 679 F. 3d, at 867, and that the changes blocked by preclearance were "calculated decisions to keep minority voters from fully participating in the political process." H. R. Rep. 109–478, at 21. On top of that, over the same time period the DOJ and private plaintiffs succeeded in more than 100 actions to enforce the §5 preclearance requirements. 1 Evidence of Continued Need 186, 250.

In addition to blocking proposed voting changes through preclearance, DOJ may request more information from a jurisdiction proposing a change. In turn, the jurisdiction may modify or withdraw the proposed change. The number of such modifications or withdrawals provides an

indication of how many discriminatory proposals are deterred without need for formal objection. Congress received evidence that more than 800 proposed changes were altered or withdrawn since the last reauthorization in 1982. H. R. Rep. No. 109–478, at 40–41.[4] Congress also received empirical studies finding that DOJ's requests for more information had a significant effect on the degree to which covered jurisdictions "compl[ied] with their obliga-tio[n]" to protect minority voting rights. 2 Evidence of Continued Need 2555.

Congress also received evidence that litigation under §2 of the VRA was an inadequate substitute for preclearance in the covered jurisdictions. Litigation occurs only after the fact, when the illegal voting scheme has already been put in place and individuals have been elected pursuant to it, thereby gaining the advantages of incumbency. 1 Evi-dence of Continued Need 97. An illegal scheme might be in place for several election cycles before a §2 plaintiff can gather sufficient evidence to challenge it. 1 Voting Rights Act: Section 5 of the Act—History, Scope, and Purpose: Hearing before the Subcommittee on the Constitution of the House Committee on the Judiciary, 109th Cong., 1st Sess., p. 92 (2005) (hereinafter Section 5 Hearing). And litigation places a heavy financial burden on minority voters. See *id.,* at 84. Congress also received evidence

––––––––

[4]This number includes only changes actually proposed. Congress also received evidence that many covered jurisdictions engaged in an "informal consultation process" with DOJ before formally submitting a proposal, so that the deterrent effect of preclearance was far broader than the formal submissions alone suggest. The Continuing Need for Section 5 Pre-Clearance: Hearing before the Senate Committee on the Judiciary, 109th Cong., 2d Sess., pp. 53–54 (2006). All agree that an unsupported assertion about "deterrence" would not be sufficient to justify keeping a remedy in place in perpetuity. See *ante,* at 17. But it was certainly reasonable for Congress to consider the testimony of witnesses who had worked with officials in covered jurisdictions and observed a real-world deterrent effect.

that preclearance lessened the litigation burden on covered jurisdictions themselves, because the preclearance process is far less costly than defending against a §2 claim, and clearance by DOJ substantially reduces the likelihood that a §2 claim will be mounted. Reauthorizing the Voting Rights Act's Temporary Provisions: Policy Perspectives and Views From the Field: Hearing before the Subcommittee on the Constitution, Civil Rights and Property Rights of the Senate Committee on the Judiciary, 109th Cong., 2d Sess., pp. 13, 120–121 (2006). See also Brief for States of New York, California, Mississippi, and North Carolina as *Amici Curiae* 8–9 (Section 5 "reduc[es] the likelihood that a jurisdiction will face costly and protracted Section 2 litigation").

The number of discriminatory changes blocked or deterred by the preclearance requirement suggests that the state of voting rights in the covered jurisdictions would have been significantly different absent this remedy. Surveying the type of changes stopped by the preclearance procedure conveys a sense of the extent to which §5 continues to protect minority voting rights. Set out below are characteristic examples of changes blocked in the years leading up to the 2006 reauthorization:

- In 1995, Mississippi sought to reenact a dual voter registration system, "which was initially enacted in 1892 to disenfranchise Black voters," and for that reason, was struck down by a federal court in 1987. H. R. Rep. No. 109–478, at 39.

- Following the 2000 census, the City of Albany, Georgia, proposed a redistricting plan that DOJ found to be "designed with the purpose to limit and retrogress the increased black voting strength . . . in the city as a whole." *Id.*, at 37 (internal quotation marks omitted).

- In 2001, the mayor and all-white five-member Board of Aldermen of Kilmichael, Mississippi, abruptly canceled the town's election after "an unprecedented number" of African-American candidates announced they were running for office. DOJ required an election, and the town elected its first black mayor and three black aldermen. *Id.,* at 36–37.

- In 2006, this Court found that Texas' attempt to redraw a congressional district to reduce the strength of Latino voters bore "the mark of intentional discrimination that could give rise to an equal protection violation," and ordered the district redrawn in compliance with the VRA. *League of United Latin American Citizens* v. *Perry*, 548 U. S. 399, 440 (2006). In response, Texas sought to undermine this Court's order by curtailing early voting in the district, but was blocked by an action to enforce the §5 preclearance requirement. See Order in *League of United Latin American Citizens* v. *Texas*, No. 06–cv–1046 (WD Tex.), Doc. 8.

- In 2003, after African-Americans won a majority of the seats on the school board for the first time in history, Charleston County, South Carolina, proposed an at-large voting mechanism for the board. The proposal, made without consulting any of the African-American members of the school board, was found to be an "'exact replica'" of an earlier voting scheme that, a federal court had determined, violated the VRA. 811 F. Supp. 2d 424, 483 (DDC 2011). See also S. Rep. No. 109–295, at 309. DOJ invoked §5 to block the proposal.

- In 1993, the City of Millen, Georgia, proposed to delay the election in a majority-black district by two

years, leaving that district without representation
on the city council while the neighboring majority-
white district would have three representatives. 1
Section 5 Hearing 744. DOJ blocked the proposal.
The county then sought to move a polling place
from a predominantly black neighborhood in the
city to an inaccessible location in a predominantly
white neighborhood outside city limits. *Id.,* at 816.

- In 2004, Waller County, Texas, threatened to prose-
cute two black students after they announced their
intention to run for office. The county then at-
tempted to reduce the availability of early voting in
that election at polling places near a historically
black university. 679 F. 3d, at 865–866.

- In 1990, Dallas County, Alabama, whose county
seat is the City of Selma, sought to purge its voter
rolls of many black voters. DOJ rejected the purge
as discriminatory, noting that it would have disquali-
fied many citizens from voting "simply because
they failed to pick up or return a voter update
form, when there was no valid requirement that
they do so." 1 Section 5 Hearing 356.

These examples, and scores more like them, fill the
pages of the legislative record. The evidence was indeed
sufficient to support Congress' conclusion that "racial
discrimination in voting in covered jurisdictions [re-
mained] serious and pervasive." 679 F. 3d, at 865.[5]

---

[5] For an illustration postdating the 2006 reauthorization, see *South
Carolina* v. *United States*, 898 F. Supp. 2d 30 (DC 2012), which in-
volved a South Carolina voter-identification law enacted in 2011.
Concerned that the law would burden minority voters, DOJ brought a
§5 enforcement action to block the law's implementation. In the course
of the litigation, South Carolina officials agreed to binding interpreta-
tions that made it "far easier than some might have expected or feared"
for South Carolina citizens to vote. *Id.,* at 37. A three-judge panel

Congress further received evidence indicating that formal requests of the kind set out above represented only the tip of the iceberg. There was what one commentator described as an "avalanche of case studies of voting rights violations in the covered jurisdictions," ranging from "outright intimidation and violence against minority voters" to "more subtle forms of voting rights deprivations." Persily 202 (footnote omitted). This evidence gave Congress ever more reason to conclude that the time had not yet come for relaxed vigilance against the scourge of race discrimination in voting.

True, conditions in the South have impressively improved since passage of the Voting Rights Act. Congress noted this improvement and found that the VRA was the driving force behind it. 2006 Reauthorization §2(b)(1). But Congress also found that voting discrimination had evolved into subtler second-generation barriers, and that eliminating preclearance would risk loss of the gains that had been made. §§2(b)(2), (9). Concerns of this order, the Court previously found, gave Congress adequate cause to reauthorize the VRA. *City of Rome*, 446 U. S., at 180–182 (congressional reauthorization of the preclearance requirement was justified based on "the number and nature of objections interposed by the Attorney General" since the prior reauthorization; extension was "necessary to preserve the limited and fragile achievements of the Act and to promote further amelioration of voting discrimination") (internal quotation marks omitted). Facing such evidence then, the Court expressly rejected the argument that disparities in voter turnout and number of elected officials

---

precleared the law after adopting both interpretations as an express "condition of preclearance." *Id.,* at 37–38. Two of the judges commented that the case demonstrated "the continuing utility of Section 5 of the Voting Rights Act in deterring problematic, and hence encouraging non-discriminatory, changes in state and local voting laws." *Id.,* at 54 (opinion of Bates, J.).

were the only metrics capable of justifying reauthorization
of the VRA. *Ibid.*

## B

I turn next to the evidence on which Congress based its
decision to reauthorize the coverage formula in §4(b).
Because Congress did not alter the coverage formula, the
same jurisdictions previously subject to preclearance
continue to be covered by this remedy. The evidence just
described, of preclearance's continuing efficacy in blocking
constitutional violations in the covered jurisdictions, itself
grounded Congress' conclusion that the remedy should be
retained for those jurisdictions.

There is no question, moreover, that the covered juris-
dictions have a unique history of problems with racial
discrimination in voting. *Ante*, at 12–13. Consideration of
this long history, still in living memory, was altogether
appropriate. The Court criticizes Congress for failing to
recognize that "history did not end in 1965." *Ante*, at 20.
But the Court ignores that "what's past is prologue." W.
Shakespeare, The Tempest, act 2, sc. 1. And "[t]hose who
cannot remember the past are condemned to repeat it." 1
G. Santayana, The Life of Reason 284 (1905). Congress
was especially mindful of the need to reinforce the gains
already made and to prevent backsliding. 2006 Reauthor-
ization §2(b)(9).

Of particular importance, even after 40 years and thou-
sands of discriminatory changes blocked by preclearance,
conditions in the covered jurisdictions demonstrated that
the formula was still justified by "current needs." *North-
west Austin*, 557 U. S., at 203.

Congress learned of these conditions through a report,
known as the Katz study, that looked at §2 suits between
1982 and 2004. To Examine the Impact and Effectiveness
of the Voting Rights Act: Hearing before the Subcommit-
tee on the Constitution of the House Committee on the

Judiciary, 109th Cong., 1st Sess., pp. 964–1124 (2005) (hereinafter Impact and Effectiveness). Because the private right of action authorized by §2 of the VRA applies nationwide, a comparison of §2 lawsuits in covered and noncovered jurisdictions provides an appropriate yardstick for measuring differences between covered and noncovered jurisdictions. If differences in the risk of voting discrimination between covered and noncovered jurisdictions had disappeared, one would expect that the rate of successful §2 lawsuits would be roughly the same in both areas.[6] The study's findings, however, indicated that racial discrimination in voting remains "concentrated in the jurisdictions singled out for preclearance." *Northwest Austin*, 557 U. S., at 203.

Although covered jurisdictions account for less than 25 percent of the country's population, the Katz study revealed that they accounted for 56 percent of successful §2 litigation since 1982. Impact and Effectiveness 974. Controlling for population, there were nearly *four* times as many successful §2 cases in covered jurisdictions as there were in noncovered jurisdictions. 679 F. 3d, at 874. The Katz study further found that §2 lawsuits are more likely to succeed when they are filed in covered jurisdictions than in noncovered jurisdictions. Impact and Effectiveness 974. From these findings—ignored by the Court—Congress reasonably concluded that the coverage formula continues to identify the jurisdictions of greatest concern.

The evidence before Congress, furthermore, indicated that voting in the covered jurisdictions was more racially polarized than elsewhere in the country. H. R. Rep. No. 109–478, at 34–35. While racially polarized voting alone

---

[6] Because preclearance occurs only in covered jurisdictions and can be expected to stop the most obviously objectionable measures, one would expect a *lower* rate of successful §2 lawsuits in those jurisdictions if the risk of voting discrimination there were the same as elsewhere in the country.

does not signal a constitutional violation, it is a factor that increases the vulnerability of racial minorities to discriminatory changes in voting law. The reason is twofold. First, racial polarization means that racial minorities are at risk of being systematically outvoted and having their interests underrepresented in legislatures. Second, "when political preferences fall along racial lines, the natural inclinations of incumbents and ruling parties to entrench themselves have predictable racial effects. Under circumstances of severe racial polarization, efforts to gain political advantage translate into race-specific disadvantages." Ansolabehere, Persily, & Stewart, Regional Differences in Racial Polarization in the 2012 Presidential Election: Implications for the Constitutionality of Section 5 of the Voting Rights Act, 126 Harv. L. Rev. Forum 205, 209 (2013).

In other words, a governing political coalition has an incentive to prevent changes in the existing balance of voting power. When voting is racially polarized, efforts by the ruling party to pursue that incentive "will inevitably discriminate against a racial group." *Ibid.* Just as buildings in California have a greater need to be earthquake-proofed, places where there is greater racial polarization in voting have a greater need for prophylactic measures to prevent purposeful race discrimination. This point was understood by Congress and is well recognized in the academic literature. See 2006 Reauthorization §2(b)(3), 120 Stat. 577 ("The continued evidence of racially polarized voting in each of the jurisdictions covered by the [preclearance requirement] demonstrates that racial and language minorities remain politically vulnerable"); H. R. Rep. No. 109–478, at 35; Davidson, The Recent Evolution of Voting Rights Law Affecting Racial and Language Minorities, in Quiet Revolution 21, 22.

The case for retaining a coverage formula that met needs on the ground was therefore solid. Congress might

have been charged with rigidity had it afforded covered
jurisdictions no way out or ignored jurisdictions that
needed superintendence. Congress, however, responded to
this concern. Critical components of the congressional
design are the statutory provisions allowing jurisdictions
to "bail out" of preclearance, and for court-ordered "bail
ins." See *Northwest Austin*, 557 U. S., at 199. The VRA
permits a jurisdiction to bail out by showing that it has
complied with the Act for ten years, and has engaged in
efforts to eliminate intimidation and harassment of vot-
ers. 42 U. S. C. §1973b(a) (2006 ed. and Supp. V). It also
authorizes a court to subject a noncovered jurisdiction to
federal preclearance upon finding that violations of the
Fourteenth and Fifteenth Amendments have occurred
there. §1973a(c) (2006 ed.).

Congress was satisfied that the VRA's bailout mecha-
nism provided an effective means of adjusting the VRA's
coverage over time. H. R. Rep. No. 109–478, at 25 (the
success of bailout "illustrates that: (1) covered status is
neither permanent nor over-broad; and (2) covered status
has been and continues to be within the control of the
jurisdiction such that those jurisdictions that have a genu-
inely clean record and want to terminate coverage have
the ability to do so"). Nearly 200 jurisdictions have suc-
cessfully bailed out of the preclearance requirement, and
DOJ has consented to every bailout application filed by an
eligible jurisdiction since the current bailout procedure
became effective in 1984. Brief for Federal Respondent 54.
The bail-in mechanism has also worked. Several jurisdic-
tions have been subject to federal preclearance by court
orders, including the States of New Mexico and Arkansas.
App. to Brief for Federal Respondent 1a–3a.

This experience exposes the inaccuracy of the Court's
portrayal of the Act as static, unchanged since 1965.
Congress designed the VRA to be a dynamic statute, capa-
ble of adjusting to changing conditions. True, many cov-

ered jurisdictions have not been able to bail out due to recent acts of noncompliance with the VRA, but that truth reinforces the congressional judgment that these jurisdictions were rightfully subject to preclearance, and ought to remain under that regime.

## IV

Congress approached the 2006 reauthorization of the VRA with great care and seriousness. The same cannot be said of the Court's opinion today. The Court makes no genuine attempt to engage with the massive legislative record that Congress assembled. Instead, it relies on increases in voter registration and turnout as if that were the whole story. See *supra,* at 18–19. Without even identifying a standard of review, the Court dismissively brushes off arguments based on "data from the record," and declines to enter the "debat[e about] what [the] record shows." *Ante*, at 20–21. One would expect more from an opinion striking at the heart of the Nation's signal piece of civil-rights legislation.

I note the most disturbing lapses. First, by what right, given its usual restraint, does the Court even address Shelby County's facial challenge to the VRA? Second, the Court veers away from controlling precedent regarding the "equal sovereignty" doctrine without even acknowledging that it is doing so. Third, hardly showing the respect ordinarily paid when Congress acts to implement the Civil War Amendments, and as just stressed, the Court does not even deign to grapple with the legislative record.

## A

Shelby County launched a purely facial challenge to the VRA's 2006 reauthorization. "A facial challenge to a legislative Act," the Court has other times said, "is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circum-

stances exists under which the Act would be valid." *United States* v. *Salerno*, 481 U. S. 739, 745 (1987).

"[U]nder our constitutional system[,] courts are not roving commissions assigned to pass judgment on the validity of the Nation's laws." *Broadrick* v. *Oklahoma*, 413 U. S. 601, 610–611 (1973). Instead, the "judicial Power" is limited to deciding particular "Cases" and "Controversies." U. S. Const., Art. III, §2. "Embedded in the traditional rules governing constitutional adjudication is the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court." *Broadrick*, 413 U. S., at 610. Yet the Court's opinion in this case contains not a word explaining why Congress lacks the power to subject to preclearance the particular plaintiff that initiated this lawsuit—Shelby County, Alabama. The reason for the Court's silence is apparent, for as applied to Shelby County, the VRA's preclearance requirement is hardly contestable.

Alabama is home to Selma, site of the "Bloody Sunday" beatings of civil-rights demonstrators that served as the catalyst for the VRA's enactment. Following those events, Martin Luther King, Jr., led a march from Selma to Montgomery, Alabama's capital, where he called for passage of the VRA. If the Act passed, he foresaw, progress could be made even in Alabama, but there had to be a steadfast national commitment to see the task through to completion. In King's words, "the arc of the moral universe is long, but it bends toward justice." G. May, Bending Toward Justice: The Voting Rights Act and the Transformation of American Democracy 144 (2013).

History has proved King right. Although circumstances in Alabama have changed, serious concerns remain. Between 1982 and 2005, Alabama had one of the highest rates of successful §2 suits, second only to its VRA-covered

neighbor Mississippi. 679 F. 3d, at 897 (Williams, J., dissenting). In other words, even while subject to the restraining effect of §5, Alabama was found to have "deni[ed] or abridge[d]" voting rights "on account of race or color" more frequently than nearly all other States in the Union. 42 U. S. C. §1973(a). This fact prompted the dissenting judge below to concede that "a more narrowly tailored coverage formula" capturing Alabama and a handful of other jurisdictions with an established track record of racial discrimination in voting "might be defensible." 679 F. 3d, at 897 (opinion of Williams, J.). That is an understatement. Alabama's sorry history of §2 violations alone provides sufficient justification for Congress' determination in 2006 that the State should remain subject to §5's preclearance requirement.[7]

A few examples suffice to demonstrate that, at least in Alabama, the "current burdens" imposed by §5's preclearance requirement are "justified by current needs." *Northwest Austin*, 557 U. S., at 203. In the interim between the VRA's 1982 and 2006 reauthorizations, this Court twice confronted purposeful racial discrimination in Alabama. In *Pleasant Grove* v. *United States*, 479 U. S. 462 (1987), the Court held that Pleasant Grove—a city in Jefferson County, Shelby County's neighbor—engaged in purposeful discrimination by annexing all-white areas while rejecting the annexation request of an adjacent black neighborhood. The city had "shown unambiguous opposition to racial

────────────

[7]This lawsuit was filed by Shelby County, a political subdivision of Alabama, rather than by the State itself. Nevertheless, it is appropriate to judge Shelby County's constitutional challenge in light of instances of discrimination statewide because Shelby County is subject to §5's preclearance requirement by virtue of *Alabama's* designation as a covered jurisdiction under §4(b) of the VRA. See *ante*, at 7. In any event, Shelby County's recent record of employing an at-large electoral system tainted by intentional racial discrimination is by itself sufficient to justify subjecting the county to §5's preclearance mandate. See *infra*, at 26.

integration, both before and after the passage of the fed-
eral civil rights laws," and its strategic annexations
appeared to be an attempt "to provide for the growth of
a monolithic white voting block" for "the impermissible
purpose of minimizing future black voting strength." *Id.*,
at 465, 471–472.

Two years before *Pleasant Grove*, the Court in *Hunter* v.
*Underwood*, 471 U. S. 222 (1985), struck down a provision
of the Alabama Constitution that prohibited individuals
convicted of misdemeanor offenses "involving moral turpi-
tude" from voting. *Id.*, at 223 (internal quotation marks
omitted). The provision violated the Fourteenth Amend-
ment's Equal Protection Clause, the Court unanimously
concluded, because "its original enactment was motivated
by a desire to discriminate against blacks on account of
race[,] and the [provision] continues to this day to have
that effect." *Id.*, at 233.

*Pleasant Grove* and *Hunter* were not anomalies. In
1986, a Federal District Judge concluded that the at-large
election systems in several Alabama counties violated §2.
*Dillard* v. *Crenshaw Cty.*, 640 F. Supp. 1347, 1354–1363
(MD Ala. 1986). Summarizing its findings, the court
stated that "[f]rom the late 1800's through the present,
[Alabama] has consistently erected barriers to keep black
persons from full and equal participation in the social,
economic, and political life of the state." *Id.*, at 1360.

The *Dillard* litigation ultimately expanded to include
183 cities, counties, and school boards employing discrim-
inatory at-large election systems. *Dillard* v. *Baldwin Cty.
Bd. of Ed.*, 686 F. Supp. 1459, 1461 (MD Ala. 1988). One
of those defendants was Shelby County, which eventually
signed a consent decree to resolve the claims against it.
See *Dillard* v. *Crenshaw Cty.*, 748 F. Supp. 819 (MD Ala.
1990).

Although the *Dillard* litigation resulted in overhauls of
numerous electoral systems tainted by racial discrimina-

tion, concerns about backsliding persist. In 2008, for example, the city of Calera, located in Shelby County, requested preclearance of a redistricting plan that "would have eliminated the city's sole majority-black district, which had been created pursuant to the consent decree in *Dillard*." 811 F. Supp. 2d 424, 443 (DC 2011). Although DOJ objected to the plan, Calera forged ahead with elections based on the unprecleared voting changes, resulting in the defeat of the incumbent African-American councilman who represented the former majority-black district. *Ibid.* The city's defiance required DOJ to bring a §5 enforcement action that ultimately yielded appropriate redress, including restoration of the majority-black district. *Ibid.*; Brief for Respondent-Intervenors Earl Cunningham et al. 20.

A recent FBI investigation provides a further window into the persistence of racial discrimination in state politics. See *United States* v. *McGregor*, 824 F. Supp. 2d 1339, 1344–1348 (MD Ala. 2011). Recording devices worn by state legislators cooperating with the FBI's investigation captured conversations between members of the state legislature and their political allies. The recorded conversations are shocking. Members of the state Senate derisively refer to African-Americans as "Aborigines" and talk openly of their aim to quash a particular gambling-related referendum because the referendum, if placed on the ballot, might increase African-American voter turnout. *Id.*, at 1345–1346 (internal quotation marks omitted). See also *id.*, at 1345 (legislators and their allies expressed concern that if the referendum were placed on the ballot, "'[e]very black, every illiterate' would be 'bused [to the polls] on HUD financed buses'"). These conversations occurred not in the 1870's, or even in the 1960's, they took place in 2010. *Id.*, at 1344–1345. The District Judge presiding over the criminal trial at which the recorded conversations were introduced commented that the "re-

cordings represent compelling evidence that political exclusion through racism remains a real and enduring problem" in Alabama. *Id.*, at 1347. Racist sentiments, the judge observed, "remain regrettably entrenched in the high echelons of state government." *Ibid.*

These recent episodes forcefully demonstrate that §5's preclearance requirement is constitutional as applied to Alabama and its political subdivisions.[8] And under our case law, that conclusion should suffice to resolve this case. See *United States* v. *Raines*, 362 U. S. 17, 24–25 (1960) ("[I]f the complaint here called for an application of the statute clearly constitutional under the Fifteenth Amendment, that should have been an end to the question of constitutionality."). See also *Nevada Dept. of Human Resources* v. *Hibbs*, 538 U. S. 721, 743 (2003) (SCALIA, J., dissenting) (where, as here, a state or local government raises a facial challenge to a federal statute on the ground that it exceeds Congress' enforcement powers under the Civil War Amendments, the challenge fails if the opposing party is able to show that the statute "could constitutionally be applied to *some* jurisdictions").

This Court has consistently rejected constitutional challenges to legislation enacted pursuant to Congress' enforcement powers under the Civil War Amendments upon finding that the legislation was constitutional as applied to the particular set of circumstances before the Court. See *United States* v. *Georgia*, 546 U. S. 151, 159 (2006) (Title II of the Americans with Disabilities Act of 1990 (ADA) validly abrogates state sovereign immunity "insofar as [it] creates a private cause of action . . . for conduct that *actually* violates the Fourteenth Amend-

---

[8] Congress continued preclearance over Alabama, including Shelby County, *after* considering evidence of current barriers there to minority voting clout. Shelby County, thus, is no "redhead" caught up in an arbitrary scheme. See *ante*, at 22.

ment"); *Tennessee* v. *Lane*, 541 U. S. 509, 530–534 (2004) (Title II of the ADA is constitutional "as it applies to the class of cases implicating the fundamental right of access to the courts"); *Raines*, 362 U. S., at 24–26 (federal statute proscribing deprivations of the right to vote based on race was constitutional as applied to the state officials before the Court, even if it could not constitutionally be applied to other parties). A similar approach is warranted here.[9]

The VRA's exceptionally broad severability provision makes it particularly inappropriate for the Court to allow Shelby County to mount a facial challenge to §§4(b) and 5 of the VRA, even though application of those provisions to the county falls well within the bounds of Congress' legislative authority. The severability provision states:

> "If any provision of [this Act] or the application thereof to any person or circumstances is held invalid, the remainder of [the Act] and the application of the provision to other persons not similarly situated or to other circumstances shall not be affected thereby." 42 U. S. C. §1973p.

In other words, even if the VRA could not constitutionally be applied to certain States—*e.g.*, Arizona and Alaska, see *ante*, at 8—§1973p calls for those unconstitutional applications to be severed, leaving the Act in place for jurisdictions as to which its application does not transgress constitutional limits.

——————

[9] The Court does not contest that Alabama's history of racial discrimination provides a sufficient basis for Congress to require Alabama and its political subdivisions to preclear electoral changes. Nevertheless, the Court asserts that Shelby County may prevail on its facial challenge to §4's coverage formula because it is subject to §5's preclearance requirement by virtue of that formula. See *ante*, at 22 ("The county was selected [for preclearance] based on th[e] [coverage] formula."). This misses the reality that Congress decided to subject Alabama to preclearance based on evidence of continuing constitutional violations in that State. See *supra*, at 28, n. 8.

Nevertheless, the Court suggests that limiting the jurisdictional scope of the VRA in an appropriate case would be "to try our hand at updating the statute." *Ante,* at 22. Just last Term, however, the Court rejected this very argument when addressing a materially identical severability provision, explaining that such a provision is "Congress' explicit textual instruction to leave unaffected the remainder of [the Act]" if any particular "application is unconstitutional." *National Federation of Independent Business* v. *Sebelius,* 567 U. S. __, __ (2012) (plurality opinion) (slip op., at 56) (internal quotation marks omitted); *id.,* at __ (GINSBURG, J., concurring in part, concurring in judgment in part, and dissenting in part) (slip op., at 60) (agreeing with the plurality's severability analysis). See also *Raines,* 362 U. S., at 23 (a statute capable of some constitutional applications may nonetheless be susceptible to a facial challenge only in "that rarest of cases where this Court can justifiably think itself able confidently to discern that Congress would not have desired its legislation to stand at all unless it could validly stand in its every application"). Leaping to resolve Shelby County's facial challenge without considering whether application of the VRA to Shelby County is constitutional, or even addressing the VRA's severability provision, the Court's opinion can hardly be described as an exemplar of restrained and moderate decisionmaking. Quite the opposite. Hubris is a fit word for today's demolition of the VRA.

### B

The Court stops any application of §5 by holding that §4(b)'s coverage formula is unconstitutional. It pins this result, in large measure, to "the fundamental principle of equal sovereignty." *Ante,* at 10–11, 23. In *Katzenbach,* however, the Court held, in no uncertain terms, that the principle "*applies only to the terms upon which States are admitted to the Union,* and not to the remedies for local

evils which have subsequently appeared." 383 U. S., at 328–329 (emphasis added).

*Katzenbach*, the Court acknowledges, "rejected the notion that the [equal sovereignty] principle operate[s] as a bar on differential treatment outside [the] context [of the admission of new States]." *Ante*, at 11 (citing 383 U. S., at 328–329) (emphasis omitted). But the Court clouds that once clear understanding by citing dictum from *Northwest Austin* to convey that the principle of equal sovereignty "remains highly pertinent in assessing subsequent disparate treatment of States." *Ante*, at 11 (citing 557 U. S., at 203). See also *ante*, at 23 (relying on *Northwest Austin*'s "emphasis on [the] significance" of the equal-sovereignty principle). If the Court is suggesting that dictum in *Northwest Austin* silently overruled *Katzenbach*'s limitation of the equal sovereignty doctrine to "the admission of new States," the suggestion is untenable. *Northwest Austin* cited *Katzenbach*'s holding in the course of *declining to decide* whether the VRA was constitutional or even what standard of review applied to the question. 557 U. S., at 203–204. In today's decision, the Court ratchets up what was pure dictum in *Northwest Austin*, attributing breadth to the equal sovereignty principle in flat contradiction of *Katzenbach*. The Court does so with nary an explanation of why it finds *Katzenbach* wrong, let alone any discussion of whether *stare decisis* nonetheless counsels adherence to *Katzenbach*'s ruling on the limited "significance" of the equal sovereignty principle.

Today's unprecedented extension of the equal sovereignty principle outside its proper domain—the admission of new States—is capable of much mischief. Federal statutes that treat States disparately are hardly novelties. See, *e.g.,* 28 U. S. C. §3704 (no State may operate or permit a sports-related gambling scheme, unless that State conducted such a scheme "at any time during the period beginning January 1, 1976, and ending August 31, 1990");

26 U. S. C. §142(*l*) (EPA required to locate green building project in a State meeting specified population criteria); 42 U. S. C. §3796bb (at least 50 percent of rural drug enforcement assistance funding must be allocated to States with "a population density of fifty-two or fewer persons per square mile or a State in which the largest county has fewer than one hundred and fifty thousand people, based on the decennial census of 1990 through fiscal year 1997"); §§13925, 13971 (similar population criteria for funding to combat rural domestic violence); §10136 (specifying rules applicable to Nevada's Yucca Mountain nuclear waste site, and providing that "[n]o State, other than the State of Nevada, may receive financial assistance under this subsection after December 22, 1987"). Do such provisions remain safe given the Court's expansion of equal sovereignty's sway?

Of gravest concern, Congress relied on our pathmarking *Katzenbach* decision in each reauthorization of the VRA. It had every reason to believe that the Act's limited geographical scope would weigh in favor of, not against, the Act's constitutionality. See, *e.g., United States* v. *Morrison*, 529 U. S. 598, 626–627 (2000) (confining preclearance regime to States with a record of discrimination bolstered the VRA's constitutionality). Congress could hardly have foreseen that the VRA's limited geographic reach would render the Act constitutionally suspect. See Persily 195 ("[S]upporters of the Act sought to develop an evidentiary record for the principal purpose of explaining why the covered jurisdictions should remain covered, rather than justifying the coverage of certain jurisdictions but not others.").

In the Court's conception, it appears, defenders of the VRA could not prevail upon showing what the record overwhelmingly bears out, *i.e.*, that there is a need for continuing the preclearance regime in covered States. In addition, the defenders would have to disprove the exist-

ence of a comparable need elsewhere. See Tr. of Oral Arg.
61–62 (suggesting that proof of egregious episodes of racial
discrimination in covered jurisdictions would not suffice to
carry the day for the VRA, unless such episodes are shown
to be absent elsewhere). I am aware of no precedent for
imposing such a double burden on defenders of legislation.

## C

The Court has time and again declined to upset legisla-
tion of this genre unless there was no or almost no evi-
dence of unconstitutional action by States. See, *e.g., City
of Boerne* v. *Flores*, 521 U. S. 507, 530 (1997) (legislative
record "mention[ed] no episodes [of the kind the legislation
aimed to check] occurring in the past 40 years"). No such
claim can be made about the congressional record for the
2006 VRA reauthorization. Given a record replete with
examples of denial or abridgment of a paramount federal
right, the Court should have left the matter where it
belongs: in Congress' bailiwick.

Instead, the Court strikes §4(b)'s coverage provision
because, in its view, the provision is not based on "current
conditions." *Ante*, at 17. It discounts, however, that one
such condition was the preclearance remedy in place in
the covered jurisdictions, a remedy Congress designed
both to catch discrimination before it causes harm, and to
guard against return to old ways. 2006 Reauthorization
§2(b)(3), (9). Volumes of evidence supported Congress' de-
termination that the prospect of retrogression was real.
Throwing out preclearance when it has worked and is
continuing to work to stop discriminatory changes is like
throwing away your umbrella in a rainstorm because you
are not getting wet.

But, the Court insists, the coverage formula is no good;
it is based on "decades-old data and eradicated practices."
*Ante*, at 18. Even if the legislative record shows, as engag-
ing with it would reveal, that the formula accurately

identifies the jurisdictions with the worst conditions of voting discrimination, that is of no moment, as the Court sees it. Congress, the Court decrees, must "star[t] from scratch." *Ante*, at 23. I do not see why that should be so.

Congress' chore was different in 1965 than it was in 2006. In 1965, there were a "small number of States . . . which in most instances were familiar to Congress by name," on which Congress fixed its attention. *Katzenbach*, 383 U. S., at 328. In drafting the coverage formula, "Congress began work with reliable evidence of actual voting discrimination in a great majority of the States" it sought to target. *Id.,* at 329. "The formula [Congress] eventually evolved to describe these areas" also captured a few States that had not been the subject of congressional factfinding. *Ibid.* Nevertheless, the Court upheld the formula in its entirety, finding it fair "to infer a significant danger of the evil" in all places the formula covered. *Ibid.*

The situation Congress faced in 2006, when it took up *re*authorization of the coverage formula, was not the same. By then, the formula had been in effect for many years, and *all* of the jurisdictions covered by it were "familiar to Congress by name." *Id.,* at 328. The question before Congress: Was there still a sufficient basis to support continued application of the preclearance remedy in each of those already-identified places? There was at that point no chance that the formula might inadvertently sweep in new areas that were not the subject of congressional findings. And Congress could determine from the record whether the jurisdictions captured by the coverage formula still belonged under the preclearance regime. If they did, there was no need to alter the formula. That is why the Court, in addressing prior reauthorizations of the VRA, did not question the continuing "relevance" of the formula.

Consider once again the components of the record before Congress in 2006. The coverage provision identified a

known list of places with an undisputed history of serious problems with racial discrimination in voting. Recent evidence relating to Alabama and its counties was there for all to see. Multiple Supreme Court decisions had upheld the coverage provision, most recently in 1999. There was extensive evidence that, due to the preclearance mechanism, conditions in the covered jurisdictions had notably improved. And there was evidence that preclearance was still having a substantial real-world effect, having stopped hundreds of discriminatory voting changes in the covered jurisdictions since the last reauthorization. In addition, there was evidence that racial polarization in voting was higher in covered jurisdictions than elsewhere, increasing the vulnerability of minority citizens in those jurisdictions. And countless witnesses, reports, and case studies documented continuing problems with voting discrimination in those jurisdictions. In light of this record, Congress had more than a reasonable basis to conclude that the existing coverage formula was not out of sync with conditions on the ground in covered areas. And certainly Shelby County was no candidate for release through the mechanism Congress provided. See *supra,* at 22–23, 26–28.

The Court holds §4(b) invalid on the ground that it is "irrational to base coverage on the use of voting tests 40 years ago, when such tests have been illegal since that time." *Ante*, at 23. But the Court disregards what Congress set about to do in enacting the VRA. That extraordinary legislation scarcely stopped at the particular tests and devices that happened to exist in 1965. The grand aim of the Act is to secure to all in our polity equal citizenship stature, a voice in our democracy undiluted by race. As the record for the 2006 reauthorization makes abundantly clear, second-generation barriers to minority voting rights have emerged in the covered jurisdictions as attempted *substitutes* for the first-generation barriers that

originally triggered preclearance in those jurisdictions. See *supra,* at 5–6, 8, 15–17.

The sad irony of today's decision lies in its utter failure to grasp why the VRA has proven effective. The Court appears to believe that the VRA's success in eliminating the specific devices extant in 1965 means that preclearance is no longer needed. *Ante,* at 21–22, 23–24. With that belief, and the argument derived from it, history repeats itself. The same assumption—that the problem could be solved when particular methods of voting discrimination are identified and eliminated—was indulged and proved wrong repeatedly prior to the VRA's enactment. Unlike prior statutes, which singled out particular tests or devices, the VRA is grounded in Congress' recognition of the "variety and persistence" of measures designed to impair minority voting rights. *Katzenbach*, 383 U. S., at 311; *supra,* at 2. In truth, the evolution of voting discrimination into more subtle second-generation barriers is powerful evidence that a remedy as effective as preclearance remains vital to protect minority voting rights and prevent backsliding.

Beyond question, the VRA is no ordinary legislation. It is extraordinary because Congress embarked on a mission long delayed and of extraordinary importance: to realize the purpose and promise of the Fifteenth Amendment. For a half century, a concerted effort has been made to end racial discrimination in voting. Thanks to the Voting Rights Act, progress once the subject of a dream has been achieved and continues to be made.

The record supporting the 2006 reauthorization of the VRA is also extraordinary. It was described by the Chairman of the House Judiciary Committee as "one of the most extensive considerations of any piece of legislation that the United States Congress has dealt with in the 27½ years" he had served in the House. 152 Cong. Rec. H5143 (July 13, 2006) (statement of Rep. Sensenbrenner).

After exhaustive evidence-gathering and deliberative process, Congress reauthorized the VRA, including the coverage provision, with overwhelming bipartisan support. It was the judgment of Congress that "40 years has not been a sufficient amount of time to eliminate the vestiges of discrimination following nearly 100 years of disregard for the dictates of the 15th amendment and to ensure that the right of all citizens to vote is protected as guaranteed by the Constitution." 2006 Reauthorization §2(b)(7), 120 Stat. 577. That determination of the body empowered to enforce the Civil War Amendments "by appropriate legislation" merits this Court's utmost respect. In my judgment, the Court errs egregiously by overriding Congress' decision.

*     *     *

For the reasons stated, I would affirm the judgment of the Court of Appeals.